1  PRIMARY LAW GROUP, P.C.
   JOSHUA KROOT (State Bar No. 291371)
2  joshua.kroot@primarylaw group.com
   355 South Grand Avenue, Suite 2450
3  Los Angeles, CA 90071
   Telephone: (213) 677-0856
4  Facsimile:  (213) 297-5771

5  Attorneys for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11 ELECTION INTEGRITY PROJECT          Case No.  2:21-cv-32-AB-MAA
   CALIFORNIA, INC., JAMES P.
12 BRADLEY, AJA SMITH, ERIC
   EARLY, ALISON HAYDEN,              **FIRST AMENDED COMPLAINT FOR
13 JEFFREY GORMAN, MARK               DECLARATORY AND INJUNCTIVE
   REED, BUZZ PATTERSON, MIKE         RELIEF**
14 CARGILE, KEVIN COOKINGHAM,
   GREG RATHS, CHRIS BISH,
15 RONDA KENNEDY, JOHNNY
   NALBANDIAN,
16

17

18             Plaintiffs,

19       v.

20
   SHIRLEY WEBER, CALIFORNIA
21 SECRETARY OF STATE, XAVIER
   BECERRA, CALIFORNIA
22 ATTORNEY GENERAL, GAVIN
   NEWSOM, GOVERNOR OF THE
23 STATE OF CALIFORNIA,
   RIVERSIDE COUNTY
24 REGISTRAR OF VOTERS
   REBECCA SPENCER, LOS
25 ANGELES COUNTY REGISTRAR
   OF VOTERS DEAN LOGAN,
26
27
28 VENTURA COUNTY REGISTRAR

_____
          FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

1  OF VOTERS MARK A. LUNN,
2  SAN BERNARDINO COUNTY
   REGISTRAR OF VOTERS BOB
3  PAGE, MONTEREY COUNTY
4  REGISTRAR OF VOTERS
   CLAUDIO VALENZUELA,
5  SACRAMENTO COUNTY
6  REGISTRAR OF
   VOTERS
7  COURTNEY BAILEY-KANELO,
   ALAMEDA COUNTY REGISTRAR
8  OF VOTERS TIM DUPUIS,
   CONTRA COSTA COUNTY
9  REGISTRAR OF VOTERS
10 DEBORAH R. COOPER, SANTA
   CLARA COUNTY REGISTRAR OF
11 VOTERS SHANNON BUSHEY,
12 SAN BENITO COUNTY
   REGISTRAR OF VOTERS JOE
13 PAUL GONZALES, SANTA CRUZ
   COUNTY REGISTRAR OF
14 VOTERS GAIL L. PELLERIN,
15 FRESNO COUNTY REGISTRAR
   OF VOTERS JAMES A. KUS,
16 ORANGE COUNTY REGISTRAR
17 OF VOTERS NEAL KELLEY,

18          Defendants.

19

20

21

22

23

24

25

26

27

28

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

Plaintiffs state for their First Amended Complaint against Defendants as follows:

## **NATURE OF THE ACTION**

1.      Election integrity and transparency are critical for the enfranchisement of every eligible voter, <u>regardless of party or political view</u>.  While many recent election cases have focused solely on the outcome of the November 2020 election, this suit primarily challenges California's unconstitutional election process for future elections. This process includes near-universal vote-by-mail ("VBM") balloting, while eliminating chain-of-custody and signature verification protections, treating in-person voters differently from VBM voters, and sending ballots to large numbers of ineligible voters.  This endangers many of California's most vulnerable populations, including the young, the elderly, and non-citizens.  It has also led to pervasive irregularities in the election process that threaten to disenfranchise California voters.

2.      Our Constitutional Republic is founded on the sacred right of every eligible citizen to cast an equal vote to determine who will represent him or her in government. The Constitution of the United States guarantees this right through the Equal Protection and Due Process Clauses of the Fourteenth Amendment and, in the case of Federal congressional elections, through the Elections Clause (Art. I, § 4, cl. 1).  It also "guarantee[s] to every State . . . a Republican Form of Government, and protect[ion] . . . against Invasion.  (Art. IV, § 4.)

3.      Over the past three decades in California, however, these rights have been intentionally eroded by an onslaught of unconstitutional statutes, regulations, executive orders, and voting practices which, taken together, are designed to create an environment in which elections could be manipulated and <u>eligible voters of all political viewpoints disenfranchised</u>.

4.      This is <u>not a partisan issue</u> but a United States Constitutional one.  Nor is it an issue that affects just one candidate or just one election.  It is an issue that <u>must be remedied to ensure the integrity of future elections for all citizens</u>.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

5.     Plaintiff EIPCa is a non-partisan organization, and defendants include both Democrats and Republicans.  Each plaintiff has joined to ensure the constitutionality of California's political process.

6.     Among other things, statutes, regulations, executive orders and voting practices in California have:

A.   Eliminated absentee ballots and massively expanded VBM balloting through which even voters who could vote in person receive less-secure VBM ballots;

B.   Legalized unrestrained and unrestricted ballot harvesting/ballot trafficking by removing mandates of "chain of custody", unleashing the exploitation of vulnerable populations such as non-citizens, college students, senior citizens and minority voters;

C.   Eviscerated protections on in-person voting;

D.   Caused VBM and in-person voters to be treated differently, causing disproportionate harm to in-person voters;

E.   Implemented laws and procedures that automatically add non-citizens to voter rolls and protect against detection and prosecution of non-citizen voting; and

F.   Failed to comply with federal laws requiring maintaining accurate voter rolls, allowing deceased persons, non-citizens, non-residents, and other ineligible voters to remain on rolls and receive ballots.

7.     These efforts culminated in new "emergency" regulations and executive orders put into place without public comment or legislative authority of the State and many of its counties, often under the pretext that they were necessary due to COVID-19.

8.     Under former Secretary of State Padilla's "emergency" regulation 2 CCR § 20991, virtually any piece of paper received in a VBM envelope could be counted as a ballot, multiple ballots could be stuffed into a single VBM envelope, and the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

information provided by the voter(s) on a VBM ballot envelope no longer needed to be provided under penalty of perjury.  The passage of California Assembly Bill 860, meanwhile, provided for every active registered voter on California's voter rolls to be mailed a VBM ballot, greatly expanding the effect of former Secretary of State Padilla's "emergency" regulations and increasing opportunities for fraud.

9.    In contradiction of statutory law, Counties across the state prevented citizen observers from meaningfully observing vote counting and ballot processing in the November 2020 election cycle.  Observers were prevented from entering voting locations; kept 30, 40 or 50 feet back from vote counting operations, or even outside the counting rooms altogether; obstructed by having screens placed between observers and election workers so that observers could not see what election workers were doing; and many other instances of obstruction and concealment.

10.    California's use of voting machines supplied by several different companies provided opportunities for registrars, election workers and others to tamper with results.  The proprietary nature of these systems prevent observers from effectively observing and challenging how votes are tallied and whether fraud or irregularities are taking place.  Courts, state registrars, academic researchers and nonpartisan security experts have found vulnerabilities significant enough to change the results of elections throughout California.  These include the ability of election officials to modify, add and delete votes, the inability to verify that votes recorded match ballot images without an audit, the ability to access and modify information on the system remotely through the internet or locally via a flash drive, and secrecy regarding the software processes used to process ballots and tabulate votes.

11.    The potential for result-changing irregularities became actuality in November 2020.  Plaintiffs have gathered evidence establishing that citizen observers were denied access to ballot processing facilities and barred from observing the remaking of military, damaged or defective ballots, and that validation of signatures on VBM ballots was either not done or done so quickly that it could not have been

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

effective.  They also show votes being changed, ballots being left unsecured, and in at least one instance, unsealed boxes of ballots being loaded into an election official's car.

12.  In Ventura County, a voting machine company employee was observed inserting a flash drive into a voting machine while it was tallying votes, after which the voting machine system was rebooted.  The employee then removed the drive from the voting machine, placed it into his own laptop, and performed operations on the laptop. He then removed the drive from the laptop and provided it to the Ventura County election official who was operating the voting machine system.

13.  In another instance, election workers screened themselves off from observers while they "remade" ballots (i.e., filled in votes on blank ballots that purportedly cured defects in VBM ballots they had received), then ran these secretly marked ballots through vote machines.  These election workers could have entered any candidates that they wished on these remade ballots while purposefully unobserved like this.

14.  Los Angeles County -- the largest county in the nation (and larger than all but 5 states) -- contracted for a voting machine company to provide a "proprietary" computerized voting system used nowhere else in the country.  California's taxpayers paid more than $280 million in 2018 for these Los Angeles County machines, software and services pursuant to a contract overseen by defendant Dean Logan and former Secretary of State Alex Padilla.

15.  In Contra Costa County, poll data tapes from voting machines show inconsistencies between votes as recorded by the machines, and later tabulation of those votes.  In multiple cases, votes were consistently added to the tally for one candidate but not the other.  Only an audit can show whether the same is true for other counties and other candidates.

16.  EIPCa has collected hundreds of sworn affidavits from citizen observers and witnesses across the state attesting to irregularities.  This is only the tip of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

iceberg.  Significant additional potential irregularities and fraud were hidden by preventing EIPCa and all citizen observers from exercising their observation rights under California law to effectively observe vote casting, processing and counting.

17.   What is desperately needed now is an audit of the original and remade/duplicated paper VBM ballots (including Remote Access VBM (RAVBM) ballots used to allow persons with disabilities to use their assistance technology at home), the original damaged ballots that were electronically adjudicated with their adjudicated electronic copies, as well as the voting machines and software, to determine the extent to which the election was compromised.

18.   Since this suit was first filed, certain county officials made commitments to preserve evidence that can be used for an audit.  Disturbingly, however, other state and county officials have made no such commitment, and some have even indicated that they are moving quickly to deny access to or wipe stored information from these machines, software and materials, preventing such an audit.

19.   Injunctive relief must be ordered to prevent the destruction of evidence and provide for an audit.  In addition, the statutes, regulations, orders and practices that gave rise to the intentionally unlawful and chaotic situation in California and disenfranchised its voters must be declared unconstitutional, so that they do not cause similar disenfranchisement in future elections.

20.   <u>This case is unlike other recent election challenges</u>.  Although Defendants have disingenuously attempted to cast it as one of many cases related to the 2020 Presidential election, it is not focused on a single candidate, a single political party or a single election. It is focused on remedying the destruction of election safeguards and disenfranchisement of citizen voters to restore fair and honest elections.  In short, <u>the goal is to ensure the integrity of future elections for citizens across the political spectrum</u>.

21.   None of the issues raised here are mooted because the political calendar has pressed forward. Already, new campaigns are beginning for future elections, including

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

by Plaintiff candidates.  Absent audit and judicial review of the statutes challenged here, the problems identified with the November 2020 election will repeat.

## PARTIES

### I.    Plaintiffs

22.   Plaintiff Election Integrity Project California, Inc. ("EIPCa") is a California non-profit public benefit corporation committed to defending, through education, research, and advocacy the civil rights of U.S. citizens to fully participate in the election process under Federal and state law.  EIPCa is a non-partisan organization qualified under § 501(c)(3) of the Internal Revenue Code.  As a non-partisan organization, EIPCa does not participate in any political campaign, nor does it endorse any candidate for public office.  EIPCa similarly does not endorse any effort to recall a public official.  EIPCa focuses on the voting process, so that every lawfully cast vote is accurately counted.  EIPCa believes that the electoral process is the cornerstone of self-governance and the preservation of our Constitutional Republic.  EIPCa takes no position on which candidate should prevail in a fair and honest election.  Candidates for public office, regardless of their political party affiliation, who seek genuine election integrity in our Constitutional Republic could cooperate with EIPCa in questioning and investigating election procedures.  That cooperation does not constitute an endorsement by EIPCa of any particular candidate.  Findings of defects or illegalities in election procedures have independent nonpartisan significance, whether or not any particular findings ultimately affect the outcome of an election.  Volunteer citizen observers for EIPCa agree to exercise their civil rights to observe election procedures under the guidance and for the benefit of EIPCa.  Volunteers generally undergo extensive training on California election procedures and issues.  Volunteers then schedule their time to observe with their county coordinator.  Volunteers agree that what they observe is confidential for the benefit of EIPCa, and may be used for legal procedures.  Because of their commitment of time and attention, EIPCa does not require membership dues.  Of course, many volunteers also donate

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

funds to EIPCa. Overall, these volunteers are dedicated to EIPCa, and anticipate that EIPCa will use their observations to advocate for greater election integrity. Their personal connection and commitment are far more profound than those of most "members" of nonprofit organizations, such as a recreational hiker who pays annual dues to become a "member" of the Sierra Club.

23. Plaintiff James P. Bradley ("Bradley") is a resident and registered voter of the State of California. Bradley was one of the final two Congressional Candidates in the November 2020 election for California's 33rd Congressional District, which is located in Los Angeles County. Plaintiff Bradley is running in the 2022 election for United States Senate. The primary election for that office is scheduled for June 2022.

24. Plaintiff Aja Smith ("Smith") is a resident and registered voter of the State of California. Smith was one of the final two Congressional Candidates in the November 2020 election for California's 41st Congressional District, located in Riverside County. Plaintiff Smith is running in the 2022 election for United States Congress. The primary election for that office is scheduled for June 2022.

25. Plaintiff Eric Early ("Early") is a resident and registered voter of the State of California. Early was one of the final two Congressional Candidates in the November 2020 election for California's 28th Congressional District, located in Los Angeles County. Plaintiff Early is running in the 2022 election. The primary election is scheduled for June 2022.

26. Plaintiff Alison Hayden ("Hayden") is a resident and registered voter of the State of California. Hayden was one of the final two Congressional Candidates in the November 2020 election for California's 15th Congressional District, which is located in Alameda and Contra Costa Counties. Plaintiff Hayden is running in the 2022 election for United States Congress. The primary election for that office is scheduled for June 2022.

27. Plaintiff Jeffrey Gorman ("Gorman") is a resident and registered voter of the State of California. Gorman was one of the final two Congressional Candidates in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

the November 2020 election for California's 20th Congressional District, which is located in San Benito, Santa Cruz, Monterey and Santa Clara Counties.  Plaintiff Gorman is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

28.   Plaintiff Mark Reed ("Reed") is a resident and registered voter of the State of California. Reed was one of the final two Congressional Candidates in the November 2020 election for California's 30th Congressional District, which is located in Los Angeles and Ventura Counties.  Plaintiff Reed is running in the 2022 election. The primary election is scheduled for June 2022.

29.   Plaintiff Buzz Patterson ("Patterson") is a resident and registered voter of the State of California. Patterson was one of the final two Congressional Candidates in the November 2020 election for California's 7th Congressional District, which is located in Sacramento County.  Plaintiff Patterson is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

30.   Plaintiff Michael Cargile ("Cargile") is a resident and registered voter of the State of California. Cargile was one of the final two Congressional Candidates in the November 2020 election for California's 35th Congressional District, which is located in San Bernardino and Los Angeles Counties.  Plaintiff Cargile is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

31.   Plaintiff Kevin Cookingham ("Cookingham") is a resident and registered voter of the State of California.  Cookingham was one of the final two Congressional Candidates in the November 2020 election for California's 16th Congressional District, located in Fresno, Merced and Madera Counties.  Plaintiff Cookingham is running in the 2022 election.  The primary election is scheduled for June 2022.

32.   Plaintiff Greg Raths ("Raths") is a resident and registered voter of the State of California.  Raths was one of the final two Congressional Candidates in the

November 2020 election for California's 45th Congressional District, located in Orange County.

33.   Plaintiff Chris Bish ("Bish") is a resident and registered voter of the State of California.  Bish was one of the final two Congressional Candidates in the November 2020 election for California's 6th Congressional District, located in Sacramento and Yolo Counties.  Plaintiff Bish is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

34.   Plaintiff Ronda Kennedy ("Kennedy") is a resident and registered voter of the State of California.  Kennedy was one of the final two Congressional Candidates in the November 2020 election for California's 26th Congressional District, located in Ventura and Los Angeles Counties.  Plaintiff Kennedy is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

35.   Plaintiff Johnny Nalbandian ("Nalbandian") is a resident and registered voter of the State of California.  Nalbandian was one of the final two Congressional Candidates in the November 2020 election for California's 27th Congressional District, located in Los Angeles and San Bernardino Counties.  Plaintiff Nalbandian is running in the 2022 election for United States Congress.  The primary election for that office is scheduled for June 2022.

## II.    Defendants

36.   Defendant Shirley Weber, Ph.D. ("Weber") is the Secretary of State of the State of California.  Defendant Weber is named in her official capacity.  During many of the events alleged herein, Alex Padilla was serving as California's Secretary of State.  However, on or about January 18, 2021, he resigned his position as Secretary of State to take up an appointment to the U.S. Senate.  Defendant Weber replaced former Secretary of State Padilla as California Secretary of State.  The Secretary of State of the State of California is the Chief Election Officer of California.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

37.  Defendant Xavier Becerra ("Becerra") is the Attorney General of the State of California.  Defendant Becerra is named in his official capacity.

38.  Defendant Gavin Newsom ("Newsom") is the Governor of the State of California. Governor Newsom is named in his official capacity.

39.  Defendant Rebecca Spencer ("Spencer") is the Registrar of Voters for Riverside County, California. Defendant Spencer is named in her official capacity.

40.  Defendant Dean Logan ("Logan") is the Registrar of Voters for Los Angeles County, California. Defendant Logan is named in his official capacity.

41.  Defendant Mark A. Lunn ("Lunn") is the Registrar of Voters for Ventura County, California. Defendant Lunn is named in his official capacity.

42.  Defendant Bob Page ("Page") is the Registrar of Voters for San Bernardino County, California. Defendant Page is named in his official capacity.

43.  Defendant Claudio Valenzuela ("Valenzuela") is the Registrar of Voters for Monterey County, California. Defendant Valenzuela is named in his official capacity.

44.  Defendant Courtney Bailey-Kanelos ("Bailey-Kanelos") is the Registrar of Voters for Sacramento County, California. Defendant Bailey-Kanelos is named in her official capacity.

45.  Defendant Tim Dupuis ("Dupuis") is the Registrar of Voters for Alameda County, California.  Defendant Dupuis is named in his official capacity.

46.  Defendant Deborah R. Cooper ("Cooper") is the Registrar of Voters for Contra Costa County, California. Defendant Cooper is named in her official capacity.

47.  Defendant Shannon Bushey ("Bushey") is the Registrar of Voters for Santa Clara County, California. Defendant Bushey is named in her official capacity.

48.  Defendant Joe Paul Gonzalez ("Gonzalez") is the Registrar of Voters for San Benito County, California. Defendant Gonzalez is named in his official capacity.

49.  Defendant Gail L. Pellerin ("Pellerin") is the Registrar of Voters for Santa Cruz County, California. Defendant Pellerin is named in her official capacity.

50.  Defendant James A. Kus ("Kus") is the Registrar of Voters for Fresno

County, California. Defendant Kus is named in his official capacity.  During many of the events alleged herein, Brandi Orth was serving as Registrar of Voters for Fresno County, California.  However, on or about February 28, 2021, she resigned her position.  Defendant Kus replaced former Registrar Orth as Registrar of Voters for Fresno County, California.

51.   Defendant Neal Kelley ("Kelley") is the Registrar of Voters for Orange County, California. Defendant Kelley is named in his official capacity.

## JURISDICTION AND VENUE

52.   This Court has subject matter jurisdiction under 28 U.S.C. 1331, which provides, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

53.   This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States and the United States Congress.  See *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

54.   Jurisdiction to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

55.   Jurisdiction to grant injunctive relief is conferred by 28 U.S.C. § 1343(a).

56.   This Court has jurisdiction over the related California Constitutional claims and state law claims under 28 U.S.C. 1367.

57.   Venue is proper under 28 U.S.C. 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" within the Central District of California, where multiple plaintiffs and defendants reside.  In addition, EIPCa's volunteer citizen observers include citizens who reside and vote within the Central District of California.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL ALLEGATIONS

### III.  California's Voting Practices Are Systematically Undermined Through Decades of Unconstitutional Laws and Regulations.

58.  For the past three decades, California's election integrity laws and regulations have been under systematic attack under the guise of increasing voter participation.  In truth, changes have been made to allow opportunities for widespread fraud and election interference to proceed unchecked.  These changes have massively expanded VBM, legalized unrestrained and unrestricted ballot harvesting/ballot trafficking and exploitation of vulnerable populations and undermined protections on in-person voting.  Cumulatively, these changes in the law and other administrative neglect have allowed voter rolls to encompass large numbers of deceased persons, non-citizens, non-residents, and other ineligible voters who, nonetheless, receive VBM ballots and who state elections data show have often voted in elections.

59.  The expansion of VBM ballots and the changes in the law to send VBM ballots to all registered voters created a process where known ineligible voters (including deceased persons, non-citizens, and non-residents) were sent live ballots.  As past elections have shown, deceased persons, non-citizens and non-residents are often recorded as having voted in elections, and that appears to have taken place in the November 2020 election as well, impacting Plaintiffs Bradley, Smith, Early, Hayden, Gorman, Reed, Patterson, Cargile, Cookingham, Raths, Bish, Kennedy and Nalbandian, and all of the citizens in each of the Congressional Districts at issue, including EIPCa's citizen observers.

60.  In 1993, Congress enacted the National Voter Registration Act ("NVRA") 52 U.S.C. § 20501, et seq. with the stated purposes of: (1) "increase[ing] the number of eligible citizens who register to vote"; (2) "enhance[ing]" their "participation ... as voters in elections for Federal office"; (3) "protect[ing] the integrity of the electoral process"; and (4) "ensur[ing] that accurate and current voter registration rolls are maintained."  *Id*., § 20501(b).  Goals 1 and 2 were to be realized, in part, by allowing

-14-

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

voter registration through state departments of motor vehicles ("DMVs").  Goals 3 and 4 were embodied in Section 8, which requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or a change in the residence of the registrant, and specifies a procedure for doing so.

61.  California, however, has failed to comply with Section 8 of the NVRA, interpreting its requirement to remove ineligible voters from voter rolls as permissive, rather than mandatory.  In other words, California massively expanded its voter rolls through DMV registration, but failed to remove ineligible voters.[1]

62.  In 1998, California exacerbated the problems created by ineligible voters on its rolls by eliminating the absentee ballot, converting what at the time was a one-time VBM ballot that had to be applied for prior to each election, to a permanent VBM ballot that would be sent to voters prior to every election, without further action on their part, and without verification that the voters were eligible to vote, still residents of California, or even still living.  As a result, approximately 75% of voters in California regularly received permanent VBM ballots even before the most recent "emergency" orders.  In many cases this was not the voter's choice.  Two Presidential Election Commissions (2001 and 2005) have determined that VBM ballots do not satisfy five requirements for fair and honest elections, and facilitate election manipulation and fraud.

63.  In 2002, the Federal government passed the Help America Vote Act (HAVA), which required the establishment of a statewide voter database.  California was one of the last states to come into compliance with this mandate, only doing so in 2016.  Even then, there were issues with California's compliance with HAVA, including the manner in which the contract was awarded (no-bid, non-competitive

---

[1] In 2018, EIPCa entered into a settlement with Los Angeles County Registrar Dean C. Logan and former Secretary of State Padilla that, among other things, required removal of 1.5 million ineligible persons from the voter list due to their failure to comply with Section 8 of the NVRA.  That settlement is not at issue in this case.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

1    award), the poor reputation of the company awarded the contract, the lack of public

2    transparency with regard to the database certification, and EIPCa's revelations of

3    serious and potentially disqualifying defects in the database (which continue even

4    now).

5          64.   In 2012, SB 397 (Stats. 2011, Chap. 561) was passed in California,

6    allowing online voter registration without effective controls against ineligible

7    registrations.  In its first month, 6,080 duplicate registrations were recorded.

8          65.   In 2012, California Proposition 14 established a top-two primary system in

9    California.  In a top-two primary, the top two vote-getters, regardless of their partisan

10   affiliations, advance to the general election.  Under this system, voters affiliated with

11   political parties other than the two major parties are effectively prevented from having

12   a candidate reflective of their values on the general election ballot.

13         66.   In 2013, California passed AB 817 (Stats. 2013, Chap. 162), which allowed

14   up to five non-citizen residents of California to work as a member of any single

15   precinct board (i.e., poll worker).  AB 817 was flawed because: a) though it required

16   specific qualifications for non-citizen workers, it provided no method other than self-

17   affirmation to enforce those requirements; and b) non-citizens cannot legally take the

18   poll worker oath because they have not relinquished allegiance to their native

19   countries, relinquished allegiance to their foreign leaders and sworn allegiance to the

20   United States.  In essence, AB 817 facilitates foreign intervention in California's

21   election process.

22         67.   In 2014, California began issuing driver licenses to undocumented

23   immigrants pursuant to AB 60 (Stats. 2013, Chap. 524), thereby providing a direct path

24   to voter registration for them.  In 2015, California exacerbated this issue further with

25   the passage of AB 1461 (Stats. 2015, Chap. 729), pursuant to which voter registration

26   became automatic through the DMV unless the driver (be they citizen or non-citizen)

27   proactively requests not to be registered. The difficulty presented by confusing

28   computer software and, in many cases, language barriers continue to cause many

individuals to effect unwanted (and illegal) registrations or registration changes such as party affiliation and preferred method of voting.  Through AB 1461, non-citizens would become registered with or without their knowledge.  Moreover, there is no way to ascertain citizenship status of a registrant other than self-identification because California election officials are barred from accessing DMV and DHS information regarding non-citizens.  (EC § 2263(d).)  In fact, the law specifically states that the DMV is not required or expected to determine eligibility for voter registration and voting.  (EC § 2262(b).) EIPCa has also documented thousands of instances in which California's online and DMV voter registration systems change registrants' reported place of birth, including many foreign-born registrants, to "California" or "United States."  These changes may conceal foreign-born non-citizens who are registered to vote, and exacerbate the state's inability to maintain accurate lists since the changes can create mismatches in critical databases such as death and felon records.

68.  In addition, AB 1461 allows pre-registration of 16 and 17-year-olds with the promise they will not be activated until their 18th birthday.  EIPCa analysis indicates that minors are showing up on the active voter rolls.

69.  In 2016, California passed SB 450 (Stats. 2016, Chap. 832), the "Voter's Choice Act," which eliminated neighborhood precinct voting and sent VBM ballots to every registered voter in participating counties.  The bill also did away with the requirement that a voter who had received a VBM ballot but wished to vote in person was required to surrender that ballot at the voter's home precinct, to be clearly marked "surrendered."  Instead, an electronic system was put in place keeping track of invalidated VBM ballots belonging to in-person voters.  In 2020, this caused many election workers to tell in-person voters to simply throw their VBM ballots and envelopes into trash cans with no invalidating markings.  This produced distrust among voters, causing potential voter suppression.  It is also unclear whether any of these discarded ballots could have been subsequently removed from the trash, filled out and counted in the vote totals.  The possibility that this happened is heightened by

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-17-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

intermittent power outages at certain election locations that appears to have affected the electronic tracking system for surrendered ballots.

70.   Also in 2016, California passed AB 1921 (Stats. 2016, Chap. 820), allowing an unlimited number of VBM ballots to be turned in by anyone, regardless of relationship to the voter.  This bill eliminated chain of custody and legalized wholesale ballot harvesting/ballot trafficking, by which one person can collect an unlimited number of ballots and turn them in, and even be paid to do so.  Because of the extreme potential for fraud, this practice is restricted or prohibited in most other states, and considered a felony in many.  In states where ballot harvesting is allowed, massive voter fraud operations have been uncovered, including cash payments for votes and ballot harvesters preying upon and deceiving vulnerable populations like the elderly, indigents, non-citizens, young voters and minority voters.

71.   In 2017, California further eroded election integrity by passing SB 286 (Stats. 2017, Chap. 806), under which voters are no longer required to state their name and address aloud and have it repeated when voting in person as was previously required under California Elections Code § 14216, further facilitating voter impersonation.

72.   In 2018, California passed SB 759 (Stats. 2018, Chap. 446) as urgency legislation (*i.e.*, effective immediately), requiring counties to contact all voters whose VBM ballots are considered for rejection so they can "cure" their signatures.  This law has significant unintended consequences.  For example, verification by a voter is done by downloading a form online or responding with a form sent in the mail; a voter may therefore never see the original ballot envelope and may "verify" a fraudulent signature.  Although the law requires the curing notice to be sent no later than 8 days prior to certification and be returned no later than 2 days before certification, former Secretary of State Padilla violated California law and issued an advisory in November 2018 that the practice can and should continue up to the date of certification.  These extensions could cause fraudulent ballots to be counted while the voters' responses are

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-18-

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

pending.

73.   AB 216 (Stats. 2018, Chap. 120) required VBM envelopes to be postage paid. This provides an incentive for voters to use USPS to return their ballots, rather than returning them to a precinct or drop box, or using another shipping provider. USPS is one of the least secure ways to submit a VBM ballot.

74.   AB 306 (Stats. 2018, Chap. 203) further facilitated ballot harvesting/ballot trafficking by prohibiting disqualification of a ballot solely because the person returning it does not provide their name, relationship to the voter or signature.

75.   In 2019, California passed a raft of new voting legislation, including: AB 963 (Stats. 2019, Chap. 559), which instituted complex and expensive programs on high school and college campuses with the goal of increasing registration and voting by students, whether eligible to vote or not; SB 72 (Stats. 2019, Chap. 565) instituting same-day voter registration at all polling places, placing undertrained, under-supervised and at times overwhelmed election workers in the position of determining voter eligibility; and SB 523 (Stats. 2019, Chap. 568), extending the "curing" process for missing or challenged VBM ballot envelope signatures from 8 days after election day to two days before certification, which, in conjunction with the processing of VBM and provisional ballots, could cause fraudulent ballots to be counted while the voters' responses are pending.

**IV.   In the Run-up to the 2020 Election, Unconstitutional Urgency Legislation and Emergency Orders and Regulations Bypass Normal Legislative Processes and Introduce Massive New Problems with VBM Ballots.**

76.   Efforts to unlawfully compromise California elections accelerated in the run-up to the 2020 election.  On May 8 and June 3, 2020, Defendant Newsom issued Executive Orders N-64-20 and N-67-20, directing that "every Californian who is eligible to vote in the November 3, 2020 General Election shall receive a vote-by-mail ballot."  On June 18, 2020, California passed AB 860 (Stats. 2020, Chap. 4), incorporating this requirement into California law for all voters in active status.

77.   As a result, every active registered voter on California's voter rolls was mailed a VBM ballot.  Millions of VBM ballots for the 2020 general election were placed in the U.S. Mail with no means to ensure that a particular ballot was actually received by the intended recipient, or that the intended recipient was still living in California and eligible to vote.  EIPCa data research shows that hundreds of thousands or ballots were sent to the last known address of individuals showing no electoral activity for 12-40 years, some never, and who are therefore likely deceased or moved out of state.

78.   Emergency regulations issued by former Secretary of State Padilla for the 2020 general election further eviscerated the standards for the vetting of VBM ballots.

79.   On September 28, 2020, after an unpublicized public comment period of only 5 days, former Secretary of State Padilla adopted new "emergency" regulations. *See CC/ROV* 20226 (Sept. 29, 2020).  These regulations include 2 *California Code of Regulations* ("*CCR*") §§ 20910, 20960-20962, 20980-20985, and 20990-20993.  These emergency regulations are in effect through July 28, 2021, and may be renewed.

80.   These emergency regulations not only gut the signature verification process required by statute [EC §§ 3009, 3019], they also directly contradict a number of state statutes intended to ensure that VBM ballots are legally cast.

81.   The new regulations virtually eliminate the possibility of meaningful standards being applied in the verification of signatures on VBM ballot return envelopes. This begins with subsection (b) of 2 *CCR* § 20960, which provides that the "comparison of a signature shall begin with the basic presumption that the signature on the petition or ballot envelope is the voter's signature."  Since the filing of the original complaint in this case, the legislature is considering legislation to codify subsection (b) into law as SB 503.

82.   Subsection (g) of 2 *CCR* § 20960 also dictates criteria for evaluation of signature matches that would justify finding a match of two signatures that clearly do not match.  Particularly egregious is the justification that the voter's signature style

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

might have changed over time. 2 *CCR* § 20960 subsection (g)(4).  This provision legitimizes acceptance of virtually any signature without subjecting clear mis-matching signatures to the safeguard of the curing process.

83.   The effect of the foregoing provisions in nullifying any possibility of meaningful signature verification is compounded by subsection (j) of 2 *CCR* § 20960, which requires that a signature match "shall only be rejected if two different elections officials unanimously find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record."  This standard cannot be justified by reference to the provision of the *California Elections Code* requiring signature verification for VBM ballots.  EC §§ 3009, 3019.  When combined with the standards of 2 *CCR* § 20960(g) set forth above, the beyond a reasonable doubt standard of § 20960(j) justifies the acceptance of virtually any signature on a VBM ballot return envelope, again without subjecting clearly mis-matching signatures to the safeguard of the curing process.

84.   The adjustment of standards for signature matching of VBM ballot return envelopes is patently gratuitous given that the *California Elections Code* § 3019(d) provides a meaningful opportunity for a voter to cure the rejection of a signature match by requiring notice to the affected voter and the opportunity to submit verification of the rejected signature match.

85.   The newly enacted emergency regulations also nullify rejections based on computer signature recognition technology, requiring that any rejection based on such technology be evaluated manually under the virtually nonexistent standards of 2 *CCR* §20960.  2 *CCR* §20961.

86.   The newly enacted emergency regulations also promote fraud by allowing the submission of multiple ballots in a single VBM ballot return envelope.  Subsections (b)(11) and (b)(12) of 2 *CCR* § 20991 allow multiple ballots to be stuffed into a single VBM return envelope, provided there is an equal number of signatures on that envelope.  This conflicts with the requirement that the signature and other

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   information included by the voter on the outside of a VBM envelope be confirmed by a

2   declaration under penalty of perjury. § 3011.

3       87.   The acceptance of multiple ballots in a single VBM return envelope

4   authorized by 2 *CCR* § 20991(b)(11) and (12) also eliminates the protection provided

5   by the barcode on the envelope, which is used to track whether a particular voter has

6   submitted a VBM ballot.  Moreover, without the barcode to scan for the extra

7   signatures, the already harried reviewers have no reasonable means of summoning

8   each voter registration affidavit signature for purposes of comparison.

9       88.   Even if it were practicable to conduct signature comparisons for multiple

10  signatures on a single VBM return envelope -- which for the reasons set forth above it

11  is not -- the signature reviewer has no means of knowing if there is a signature for each

12  ballot included in the envelope. Signatures are verified before the envelope is opened.

13      89.   The acceptance of multiple ballots in a single VBM return envelope also

14  creates intractable practical problems for determining which votes have been legally

15  cast. If after opening a VBM ballot return envelope there are more ballots in the

16  envelope than signatures on the envelope, there is no means of determining which of

17  the multiple ballots is to be rejected, assuming any effort were made to make this

18  comparison.  The same would hold true if one or more signatures on the VBM

19  envelope were rejected (which for the reasons set forth above, would never occur

20  under the standards set forth in 2 *CCR* §§ 20960 and 20961); there would be no way to

21  determine which ballot should not be counted.

22      90.   The emergency regulations also dispose of state law requirements for what

23  may be considered a valid ballot. Subsection (b)(9) of 2 *CCR* § 20991 allows the voter

24  to submit virtually any piece of paper as a VBM ballot.  Subsection (b)(10) of 2 *CCR* §

25  20991 allows the voter to submit votes for a VBM ballot on a sample ballot.  These

26  regulations contravene EC § 13200, which provides that ballots not printed according

27  to statutory specifications cannot be cast or counted and EC § 13002, which requires

28  watermarking of printed ballots.  The required use of official ballots is further

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reinforced by EC § 14299, which requires strict procedures to be followed for alternative ballots when a polling place exhausts its supply of ballots.

91.   The fundamental dishonesty of the foregoing regulations and the clear intent of the State to allow the counting of illegal votes is demonstrated by statements made by former Secretary of State Padilla to assure voters that the mass mailing of VBM ballots would not lead to voter fraud.  On August 18, 2020, former Secretary of State Padilla published an opinion piece on the editorial pages of the San Francisco Chronicle.  It stated that, "vote-by-mail ballots use specific paper types and watermarks to prevent forgery and fabrication," and that "Each vote-by-mail ballot return envelope has a unique barcode that elections officials utilize to ensure a voter has not already cast a ballot."  https://www.sfchronicle.com/opinion/article/Vote-by-mail-Yes-we-can-do-it-securely-in-15485395.php. These safeguards are intentionally discarded by subsections (b)(9) and (b)(10) of 2 *CCR* § 20991.

92.   The emergency regulations also require the acceptance of VBM ballot envelopes with no reliable indication that the ballot was cast on or before election day. This is reflected in subsection (b)(8) of 2 *CCR* § 20991, which provides that a VBM ballot must be accepted when a "vote-by-mail ballot identification envelope has no dated postmark, the postmark is illegible, and there is no date stamp for receipt from a bona fide private mail delivery service, but the voter has dated the vote-by-mail ballot identification envelope or the envelope otherwise indicates that the ballot was executed on or before Election Day."

93.   Moreover, the legislature amended EC § 3020 to provide that, "for the statewide general election to be held on November 3, 2020, any vote by mail ballot cast under this division shall be timely cast if it is received by the voter's elections official via the United States Postal Service or a bona fide private mail delivery company by the 17th day after election day . . ."

94.   Thus, under the *California Elections Code* and the emergency regulations, VBM ballots that cannot reliably be determined to have been cast on or before election

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-23-

day are nevertheless required to be accepted up to 17 days after election day. This creates an open invitation to submit illegal ballots after election day to overturn reported election results, especially election contests decided by margins of very few votes.

## V. Evidence Suggests Required Audits in Sacramento Never Took Place and Cyber Security Practices were Lacking

95.  In 2010, hackers hijacked San Mateo's Registrar of Voters Election website and in 2016 cyberthieves successfully breached several employee email accounts using phishing techniques. A 2018-19 San Mateo County Grand Jury ("SMCGJ") report, "Security of Election Announcements," focused on the vulnerabilities of their county's email and online communication platforms to hijacking and propagating disinformation in the guise of election instructions and/or announcements, and included a series of recommendations which proposed short-term fixes to address the immediate risk to upcoming elections and longer term changes to assess the broader cybersecurity threats to election information.

96.  In 2019, the Sacramento County Grand Jury ("SCGJ") received a citizen inquiry regarding whether Sacramento's Voter Registration System could benefit from the recommendations adopted in San Mateo. The SCGJ forwarded this report to the Sacramento County Registrar of Voters ("SCRV") to ask if these recommendations applied to Sacramento and, if so, whether they were being implemented. In reviewing the recommendations, the SCGJ also determined that the Sacramento Department of Technology was not regularly performing vulnerability scans and penetration testing of Sacramento County information technology systems.

97.  Specifically, according to a report revealed via a public records request, the SCGJ was "unable to determine when the last external audit was done to evaluate the security of Sacramento County Election systems."

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

## VI.  EIPCa Warns Secretary of State about Serious Irregularities with Voter Rolls Prior to the 2020 Election, but They Go Unremedied.

98.  On March 1, 2020, prior to the primary election, EIPCa sent a letter to former Secretary of State Padilla warning him that "[w]e have identified in the [State of California's voter registration] file over 22,000 Californians that appear to be registered twice, some registered three or four times. Of these, we estimate that almost 5,000 duplicated registrants have been mailed two or more VBM ballots this election." EIPCa noted that duplicate voting was likely to result.

99.  On April 28, 2020, EIPCa sent former Secretary of State Padilla statutory notice pursuant to 52 U.S.C. § 20510(b) of violations of Section 8 of the NVRA, 52 U.S.C. § 20507. The notice highlighted over 458,000 likely ineligible registrants who would be mailed ballots for the November election and an additional 24,000 duplicated registrants who would each be mailed two or more ballots unless corrected. The notice included supporting evidence that the state has over 1 million more registered voters than eligible citizens, per official government data.

100. On July 11, 2020, EIPCa warned former Secretary of State Padilla that EIPCa had identified large numbers of ineligible voters on California's voter rolls, including "13,456 California registrants who match a California Department of Public Health (CDPH) Death Index record" (327 of whom were 105+ years old), and 106,315 other voters who appear to be ineligible for a variety of reasons, such as having moved out of the state or being below the minimum age to vote.  California's failure to comply with the NVRA's requirement to cancel registrations of ineligible voters is a major contributor to these issues.

101. EIPCa's estimates of ineligible voters are conservative and significantly underestimate the full extent of the problem.  For example, if a name and birthdate appearing on the voter roll is shared by both a deceased and a living person, EIPCa assumes the name belongs to the living person and does not include that name within its count of deceased voters, even though it is possible that the name on the voter roll

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

refers to the deceased person.  Further, EIPCa does not include in its analysis names that are particularly common within the population (e.g., John Smith, Jose Gonzalez). An audit would likely find many times more ineligible voters than EIPCa is able to estimate with the information available to it.

102. EIPCa received responses to its letters downplaying EIPCa's concerns and refusing to remedy the identified problems.

103. EIPCa's concerns, however, would prove to be well-founded when massive irregularities and opportunities for fraud occurred during the November 2020 election.

**VII.   The Conduct of the 2020 Election Eviscerates Citizen Oversight, Causes Mass Irregularities and Opportunities for Fraud, and Violates the Rights of Lawful Voters, Citizen Observers and Candidates.**

**A.   Citizen Observers Were Obstructed from Meaningfully Observing Vote Collection and Tabulation**

104. California citizens have the right to observe the entire election process, including vote collection, signature verification, the remaking of "damaged" and military ballots, and tabulation.  These rights are codified in California Elections Code §§ 2300 ((a) (9)(A)(B), (a)(10) and 15100 – 15105.

105. However, for observer rights to be effectuated, observers need to be close enough to ballot processing and vote tabulation activities to see what is actually taking place.  AB 1573 (Stats. 2009, Chap. 548) explicitly authorizes observers to see the voter's signature on each ballot that is processed, and the legislative history of the code notes that observers must receive "sufficiently close access" to examine ballots, as well as signatures on VBM ballot envelopes and ballots being remade (duplicated).

106. EIPCa provides non-partisan training to citizen observers across the State of California regarding how to observe the election process at polling locations and vote centers, as well as ballot processing and vote tabulation consistent with their rights under California law.  These citizen election process observers provide Incident Reports to EIPCa, signed under penalty of perjury, regarding any irregularities they

-26-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

witness.  Other citizens also report irregularities to EIPCa.

107. In relation to the November 2020 election, EIPCa received hundreds of Incident Reports signed under penalty of perjury establishing that EIPCa observers were not allowed sufficiently close access to see the signatures on VBM ballots with sufficient clarity to determine if established procedures were being followed. Observation distances were too great.  Observers were limited, at times, to a few minutes of observing.  In some cases, observation was provided through remote video access which precluded the ability of observers to challenge whether established procedures were being followed.  In some counties, observers were not allowed to observe the remaking of military, damaged or defective ballots.  In others, they were denied effective viewing of voting machines.  In many cases, COVID-19 was used as cover for these unreasonable and unlawful restrictions, yet county employees and contractors, as well as employees of the companies that supplied and operated the voting machines, were generally not subjected to these same restrictions.  Defendant county registrars implemented different election rules and practices, thereby causing voters in one county to be treated differently from those in another, disadvantaging voters and diminishing the value of votes legally cast by and for the Plaintiffs in certain counties in comparison to those legally cast in other counties.  Most of the Congressional districts in which the candidate Plaintiffs ran crossed county lines, causing them to be disadvantaged in certain counties over others.

108. Defendants' obstruction of citizen observers in general, and EIPCa volunteers in particular, was pervasive and well beyond the obstruction experienced in previous elections, forcing EIPCa to expend significant additional resources to facilitate observation of voting practices and document obstruction and irregularities. Because the same or substantially similar laws, regulations, orders and practices are governing and will govern upcoming elections, the same situation will repeat in these elections absent Court intervention.

109. Below is a sampling of the ways in which observation was obstructed on a

-27-

county-by-county basis:

110. **Alameda County**:

G.   An EIPCa citizen observer was informed by multiple county employees that no observers were allowed to observe vote processing and counting <u>at all</u> due to COVID-19.

111. **Fresno County**:

H.   Throughout Fresno County, citizen observers were kept in confined areas too far from vote processing and counting activities to effectively observe them.  Former Fresno County Registrar of Voters Brandi Orth told citizen observers at the Orange Cove Library that they "needed to stay in [their] area and Observe!"  It was her interpretation that observers did not need to be close enough to hear what was going on, as she informed the observer.

I.   At Reedley Precinct 13, citizen observers were forced to remain in an observer area which was approximately 35 feet back from check-in and in the back of the room.  It was difficult to see and hear.  A vote center supervisor would stare at observers if they moved from the designated observation area.

J.   At Orange Cove Precinct 14, citizen observers were required to stay in a confined area behind tables approximately 50 feet from vote processing and counting activities.  It was difficult to see or hear.

112. **Los Angeles County**:

K.   A citizen observer was told by a head poll worker at Vasquez High School that "it was illegal for [her] to be [there]" as a poll observer after the polls closed.  Because of this the citizen observer was forced to leave five minutes before the doors to the voting center closed.

113. **Monterey County**:

L.   Citizen observers were separated from election officials processing

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

ballots by thick glass, making it impossible to hear the process, and more than ten feet away from the election officials' desks, making it virtually impossible to see what they were doing.

114. **Orange County**:

M.   In Orange County, citizen observers were provided with computer "observation screens" on which to view ballot processing activities. However, observers were kept far away from these screens, making observation of details like signatures impossible to verify. One citizen observer resorted to viewing the screens with binoculars, but was still too far away to see signatures clearly.

N.   Observation screens were also turned off with varying or no explanation while the count continued. Citizens were unable to view or object to signature matches and the processing of conditional ballots because these screens were off.

O.   The Registrar of Voters informed citizen observers that it had halted "first pass" ballot counting at 5:00 p.m. However, counting took place again later in the evening without the knowledge or observation of citizen observers. This would never have been discovered but for a citizen observer who logged into the Remote Observing System at 6:30 p.m. and was "stunned" to see the video "was an active and live viewing of 'first pass' signatures" going on.

115. **Riverside County**:

P.   Citizen observers were prevented from seeing ballots being remade in Riverside County. When an observer raised this with an election official, he told the observer there would be no changes to the process to enable observers to see ballots being remade. A temporary Elections Assistant in Riverside who took part in the remaking of ballots reported that she observed no method of accountability for the

remaking of ballots that would ensure the voter's original choice was accurately marked on the new ballot. The employees sat across from each other without view of what the other was doing and this occurred in the back of the room, far from where citizen observers could see because tall carts obstructed the view.

116. **Sacramento County**:

Q.   A citizen observer in Sacramento County was positioned more than 6 feet from the counting desks which were also surrounded by plexiglass, making it nearly impossible to see ballot marks.

117. **Santa Clara County**:

R.   A citizen observer in Santa Clara reported "Observers were not allowed into the tabulation room to observe counting.  Observers watched from conference room over zoom link, but camera was filming from the doorway/outside the room."  As such, observers had limited view on the operation and could not readily object.

118. **Ventura County**:

S.   Ventura County allowed only a limited number of citizen observers to observe ballot processing and vote tabulation in person, and they were directed to stand outside the vote tabulation center in the hall and observe through the window, approximately 20 feet away from the process.  Ventura County also set up a limited number of streaming cameras to allow citizen observers to observe remotely, but they provided limited view of the facility and did not show the activity on computer screens.

**B.     EIPCa Observes Widespread Irregularities and Evidence of Opportunities for Fraud in Hundreds of Sworn Declarations, Despite Obstruction of Election Observers**

119. Even with all of the measures put in place by Defendant County Registrars

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-30-

to disrupt citizen observers, citizens still observed a vast number of pervasive irregularities, which are documented in hundreds of sworn affidavits collected by EIPCa.

120. These affidavits demonstrate that signature verifications for VBM ballots for the November 2020 election were not meaningfully conducted statewide.  As massive numbers of VBM ballots flooded vote counting centers, their signatures were visually checked at the rate of one signature pair every one to four seconds.  In some cases, four signature comparisons were conducted simultaneously using images projected on computer monitors, at the rate of one to four seconds per screen.  This cursory review is patently inadequate to ensure that the VBM ballots were properly vetted as legal votes as required by EC § 3019.  Defendant county registrars implemented different election rules and practices, thereby causing voters in one county to be treated differently from those in another, disadvantaging voters and diminishing the value of votes legally cast by and for the Plaintiffs in certain counties beyond those legally cast in other counties.

121. The sheer number and variety of irregularities caused EIPCa to expend significant additional resources to facilitate observation of voting practices and document obstruction and irregularities.  Because the same or substantially similar laws, regulations, orders and practices are governing and will govern upcoming elections, the same situation will repeat in these elections absent Court intervention.

122. Observers noted widespread additional irregularities and potential for fraud across many counties:

123. **Contra Costa County**:

In Contra Costa County, poll data tapes from voting machines show inconsistencies between votes as recorded by the machines, and later tabulation of those votes in the vote for President.  In multiple cases, votes were added to the tally for Biden but not for Trump.  The data tape from one poll center tabulator shows 95 votes for Biden and 147

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-31-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

for Trump, but the report released by the County shows 96 (an additional vote) for Biden and the same 147 for Trump.  The same thing happened in at least three other cases.  In each instance, Trump's votes remained constant while votes were added for Biden.  Only an audit can show whether the same irregularities hold true for other counties and other candidates.

T.   A voter had his ballot envelope signed by another person with <u>a different name</u>, and the County accepted the signature because no signature matching was taking place.

U.   A citizen who was voting observed a poll worker who instructed another voter how to vote on certain ballot items that voter had left blank because the voter knew nothing about them, per her own admission. The poll worker provided her this guidance without solicitation.

124. **Fresno County**:

V.   At Fresno County's Clovis Center, a supervisor informed a citizen observer that the ballots for the first day of early voting (10/31/2020) had been left inside a vote tallying machine "unattended in a locked room overnight," and that it was his understanding this practice would continue every night until the final closing of the voting center.

125. **Los Angeles County**:

W.   A citizen at Los Angeles County's Pasadena Victory Park center witnessed a machine <u>change a voter's vote</u>.

X.   Multiple observers at voting centers saw "many workers with open bags, big purses and other stuff around desks" in violation of security procedures, noting that "[b]allots could easily have been taken."

Y.   An observer at Los Angeles County's Claremont center witnessed two different women drop off <u>multiple ballots without voter signatures</u>.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

Nevertheless, <u>the ballots were counted by election officials</u>.

Z.   Even where signature matching was done, it was not done effectively. One observer watched a worker matching signatures four at a time (as in other counties) and spending five seconds or less per each set of four.  The observer saw over 40 signatures that did not match, and three with no reference signature to match whatsoever, but only one was flagged.  Another observed 95 signatures that should have been challenged but were not. Including "<u>[m]any [that] had no signature or a total mismatch</u>."  (Emphasis added.)

126. **Monterey County**:

AA. Voters in Salinas who voted in person were advised that a provisional ballot must be used.  A mail carrier in the Salinas Post Office informed a voter that his superiors had instructed him to "cram all the ballots into a mailbox" even if he knew many of the voters at the address did not live there.

127. **Orange County**:

BB. Election officials did not perform meaningful signature matching of signatures on VBM ballot envelopes with those on record.  Signatures were displayed four at a time on computer screens and remained on the screen for only a few seconds, leaving no actual time for signature matching to occur or for observers to object.  Ballots with signatures that did not appear to match were allowed to be counted.  Incredibly, an election official informed a citizen observer that "they do not verify signatures for provisional ballots" at all.  Another election official informed a citizen observer that Defendant Kelley had modified a ballot processing rule that previously required signature pairs to be examined for 12 seconds each.

CC. The status of VBM envelope signatures that were challenged by

-33-

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

citizen observers was changed from "challenged" to "good" without meaningful review by election officials.  During ballot processing, an election official announced over the public address system that citizen observers were challenging too many signatures and that the election officials would not have time to get to all of them.

DD. At the meeting of the League of Women Voters of Central Orange County on November 16, Defendant Kelley expressed surprise about the changes regarding signature verification because the new instruction essentially amounted to a directive that "basically all ballots were to be considered valid unless there was substantial proof otherwise." He elaborated the Registrars were notified of the changes to the CCRs on September 28 in relation to the Emergency Regulation passed down by former Secretary of State Padilla.

128. **Riverside County**:

EE.  An observer witnessed ballots put into <u>boxes that were never sealed</u>, and were <u>put into an election official's car</u> in which another unidentified individual was riding.

FF.  A temporary assistant at the Registrar of Voters was assigned to accept drive-in VBM ballots curbside. She "observed temp. employees taking ballots without checking for signatures or if the person was dropping off for others.  NO effort was made to check for their signature and their relationship to the person."

129. **Sacramento County**:

GG. A citizen observer reported that he saw on multiple occasions a ballot marked for both Biden and Trump, but with the Trump indicator having an "x" through it.  The observer mentioned this to the adjudicators, who refused to elevate the issue to supervisors, concluding, without evidence, the voter had just changed his or her

-34-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

mind.  On another date, the same citizen observer again saw a ballot marked for both Trump and Biden, with the Trump indicator having an "x" through it, and the ballot being counted for Biden.

130. **San Bernardino County**:

HH. An election official at the San Bernardino Registrar of Voters informed a citizen, "not all of the ballots will be counted, because California is such a Democrat state," in response to the citizen's inquiry as to why her in-person ballot had not already been counted.

II. A citizen observer observed that there were 400+ more registered voters on the rolls than there had been the night before (after polls had closed).  No explanation was found for this increase.

JJ. A citizen observer witnessed voters being registered to vote provisionally without providing ID.

131. **Santa Clara County**:

KK. On November 2, a citizen observer arrived at the Santa Clara Registrar of Voters at 7:02 a.m. and found the double entrance doors and side doors leading to ballot processing area open and unattended.  An employee arrived at 7:08 a.m. and said that the area was not supposed to be open.  No supervisor or other employee was found in the area and the unopened doors were not explained.

132. **Ventura**:

LL. In Ventura County, a voting machine company employee was observed inserting a flash drive into a voting machine while it was tallying votes, after which the system was rebooted.  The employee then removed the drive from the machine, placed it into his own laptop, and performed operations on the laptop.  He then removed the drive from the laptop and provided it to the Ventura County election official who was operating the voting system.

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

**C.   Voting Machines Used to Collect and Tabulate Votes Contain Known Vulnerabilities Allowing Miscounting and Vote Manipulation**

133. Most California counties processed ballots and tabulated votes in the November 2020 election using computerized voting machines.

134. The voting machine companies consider their software proprietary and refuse to share the full source code with the public.  This means that the system used to process ballots and tabulate votes is secret.

135. Even with this secrecy, there are well-established vulnerabilities in the voting machine systems.

136. These systems classify ballots into two categories, 1) normal ballots and 2) adjudicated ballots.  Ballots sent to adjudication can be altered by election officials, and adjudication files can be moved between different Results Tally and Reporting (RTR) terminals with no audit trail of which election official actually adjudicates (i.e., votes) the ballot batch.  This demonstrates a significant and fatal error in security and election integrity because it provides no meaningful observation of the adjudication process or auditable trail of which election official actually adjudicates a ballot.  Without an audit to show how many ballots are "adjudicated," it is impossible to tell how many votes election officials are given access to manipulate.  In an audit of votes in Michigan Central Lake Township in Antrim County, there were 1,222 ballots reversed out of 1,491 total ballots cast, resulting in an 81.96% rejection rate, meaning the vast majority of all ballots cast were sent to adjudication for a decision by election officials.  Even a much smaller percentage of adjudicated ballots would allow election officials to modify votes to change the outcome of nearly any race in the State of California.

137. Voting machines also allow election officials to generate reports as vote counting is ongoing.  Such reports could be used by a malicious party to determine how many votes would need to be changed in order to manipulate the outcome of an election.  These reports, however, are deleted after they are run and are not available to

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

the public, concealing any such misuse of the software.

138. Ballot images, ballot totals and ballot envelopes processed by voting machine systems are not available to the public, so the accuracy of the systems' vote processing cannot be validated without an audit.

139. Ballots and envelopes are separated during VBM ballot processing, leaving no audit trail.  If a signature on a VBM envelope is later determined to have been invalid, the ballot or ballots from that envelope cannot be identified and removed from the vote count.

140. Voting machine systems can be connected to the internet while processing ballots and tabulating votes.  This creates the opportunity for unlawful remote manipulation of election results.

141. Information can also be moved to and from systems locally using flash drives, as was apparently done in Ventura County (*supra* ¶ 130).  This too creates the opportunity for unlawful manipulation of election results.

### D. Concerns Regarding Voting Machine Systems Have Been Raised by Many Other Credible Entities, Including Federal and State Courts, State Registrars, Security Experts and Academic Publications

142. There is widespread concern across institutions at the State and Federal levels, as well as in academia and the security industry, regarding the systemic problems and vulnerabilities with computerized voting systems.

143. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to computerized machines, "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another.  I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it and a screwdriver."  *See* Andrew W. Appel, et al., "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019) ("Appel Study").

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

144. A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience." *See* Matt Caufield, The Business of Voting, July 2018.

145. In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§ 5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including vote counting source code, which Dominion claims is proprietary – and must be kept secret from the public.  (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020).  Rather than engaging in an open and transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

146. The same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … is safe from fraudulent or unauthorized manipulation." *See* State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

147. Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. See, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

particular, Dr. Halderman's testing indicated the practical feasibility through a  of causing the swapping or deletion of specific votes cast and the compromise of the system through different  strategies, including through access to and alteration or manipulation of the QR barcode.")

148. Similarly, a District Judge in Georgia found that Dominion's ballots are not voter verifiable, and they cannot be audited in a software independent way.  The credibility of a ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised.  Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the [ballot marking device] BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, … communicate such interpretation for elector verification, and print an elector verifiable paper ballot;" and (2) "produce paper ballots which are marked with the elector's choices in a format readable by the elector" O.C.G.A. § 21-2-2(7 1); O.C.G.A. § 21-2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are required to vote on a system that does none of those things. Rather, the evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code.

> *See* Order, pp. 81-82.

149. This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Supp. 3d 1270 (11th Cir. 2018).  The Court found:

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related Curling case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.
>
> *Id*. at 1294-1295.

150. The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, see Ex. 107, wherein he testified or found:

> A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes not to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level."  "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to election workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id*. ¶26.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

151. A forensic audit of Antrim County, Michigan vote tabulation found that the computerized system had an astonishing error rate of 68%. *See* Ramsland Jr., Russell. "Antrim Michigan Forensics Report." *William Bailey v. Antrim County*, Michigan, December 13, 2020.

https://depernolaw.com/uploads/2/7/0/2/27029178/antrim_michigan_forensics_report_[121320]_v2_[redacted].pdf

152. By way of comparison, the Federal Election Committee requires that election systems must have an error rate no larger than 0.0008%. *See* "Excerpts from the 2002 FEC Voting System Standards – 3.2.1 Accuracy Requirements." Michigan Secretary of State.  https://www.michigan.gov/sos/0,4670,7-127-1583-130621--,00.html

153. Also, in Michigan Central Lake Township County, there were 1,222 ballots reversed out of 1,491 total ballots cast, resulting in an 81.96% rejection rate. All reversed ballots are sent to adjudication for a decision by election personnel, a process that invites human error and fraud into the voting process.

**E.      In-Person Voters Were Subject to Unequal Treatment Compared to VBM Voters, Disproportionately Burdening People, Including Vulnerable Populations, Who Prefer to Vote in Person**

154. Under California law, in person voters can only vote if they are in line at the time the polls close, which was 8 p.m. during the November 2020 election.

155. Under former Secretary of State Padilla's guidance, VBM voters could legally vote by dropping off ballots in drop boxes until 11:59 p.m. and still have their ballots postmarked on election day and therefore counted.

156. Further, because ballots were not picked up from drop boxes until well into the day after the election and because the drop boxes were unmonitored, nothing prevented VBM voters from voting the day after election day by dropping ballots in such boxes.  Reports of such late voting and ballot pickups have been documented.

157.  This difference in timing, which allots at least four additional hours for VBM voters to vote, allows VBM voters to vote even after poll results are being announced, whereas in-person voters cannot. Such unequal treatment disproportionately burdens people who prefer to vote in person.  It also disproportionately burdens the ability of Black and other minority voters to cast their votes, because data shows these communities have historically relied on in-person voting to a greater degree than other groups.

158.  Similar issues have been found unconstitutional in multiple recent challenges to election law. *See League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (2014); *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (2016).  In *League of Women Voters* and *McCrory,* plaintiffs successfully argued that curtailing in-person voting disproportionately burdens the

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

-42-

ability of Black and other minority voters to cast their votes.  Defendants in those cases argued unsuccessfully that VBM was still available to these voters, but these arguments were unavailing.

**VIII.   An Audit and Special Master Are Needed to Identify the Full Extent of the Irregularities and Potential Fraud and the Effects of the California's Unconstitutional, Laws, Regulations, Orders and Voting Practices, and to Ensure the Fair and Honest Conduct of Future Elections.**

159. In spite of an election marred by lack of citizen oversight, and policies and procedures that created massive opportunities for both error and fraud, California has provided no meaningful access to the VBM ballots and envelopes, the voting machines used to record, tabulate and report votes, or additional infrastructure that was implicated in election irregularities, including laptops and flash drives used by those who had access to voting machines.  The entire process of receiving, tabulating and reporting votes remains effectively hidden from citizens.

160. This situation is intolerable in light of evidence of vote irregularities that are widespread enough that they could have changed the outcome of the November 2020 election for the candidate Plaintiffs, as well as others, disenfranchising citizens throughout the state.  These irregularities stand to be repeated if the unconstitutional laws, orders, regulations and voting practices are allowed to govern the conduct of upcoming elections.

161. Evidence must be preserved and made available to qualified experts, so that an audit can be conducted to determine the extent and effect of the irregularities and potential fraud reported.  Such an audit should include, among other things, a review of the signatures on VBM ballots against the signatures on file, given the historically low rejection rate for signatures in the November 2020 election.  It should include all ballots for which election officials selected the voter's choices, including all "remade" and "adjudicated" ballots.  It should also include voting machine access logs, tabulations, ballot images, and other information.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

162. Further, one or more special masters should be appointed to oversee the audit, as well as the conduct of the upcoming elections.  Local and special elections have begun on March 2, 2021, and are scheduled to take place throughout this year and next, including potential recall elections in 2021, and primary and general elections in 2022.  They will be similarly affected.  Indeed, former Secretary of State Padilla's emergency regulations will still be in effect when these elections start, and they are likely to be extended.  The legislature has already taken steps to codify some such regulations into law as described above.  Enactment of SB 29, Stats. 2021 Chap. 3, for example, provides that ballots will again be mailed to all "active" registered voters throughout 2021.  As such, the violations described herein are capable of repetition.

163. By providing this transparency and oversight, all eligible voters can be given assurance that they will be fully enfranchised in California's forthcoming elections.

## FIRST CAUSE OF ACTION

**Violation of Elections Clause: Art. I, § 4, cl. 1 of U.S. Constitution; 42 USC 1983**

164. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165. The Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State <u>by the Legislature thereof</u>." Art. I, § 4, cl. 1 (emphasis added).

166.  The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id*. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*., 135 S. Ct. 2652, 2668 (2015).

167. Defendants have violated, and are engaged in the continued violation of, the Elections Clause by usurping the California State Legislature's constitutional authority to set the manner of elections.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

168. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of defendants' violation of the Elections Clause.

169. The damage Plaintiffs have suffered is capable of repetition, yet evading review, including because there are forthcoming elections that will be conducted.

170.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Elections Clause.

171.   Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Elections Clause.

## SECOND CAUSE OF ACTION

**Denial of Equal Protection: 14th Amendment of U.S. Constitution; 42 USC 1983**

172. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 171 of this Complaint as if fully set forth herein.

173. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

174. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause, including by diminishing the value of votes legally cast by and for the individual Plaintiffs and EIPCa's citizen observers by the application and enforcement of the laws, statutes, regulations, orders and practices described herein.

175. Defendants have violated, and are engaged in the continued violation of, the

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Equal Protection Clause, including by intentionally failing to ensure that only legally cast VBM ballots were included in the canvass for the 2020 general election in California.

176. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause by applying disparate rules in different counties, causing the votes of some California citizens, including individual Plaintiffs and their supporters, and EIPCa's citizen observers, to be treated differently from those of others.

177. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause by treating VBM voters differently from in-person voters, disproportionately burdening people who prefer to vote in person, including Black and other minority voters, including individual Plaintiffs and their supporters, and EIPCa's citizen observers.

178. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause by applying laws, regulations, orders and voting practices the disproportionately burden certain classes of voters, including individual Plaintiffs and their supporters, and EIPCa's citizen observers.

179. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of Defendants' violation of the Equal Protection Clause.

180.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Equal Protection Clause.

181.   Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Equal Protection Clause.

## **THIRD CAUSE OF ACTION**

### **Denial of Due Process: 14th Amendment of U.S. Constitution; 42 USC 1983**

182. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 181 of this Complaint as if fully set forth herein.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

183. The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at 663. *See also Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)); *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

184. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

185. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

186. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).  Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

187.  The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), aff'd due to absence of quorum, 339 U.S. 974 (1950)).

188.  Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the diminution in value of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

189. Defendants have violated, and are engaged in the continued violation of, the Due Process Clause, including by diminishing the value of votes legally cast by and for the individual Plaintiffs and EIPCa's citizen observers by the application and enforcement of the laws, statutes, regulations, orders and practices described herein.

190. Defendants have violated, and are engaged in the continued violation of, the Due Process Clause, including by intentionally failing to ensure that only legally cast VBM ballots were included in the canvass for the 2020 general election in California.

191. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of Defendants' violation of the Due Process Clause.

192.  Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Due Process Clause.

193.  Plaintiffs are entitled to declaratory relief and temporary, preliminary and

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

permanent injunctive relief invalidating or restraining the defendants' violations of the Due Process Clause.

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

## **FOURTH CAUSE OF ACTION**

### **Violation of Guarantee Clause: Art. IV, § 4 of U.S. Constitution; 42 USC 1983**

194. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 193 of this Complaint as if fully set forth herein.

195. The Guarantee Clause of the U.S. Constitution states that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion. . . ."  (Art. IV, § 4.)

196. Defendants have violated, and are engaged in the continued violation of, the Guarantee Clause by implementing laws, regulations, orders and voting practices, and conducting elections, so as to deny California and its citizens, including Plaintiffs, a republican form of government.

197. Defendants have further violated, and are engaged in the continued violation of, the Guarantee Clause by implementing laws, regulations, orders and voting practices, and conducting elections, so as to allow foreign interference in California elections, denying California and its citizens, including Plaintiffs, from protection against invasion.

198. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of defendants' violation of the Guarantee Clause.

199.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Guarantee Clause.

200.   Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Guarantee Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against Defendants as follows:

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856

A.   An order directing Defendants to preserve all voting machines, software, peripherals (including flash drives and other memory storage), computers, reports generated, and other data and equipment used to cast, examine, count, tabulate, modify, store or transmit votes or voting data in the November 2020 elections in California for inspection and audit by experts;

B.   An order directing Defendants to preserve all VBM ballots, VBM ballot envelopes, RAVBM ballots, remade or duplicated ballots, adjudicated ballots and other documents used to cast votes in the November 2020 elections in California for inspection and audit by experts;

C.   The appointment of one or more special masters to oversee the evidence preservation and audit process;

D.   The appointment of one or more special masters to oversee and monitor the accuracy of vote counting in California's upcoming elections;

E.   A declaratory judgment that the following are unconstitutional on their face and as applied:

    a.   California Assembly Bills 60 (Stats. 2013, Chap. 524), 306 (Stats. 2018, Chap. 203), 860 (Stats. 2020, Chap. 4), 1461 (Stats. 2015, Chap. 729)  and 1921 (Stats. 2016, Chap. 820);

    b.   California Senate Bills 29 (Stats. 2021, Chap. 3), 397 (Stats. 2011, Chap. 561), 450 (Stats. 2016, Chap. 832), 503 (not yet codified – introduced 2/17/21) and 523 (Stats. 2019, Chap. 568);

    c.   Governor Newsom's Executive Orders numbers N-64-20 and 67-20;

    d.   California Code of Regulations §§ 20910, 20960, 20961, 20962, 20980, 20981, 20982, 20983, 20984, 20985, 20990, 20991, 20992, and 20993;

    e.   California Elections Code § 3020;

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

f.   The restrictions imposed on citizen observers by Defendant County

2

Registrars during and after the November 2020 election;

3

F.   Plaintiffs' costs of suit;

4

G.   Reasonable attorneys' fees; and

5

H.   Such other relief as is just and proper.

6

7

DATED: March 8, 2021                    PRIMARY LAW GROUP, P.C.

8

9

/s/ Joshua Kroot

10

By:   Joshua Kroot
        Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PRIMARY LAW GROUP, P.C.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
(213) 677-0856