MATTHEW RODRIQUEZ
Acting Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
RYAN A. HANLEY
Deputy Attorney General
State Bar No. 330729
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6064
  Fax:  (916) 324-8835
  E-mail:  Ryan.Hanley@doj.ca.gov
*Attorneys for Secretary of State Dr. Shirley Weber,*
*Governor Gavin Newsom, and Acting Attorney*
*General Matthew Rodriquez*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELECTION INTEGRITY PROJECT CALIFORNIA, INC, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**SHIRLEY WEBER, California Secretary of State, et al.,**<br><br>Defendants. | 2:21-cv-00032<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Date:  May 14, 2021<br>Time:  10:00 A.M.<br>Courtroom:  7B<br>Judge:  The Hon. André Birotte Jr.<br>Action Filed:  January 4, 2021 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

   I.    Facts Alleged in the First Amended Complaint.................................2

   II.   Procedural History .............................................................................3

LEGAL STANDARD ...........................................................................................3

   I.    Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ..................3

   II.   Federal Rule of Civil Procedure 9(b)................................................4

ARGUMENT .........................................................................................................5

   I.    Plaintiffs' Claims Are Not Justiciable ..............................................5

       A.    Plaintiffs Lack Article III Standing for All of Their Claims ..................................................................................5

           1.    Plaintiffs' Alleged Injuries Are Wholly Speculative and Impermissibly Generalized.................................5

           2.    Plaintiffs' Claims Do Not Satisfy the Causation and Redressability Prongs of the Standing Inquiry ...............9

       B.    Several of Plaintiffs' Claims Would Be Moot .........................11

       C.    Plaintiffs' Guarantee Clause Claim Is Nonjusticiable..............13

   II.   Plaintiffs Fail to Satisfy the Pleading Requirements of Rule 9(b) .....14

   III.  Plaintiffs Otherwise Fail to State a Claim .........................................17

       A.    Elections Clause Claim..............................................................17

       B.    Equal Protection and Due Process Claims ................................20

       C.    Guarantee Clause Claim ...........................................................24

   IV.  The Eleventh Amendment Bars Plaintiffs' Claims Against Governor Newsom ........................................................................24

CONCLUSION.....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*A. Farber & Partners, Inc. v. Garber*
   234 F.R.D. 186 (C.D. Cal. 2006) ........................................................ 13

*Anderson v. United States*
   417 U.S. 211 (1974) .......................................................................... 23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*
   135 S. Ct. 2652 (2015) ..................................................................... 19

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
   729 F.3d 937 (9th Cir. 2013) ............................................................ 25

*Bognet v. Sec'y of Commonwealth of Pa.*
   980 F.3d 336 (3d Cir. 2020) ...................................................... 11, 21

*Bowyer v. Ducey*
   No. CV-20-02321-PHX-DJH, 2020 WL 7238261 (D. Ariz. Dec. 9,
   2020) ........................................................................... 7, 9, 12, 17, 21

*Citizens for Fair Representation v. Padilla*
   815 F. App'x. 120 (9th Cir. 2020) .................................................... 21

*Coal. to Defend Affirmative Action v. Brown*
   674 F.3d 1128 (9th Cir. 2012) .......................................................... 25

*DeFunis v. Odegaard*
   416 U.S. 312 (1974) .......................................................................... 12

*Donald J. Trump for President, Inc. v. Cegavske*
   No. 2:20-cv-1445-JCM-VCF, 2020 WL 5626974 (D. Nev. Sept. 18,
   2020) ............................................................................................... 6, 7

*Drake v. Obama*
   664 F.3d 774 (9th Cir. 2011) .............................................................. 7

*Fayer v. Vaughn*
   649 F.3d 1061 (9th Cir. 2011) .......................................................... 19

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
  528 U.S. 167 (2000) .......................................................................... 7

5
6

*Holley v. Cal. Dep't of Corr.*
  599 F.3d 1108 (9th Cir. 2010) .......................................................... 24

7
8

*Juliana v. United States*
  947 F.3d 1159 (9th Cir. 2020) ............................................................ 7

9

*King v. Whitmer*
  No. 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020) ........... 12

10
11

*Lance v. Coffman*
  549 U.S. 437 (2007) .......................................................................... 8

12
13

*Lightfoot v. Cendant Mortgage Corp.*
  137 S. Ct. 553 (2017) ........................................................................ 4

14
15

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992) ...................................................................... 5, 9

16
17

*Murtishaw v. Woodford*
  255 F.3d 926 (9th Cir. 2001) ............................................................ 14

18
19

*N. Star Int'l v. Ariz. Corp. Comm'n*
  720 F.2d 578 (9th Cir. 1983) .............................................................. 4

20
21

*Paher v. Cegavske*
  No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301 (D. Nev. May
  27, 2020) .......................................................................................... 7

22
23

*Preiser v. Newkirk*
  422 U.S. 395 (1975) ..................................................................... 11, 12

24
25

*Reynolds v. Sims*
  377 U.S. 533 (1964) ..................................................................... 23, 24

26
27

*Rucho v. Common Cause*
  139 S. Ct. 2484 (2019) ................................................................. 14, 23

28

1

2

### TABLE OF AUTHORITIES
### (continued)

Page

3

4

*Schmier v. U.S. Ct. of Appeals for Ninth Cir.*
   279 F.3d 817 (9th Cir. 2002) ...................................................................... 6

5

6

*Short v. Brown*
   893 F.3d 671 (9th Cir. 2018) ..............................................................22, 23, 24

7

8

*Smegen v. Weidner*
   780 F.2d 727 (9th Cir. 1985) ..................................................................... 4

9

10

*South v. Peters*
   339 U.S. 276 (1950) ................................................................................ 24

11

*Stack v. Lobo*
   903 F.Supp. 1361 (N.D. Cal. 1995) ....................................................4, 15, 17

12

13

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*
   633 F.Supp.2d (D. Ariz. 2009) ............................................................. 15, 17

14

15

16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church
   & State*
   454 U.S. 464 (1982) ................................................................................. 5

17

*Vess v. Ciba-Geigy Corp. USA*
   317 F.3d 1097 (9th Cir. 2003) .............................................................4, 16, 17

18

19

*Will v. Michigan State Dep't Police*
   491 U.S. 58 (1989) ................................................................................ 24

20

21

*Wood v. Raffensperger*
   981 F.3d 1307 (11th Cir. 2020) ................................................................. 13

22

23

*Ex Parte Young*
   209 U.S. 123 (1908) ............................................................................... 25

24

25

26

27

28

iv

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

California Elections Code

§ 3020 ...................................................................5, 11, 13, 17
§ 3020(d) ...........................................................................13
§ 3026 ...............................................................................18
§ 13002 ..............................................................................19
§ 13200 ..............................................................................19
§ 14299 ..............................................................................20
§ 14299(b) ..........................................................................20
§ 14299(c) ..........................................................................20
§ 14314 ..............................................................................18
§ 15210 ..............................................................................20
§ 16003 ..............................................................................12
§ 16400 ..............................................................................12
§ 16401 ..............................................................................12
§§ 17300-17306 ..................................................................12

California Government Code

§ 8550 et seq. .....................................................................18
§ 8567 ...............................................................................18
§ 8567(a) ...........................................................................18
§ 8571 ...............................................................................18
§ 8627 ...............................................................................18
§ 12172.5 ...........................................................................18
§ 12172.5(d) .......................................................................18

**CONSTITUTIONAL PROVISIONS**

United States Code, Title 52

§ 21081(a)(6) ......................................................................18

United States Constitution

Article I, § 4, cl. 1 ..............................................................17
Article III .........................................................1, 5, 6, 7, 8, 11, 13
Article IV, § 4 ....................................................................13

# TABLE OF AUTHORITIES
### (continued)

**Page**

## COURT RULES

Federal Rules of Civil Procedure
    Rule 9(b) ..................................................................2, 4, 11, 14, 15, 16, 17
    Rule 12(b)(1) ............................................................................................ 3
    Rule 12(b)(6) ...............................................................................4, 19, 20
    Rule 53(a) ............................................................................................... 16
    Rule 53(a)(1)(A) .................................................................................... 16
    Rule 53(a)(1)(B)(i) ................................................................................ 16

## OTHER AUTHORITIES

California Code of Regulations, Title 2
    § 20136 ..............................................................................................8, 22
    § 20910 ................................................................................................3, 5
    § 20960-20962 ...................................................................................3, 5
    § 20980-20985 ...................................................................................3, 5
    § 20990-20993 ...................................................................................3, 5
    § 20991(b)(9) .................................................................................19, 20

**INTRODUCTION**

Notwithstanding Plaintiffs' belated attempt to disavow their frivolous effort to overturn the 2020 election, this action remains the latest in a line of similar—and similarly reckless—lawsuits peddling conspiracy theories that seek to undermine public confidence in the integrity of our elections.  Like its counterparts, which have been rejected by court after court across the country, this case should be dismissed without leave to amend.

Plaintiffs are thirteen congressional candidates who lost in the 2020 general election, and the nonprofit Election Integrity Project California, Inc. ("EIPCa"). They raise their claims against three state officials, named in their official capacities—Secretary of State Dr. Shirley Weber, Governor Gavin Newsom, and Acting Attorney General Matthew Rodriguez (collectively, "State Defendants")— and thirteen County Registrars of Voters (collectively, "County Defendants"). Against both State and County Defendants, Plaintiffs allege injuries under four provisions of the United States Constitution—the Elections Clause, the Equal Protection Clause, the Due Process Clause, and the Guarantee Clause.  And they seek sweeping relief, including an audit of the November 2020 election results, the appointment of special masters to oversee both this audit and the vote counting in California's upcoming elections, a declaratory judgment that numerous statutory and regulatory provisions of California election law are unconstitutional, and a preservation order covering twenty-four separate categories of electronic and vote-by-mail ("VBM") election equipment and materials.

All of Plaintiffs' claims against the State Defendants fail as a matter of law. As a threshold matter, Plaintiffs' claims are not justiciable.  First, Plaintiffs do not have Article III standing for the claims they raise or the relief they seek: Plaintiffs' alleged injuries are wholly speculative and impermissibly generalized, and they have failed to establish the requisite causation or redressability components for standing.  Second, even if Plaintiffs' claims had once been otherwise justiciable,

several of those claims would since have become moot.  Third, Plaintiffs' claims under the Guarantee Clause are political questions outside the scope of the federal courts' jurisdiction.  Even if Plaintiffs' claims were justiciable, Plaintiffs have failed to state a claim on the merits—not least because they fail to satisfy the pleadings standards of Rule 9(b), as required given their allegations of fraud.

Finally, even if Plaintiffs' complaint were otherwise justiciable and had not failed to state a claim, Eleventh Amendment sovereign immunity would be sufficient to bar Plaintiffs' claims against Governor Newsom.

For these reasons, the Court should dismiss the complaint with prejudice.

## BACKGROUND

### I.  FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT

As mentioned, Plaintiffs are thirteen congressional candidates, each of whom lost their races in the November 2020 general election, and EIPCa, a California non-profit organization.  *See* ECF No. 68 ("FAC") at ¶¶ 22–35.[1]  Relevant to State Defendants, Plaintiffs allege that for three decades, California officials and legislators have made changes to election laws "under the guise of increasing voter participation," with the true goal of "allow[ing] widespread fraud and election interference to proceed unchecked."  FAC at ¶ 58.  According to Plaintiffs, this fraudulent scheme is intentional: Plaintiffs allege that Californians' right to vote has been "intentionally eroded" by laws "designed to create an environment in which elections could be manipulated and eligible voters of all political viewpoints disenfranchised."  FAC at ¶ 3.  However, these changes all constitute reforms expanding access to voting rights, for instance by implementing a permanent VBM option, allowing for online voter registration, and enacting a cure process for voters

---

[1] In the FAC, Plaintiffs make numerous references to the alleged nonpartisan nature of this action.  *See* FAC at ¶¶ 1, 3–5, 20.  They note that "defendants include both Democrats and Republicans."  FAC at ¶ 5.  The FAC fails to mention that all thirteen individual plaintiffs were Republican congressional candidates who lost their races to Democratic candidates.

2

whose VBM ballots are flagged for rejection.  *See* FAC at ¶¶ 60–75.  Plaintiffs
challenge some, but not all, of these laws.  *See* FAC at 50, ¶ E.

Plaintiffs also challenge as unconstitutional several executive orders and
emergency regulations issued in 2020 by Governor Newsom and former Secretary
of State Alex Padilla.  FAC at ¶¶ 76–94.  Executive Orders N-64-20 and N-67-20—
which were later superseded by legislation, and which were limited to an election
that has since taken place—required that every registered voter in California be
mailed a VBM ballot for the November 2020 election, and were superseded by
legislation in June 2020 (at which point, the executive orders had no further force or
effect).  FAC at ¶ 76; Req. for Judicial Notice in Supp. of State Defs.' Mot. to
Dismiss the FAC ("State Defs.' RJN") at 1–3, Ex. 1.  Former Secretary Padilla
issued emergency regulations relating to signature verification, ballot processing,
and ballot counting in September 2020.  FAC at ¶¶ 79–94; *see* Cal. Code Regs. tit.
2 ("2 CCR"), §§ 20910, 20960-20962, 20980-20985, 20990-20993; State Defs.'
RJN at 4–9, Ex. 2.

Finally, Plaintiffs also allege differential treatment of voters based upon their
county of residence and voting method (in-person versus VBM).  FAC at 154–58.

## II.   PROCEDURAL HISTORY

The action was filed on January 4, 2021.  *See* ECF Nos. 1, 21.  The Court
denied Plaintiffs' TRO application on January 11, without a hearing, and
Defendants filed motions to dismiss on February 12.  ECF Nos. 31, 35, 43, 45.
Rather than oppose the motion, Plaintiffs filed the now-operative First Amended
Complaint on March 8, and a Notice of Errata on March 29.  ECF Nos. 68, 81.

## LEGAL STANDARD

## I.   FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

The legal standards applicable to motions under Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6) are well known.  In short, Rule 12(b)(1) requires a
court to dismiss a claim if it lacks subject-matter jurisdiction, which "defines [a

court's] power to hear cases." *Lightfoot v. Cendant Mortgage Corp.*, 137 S. Ct. 553, 560 (2017).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint.  *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

## II.   FEDERAL RULE OF CIVIL PROCEDURE 9(B)

Federal Rule of Civil Procedure 9(b) requires heightened pleading standards when a party makes allegations of fraud.  *See* Fed. R. Civ. P. 9(b).  In cases where fraud is not a necessary element of a claim but the plaintiff nevertheless chooses to allege fraudulent conduct on the part of defendants, the rule still applies.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  In such cases, "the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim," in which event "the claim is said to be 'grounded in fraud' . . . and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."  *Id.* (internal citations omitted).  A motion to dismiss such a claim "under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim," as "there is effectively nothing left of the complaint."  *Id.* at 1107.

Alternatively, "a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct."  *Id.* at 1104.  In such cases, "only allegations . . . of fraudulent conduct must satisfy . . . Rule 9(b)."  *Id.* at 1105.  The court shall then "strip" the noncompliant allegations from the complaint, and "examine the allegations that remain to determine whether they state a claim."  *Id.*

While detailed evidentiary pleadings are not required, the Ninth Circuit has held that "[m]erely making conclusory allegations of fraud, and then reciting a list of neutral facts, is not sufficient" to satisfy the requirements of Rule 9(b).  *Stack v. Lobo*, 903 F.Supp. 1361, 1367 (N.D. Cal. 1995) (citing *Smegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).

# ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

### A.   Plaintiffs Lack Article III Standing for All of Their Claims

Article III of the United States Constitution confines the jurisdiction of federal courts "to the resolution of cases and controversies." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982) (internal quotation marks omitted).  One of the "landmarks" used by courts to identify cases "that are of the justiciable sort referred to in Article III . . . is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This "irreducible constitutional minimum of standing" requires that a plaintiff demonstrate three elements: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) "a causal connection between the injury" and the defendant's conduct; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Id.* at 560–61 (quotation marks omitted).

Relevant to State Defendants, Plaintiffs here ask the Court for: (1) immediate orders directing Defendants to preserve certain election equipment and materials; (2) the appointment of one or more special masters to oversee evidence preservation, an audit of the November 2020 election results, and vote counting in future elections; and (3) a declaration that Assembly Bills 60, 306, 860, 1461, and 1921, Senate Bills 29, 397, 450, 503, and 523, Executive Orders N-64-20 and N-67-20, California Elections Code section 3020, and California Code of Regulations, title 2, sections 20910, 20960–20962, 20980–20985, and 20990–20993 are unconstitutional.  FAC at 50, ¶¶ A–E.  On these claims, none of the Plaintiffs satisfy all three requirements needed to establish Article III standing.

#### 1.   Plaintiffs' Alleged Injuries Are Wholly Speculative and Impermissibly Generalized

First, Plaintiffs have failed to sufficiently allege any injury cognizable under Article III.

Plaintiffs do *not* allege that they or their supporters were prohibited from voting, were denied the ability to vote in the manner in which they chose, or that their votes were not counted.  Rather, Plaintiffs appear to put forth three theories of their "injury in fact."  In their equal protection and due process claims, Plaintiffs advance an unusual and unsupported theory of vote dilution, by which the value of their votes (and their supporters' votes) was diminished by Defendants' actions "intentionally failing to ensure that only legally cast VBM ballots were included in the canvass for the 2020 general election in California."  FAC at ¶¶ 174–75, 188–90.  In their equal protection claim, Plaintiffs allege differential treatment between voters in different counties, as well as between VBM and in-person voters.  FAC at ¶¶ 176–78.  And in their Elections Clause and Guarantee Clause claims, Plaintiffs raise allegations of generalized grievances relating to government conduct allegedly in violation of federal law.  *See* FAC at ¶¶ 167–68, 196–98.  These injuries are insufficient to meet the requirements for Article III standing because they are both wholly speculative and impermissibly generalized.  *See, e.g.*, *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002).

Recent decisions from neighboring districts illustrate the flaws in Plaintiffs' theory of injury.  Prior to the November 2020 election, one presidential campaign challenged a Nevada law that mandated ballots be mailed to all registered voters, similar to the laws challenged here by Plaintiffs.  Granting defendant's motion to dismiss, the court held that "[e]ven if accepted as true, plaintiffs' pleadings allude to vote dilution that is impermissibly generalized."  *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-1445-JCM-VCF, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020).  The court highlighted plaintiffs' failure to "describe how their member voters will be harmed by vote dilution where other voters will not," and agreed with an earlier district court decision that "plaintiffs' claims of a substantial risk of vote dilution 'amount to general grievances that cannot support a finding of particularized injury as to [p]laintiffs.'"  *Id.* (quoting *Paher v. Cegavske*, No. 3:20-

cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020).  A

similar argument was also rejected in a post-election challenge in Arizona, where

the court noted not only the speculative and generalized nature of the alleged injury,

but also the plaintiffs' failure to advance a viable theory of vote dilution.  *See*

*Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *5 (D. Ariz.

Dec. 9, 2020) ("As courts have routinely explained, vote dilution is a very specific

claim that involves votes being weighed differently and cannot be used generally to

allege voter fraud."); *see also id.* at *6 (collecting cases).

Here, Plaintiffs' claims of vote dilution are based wholly on speculation that

fraudulent ballots *may* have been counted.  *See, e.g.*, FAC at ¶ 13 ("These election

workers *could* have entered any candidates that they wished on these remade ballots

while purposefully unobserved like this.") (emphasis added).  There are no specific

allegations regarding the number of fraudulent ballots, whether those ballots were

in fact counted *for* or against Plaintiffs, or where exactly those ballots were cast.

Any hypothetical injuries inflicted on Plaintiffs as a result of this purported vote

dilution "are nothing more than generalized grievances that any one of the [17.5

million Californians] who voted could make if they were so allowed."  *Id.* at *5; *cf.*

*Juliana v. United States*, 947 F.3d 1159, 1174 (9th Cir. 2020) ("[A]ny injury from

the dissolution of the Republic would be felt by all citizens equally, and thus would

not constitute the kind of discrete and particularized injury necessary for Article III

standing.") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167, 180–81 (2000)).[2]

_____

[2]  Plaintiffs' status as former congressional candidates does not provide them
any specialized basis for standing here.  This action was commenced on January 4,
2021.  At that time, California's election results had already been certified, and the
members of the 117th Congress had been sworn in.  *See* State Defs' RJN at 24–29,
Exs. 4–5.  Thus, as of the commencement of this suit, those Plaintiffs had ceased to
be candidates for the 2020 general election.  *See Drake v. Obama*, 664 F.3d 774,
783–84 (9th Cir. 2011) ("Once the 2008 election was over and the President sworn
in, Keyes, Drake, and Lightfoot were no longer 'candidates' for the 2008 general
election.")  And because they were no longer candidates, they did not have any
basis to claim harm based on their failed congressional campaigns.  Although
twelve of the Plaintiffs allege in the FAC that they are running in the 2022 election,

Indeed, on their differential treatment theory, Plaintiffs do not appear to even allege any injury—let alone an injury that they themselves suffered.  The argument is largely inscrutable, but appears to be that because "VBM voters" could allegedly drop their ballots in mail boxes[3] up to four hours later than the polls were open, those who chose to vote in person were "disproportionately burden[ed]."  *See* FAC at ¶¶ 154–57, 177.  Plaintiffs also assert that the application of "disparate rules in different counties" somehow resulted in "the votes of some California citizens . . . [being] treated differently from those of others."  FAC at ¶ 176.  But Plaintiffs do not explain how these challenged practices have caused them any particularized injury.  Again, they make no allegations that their ballots were not counted while others' were.  They make no allegations that they were unable to vote in the manner in which they preferred.  They make no allegations that their ballots were in fact counted or weighed differently from county to county.  There is absolutely no injury alleged here, let alone any actual, concrete, particularized injury that Plaintiffs themselves suffered—as required for Article III standing.

Moreover, to the extent that Plaintiffs allege generalized injuries relating to Defendants' alleged violations of the law, such injuries are insufficient for standing.  "The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed.  This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also Bowyer*, 2020 WL 7238261, at *4 (rejecting plaintiffs' Elections

---

the candidate filing period for that election has not yet opened, and any claim of specialized basis for standing is accordingly not ripe at this time.

[3] Plaintiffs filed a Notice of Errata replacing "drop boxes" with "mail boxes" in paragraph 155; the Notice of Errata erroneously attributes this error to paragraph 153.  *See* ECF No. 81.  It is unclear whether Plaintiffs also intended to write "mail boxes" in paragraph 156, alleging that "because the drop boxes were unmonitored, nothing prevented VBM voters from voting the day after election day by dropping ballots in such boxes."  FAC at ¶ 156.  As it stands, the allegations in paragraph 156 are patently false.  *See* 2 CCR 20136 ("Upon the closing of the polls on Election Day, all drop boxes shall be locked and covered or otherwise made unavailable at 8:00 p.m. to ensure that no ballots are dropped off after the polls have closed.")  All of this contributes to the inscrutability of this portion of the FAC.

Clause claim on standing grounds).  Accordingly, Plaintiffs' failure to allege any concrete injuries in this matter are fatal to their claims against State Defendants, and on their own provide sufficient grounds for dismissal.

### 2.    Plaintiffs' Claims Do Not Satisfy the Causation and Redressability Prongs of the Standing Inquiry

Even if Plaintiffs had alleged an injury sufficient to establish standing—and they have not—their claims do not pass muster as to the other two prongs of standing.  Plaintiffs have failed to show how their alleged injuries are fairly traceable to State Defendants' conduct, and their requested relief would do absolutely nothing to actually redress any injuries Plaintiffs have alleged.  *See, e.g.*, *Lujan*, 504 U.S., 560–61.

Turning first to causation, Plaintiffs present no theory showing how former Attorney General Becerra caused either a diminution in the value of Plaintiffs' votes, or the differential treatment alleged under their equal protection claim.  In regard to Governor Newsom, Plaintiffs rely on the fact that he issued Executive Orders N-64-20 and N-67-20 to mandate that all registered voters be mailed a VBM ballot (ignoring the fact that these executive orders were later superseded by legislation enacting the same requirement).  *See* FAC at ¶ 76; State Defs.' RJN at 1–3, Ex. 1.  And for former Secretary Padilla, Plaintiffs allege that the emergency regulations adopted on September 28, 2020 allowed for fraud that allegedly diluted Plaintiffs' votes and contributed to the differential treatment between VBM and in-person voters. *See* FAC at ¶¶ 78–94.

The crux of Plaintiffs' argument against State Defendants is that the expansion of vote-by-mail preceding the 2020 general election created the conditions for widespread voter fraud, and that State Defendants' actions were simply the latest in a decades-long scheme to intentionally allow voter fraud at a massive scale.  *See* FAC at ¶¶ 58, 76; *see also infra*, II.  By Plaintiffs' own admission, even prior to the emergency orders, "approximately 75% of voters in California regularly received

permanent VBM ballots . . . ."  FAC at ¶ 62.  And none of the State Defendants carried out the election activities where Plaintiffs allege much of this fraud occurred (e.g., signature verification, vote tabulation)—those are the tasks of local officials, and are also the focus of Plaintiffs' most concrete allegations.  There are no allegations, for example, that the State Defendants somehow manipulated vote tallies, submitted fraudulent votes, or allowed drop boxes to be compromised at any point of the voting period.  The Secretary of State's emergency regulations were issued explicitly to "provide clear and uniform guidance" to counties regarding election administration, and to "ensure uniform practices" in relevant respects across the state.  State Defs.' RJN at 5, Ex. 2.  Such uniformity in fact helps ensure that no votes are "diluted," and that every valid vote is counted accurately and equally, regardless of what county in which a voter resides or what voting method they use.  Perhaps realizing this absence of any discrete allegations of fraud on the part of State Defendants, Plaintiffs have instead chosen to advance their theory of a massive, long-running scheme to compromise the election results (discussed at greater length *infra*, II).

Plaintiffs thus go to great lengths to raise this specter of a state-supported fraud operation because without such allegations, many of their claims would also fail the redressability requirement.  In their prayer for relief, Plaintiffs request orders mandating the preservation of certain election equipment and materials, as well as the appointment of special masters to oversee an audit of the 2020 election results and the accuracy of vote counting in future California elections.  FAC at 50, ¶¶ A–D.  The only way that these requests could redress any of Plaintiffs' alleged injuries is if Plaintiffs are accurate in alleging the existence of a massive and ongoing fraud scheme.  Absent such a scheme, the relief that Plaintiffs request would do nothing to change the results of the election, rectify Plaintiffs' alleged vote dilution, or correct for the disparities between vote methods.  But if Plaintiffs

1  are indeed alleging such an operation, then the FAC fails under Rule 9(b).  *See*
2  *infra*, II.

3       Finally, Plaintiffs request declaratory relief finding numerous election
4  provisions to be unconstitutional.  FAC at 50, ¶ E.  Plaintiffs do not explain how
5  such declaratory relief would redress their alleged injuries—and to the extent
6  Plaintiffs' alleged injuries turn on supposed "irregularities" in the local
7  administration of an election that has already occurred, it clearly would not.
8  Likewise, Plaintiffs' challenges to AB 860 (which applied only to the November
9  2020 election) and Executive Orders N-64-20 and N-67-20 (which, upon the
10 enactment of AB 860, had no further force or effect) cannot possibly provide
11 redress for any alleged injury they might suffer in the future.  And Plaintiffs do not
12 and cannot explain how any remaining challenges to California's election laws (for
13 example, Elections Code section 3020)[4] would redress any alleged injury, either.[5]

14      Failing to meet any of the three prongs for Article III standing is fatal to a
15 plaintiff's claim.  Here, Plaintiffs have failed to meet even one.  On this basis alone,
16 the entirety of Plaintiffs' claims against State Defendants should be dismissed.

17 **B.    Several of Plaintiffs' Claims Would Be Moot**

18      Additionally, even if Plaintiffs' claims had once been otherwise justiciable,
19 several of those claims would have since been rendered moot.

20      "The inability of the federal judiciary to review moot cases derives from the
21 requirement of Art. III of the Constitution under which the exercise of judicial
22 power depends upon the existence of a case or controversy."  *Preiser v. Newkirk*,
23 422 U.S. 395, 401 (1975).  A controversy must be "definite and concrete" and

24      [4]  *See* FAC at 50, ¶ E (seeming to challenge Elections Code section 3020);
25 *but see* FAC at ¶¶ 93–94 (seeming to challenge only those aspects of Elections
   Code section 3020 that applied specifically to the November 2020 election).
        [5]  Additionally, Plaintiffs' challenge to numerous elections statutes duly
26 enacted by the California Legislature stands in deep (and seemingly irreconcilable)
   tension with any theory of injury they might seek to advance under the
27 Constitution's Elections Clause, which stands for the Legislature's power to enact
   laws concerning elections procedures.  *See* FAC at ¶¶ 164–71; *cf. Bognet v. Sec'y of
28 Commonwealth of Pa.*, 980 F.3d 336, 350–52 (3d Cir. 2020), *petn. for cert
   docketed*, No. 20-740 (Nov. 27, 2020).

"touch[] the legal relations of the parties having adverse legal interests." *DeFunis
v. Odegaard*, 416 U.S. 312, 317 (1974).  Federal courts lack the power to "decide
questions that cannot affect the rights of litigants in the case before them."  *Preiser*,
422 U.S. at 401 (internal quotation marks omitted).

In the FAC, Plaintiffs no longer seek decertification of the November 2020
election results.  Even if they did, such relief would not be a viable remedy.  *See*
Cal. Elec. Code §§ 16003, 16400, 16401 (setting procedure for contesting election
results).  Plaintiffs do, however, seek preservation orders and an audit, as well as
the appointment of one or more special masters to oversee these efforts.  FAC at 50,
¶¶ A–C.  It is unclear to what end Plaintiffs seek this backward-looking relief—but
given that decertification is not an option, it would be meaningless to grant these
requests.  Similar requests have been made in other states, and dismissed as moot.
*E.g., Bowyer*, 2020 WL 7238261, at *12 ("Because this Court cannot de-certify the
results, it would be meaningless to grant Plaintiffs any of the remaining relief they
seek."); *King v. Whitmer*, No. 20-13134, 2020 WL 7134198, at *5 n.3 ("[T]he
evidence Plaintiffs seek to gather by inspecting voting machines and software
security camera footage only would be useful if an avenue remained open for them
to challenge the election results."), *appeal filed*, No. 20-2205 (6th Cir. Dec. 10,
2020).

Plaintiffs' request for protective orders should further be dismissed as moot
because they do not represent any genuine controversy.  There is no valid reason or
need to order State Defendants not to destroy supposed evidence, primarily because
there is absolutely no indication that spoliation of evidence has occurred or is being
contemplated or planned.  California Elections Code sections 17300 to 17306
already require that certain election materials be preserved for twenty-two months
following an election.  And to the extent that Plaintiffs' request includes materials
or equipment not already covered under the Elections Code, State Defendants are
on notice and therefore under a federally-imposed "duty to preserve evidence [they]

know[] or should know is relevant to imminent litigation." *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 193 (C.D. Cal. 2006).  This Court has already addressed this issue in its order denying Plaintiffs' request for TRO, see ECF No. 35 at 4, and nothing has changed since then.

Plaintiffs' requests for declaratory relief seeking invalidation of Executive Orders N-64-20 and N-67-20, AB 860, and California Elections Code section 3020 should likewise be dismissed because they do not present an ongoing case or controversy.  Again, the executive orders concerned only the November 2020 general election and ceased to have any force or effect long before this action was commenced.[6]  Similarly, the amendments enacted through AB 860, primarily mandating the State to send VBM ballots to every registered California voter, related only to the November 2020 general election.  State Defs.' RJN at 20–23, Ex. 3.  And while Plaintiffs ostensibly request that the entirety of Elections Code section 3020 be declared unconstitutional, they only take issue with the most recent amendments providing that VBM ballots received within seventeen days of the 2020 general election be considered timely.  *See* FAC at ¶¶ 93–94; Cal. Elec. Code § 3020(d).  These claims are moot because they relate only to the election that has already passed and been certified.  *Cf. Wood v. Raffensperger*, 981 F.3d 1307, 1317 (11th Cir. 2020) ("We cannot turn back the clock and create a world in which the 2020 election results are not certified.") (internal quotation marks and citation omitted).

## C.   Plaintiffs' Guarantee Clause Claim Is Nonjusticiable

The Guarantee Clause of the United States Constitution states that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion . . . ."  U.S. Const., art. IV, § 4.  Plaintiffs allege that Defendants have violated the Guarantee Clause

---

[6] For this reason, and because standing is assessed at the time the relevant complaint is filed, it may (strictly speaking) be most correct to dismiss the challenges to those orders for want of Article III standing, while dismissing Plaintiffs' remaining challenges as moot.

"by implementing laws, regulations and orders, and conducting elections, so as to deny California and its citizens, including Plaintiffs, a republican form of government," and "so as to allow foreign interference in California elections." FAC at ¶¶ 196–97.  But it is well-established, and as recently as 2019 the Supreme Court reiterated, "that the Guarantee Clause does not provide the basis for a justiciable claim."  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019); *see Murtishaw v. Woodford*, 255 F.3d 926, 961 (9th Cir. 2001) ("A challenge based on the Guarantee Clause, however, is a nonjusticiable political question.") Accordingly, Plaintiffs' fourth cause of action, based wholly on alleged violations of the Guarantee Clause, should be dismissed.

## II.   PLAINTIFFS FAIL TO SATISFY THE PLEADING REQUIREMENTS OF RULE 9(B)

Although fraud is not a necessary element of any of Plaintiffs' claims, the bedrock upon which the entirety of the FAC rests is the alleged scheme of widespread, ongoing, and intentional fraud on the part of State Defendants. Plaintiffs make this explicit from the jump.  *See, e.g.*, FAC at ¶ 3.  And they proceed to lean on this allegation of a "unified course of fraudulent conduct" throughout.  Plaintiffs repeatedly refer to former Secretary Padilla's emergency regulations facetiously (placing "emergency" in quotation marks), and call the rationale for such regulations—to protect citizens' right to vote in amidst the COVID-19 pandemic—mere "pretext."  FAC at ¶¶ 7, 8, 79.  They allege that voting rights legislation over the past three decades are in fact part of a "systematic attack" intentionally designed to enable voting fraud to "proceed unchecked."  FAC at ¶ 58. They falsely state that some defendants, including State Defendants, intend to destroy evidence.  FAC at ¶ 18.  And they accuse Governor Newsom and former Secretary Padilla of spearheading "efforts to unlawfully compromise California elections . . . ."  FAC at ¶ 76.  Accompanying these conclusory allegations of fraud

1  are recitals of various neutral laws, all of which have expanded and protected

2  voting access for all eligible California voters. *See* FAC at ¶¶ 58–94. Such a

3  complaint does not satisfy Rule 9(b). *See Stack*, 903 F.Supp., at 1367 ("Merely

4  making conclusory allegations of fraud, and then reciting a list of neutral facts, is

5  not sufficient" to satisfy the requirements of Rule 9(b).) (citation omitted).

6        Moreover, Plaintiffs explicitly rely on these conclusory allegations of fraud in

7  support of both their equal protection and due process claims, asserting that State

8  Defendants "intentionally fail[ed] to ensure that only legally cast VBM ballots were

9  included in the canvass for the 2020 [election]." FAC at ¶¶ 175, 190. Plaintiffs

10  also implicitly rely on their fraud allegations to support their two other claims,

11  alleging that State Defendants have proceeded with their fraudulent scheme in order

12  to "usurp[]" the Legislature's authority, and have in turn have implemented these

13  laws "so as to deny California and its citizens . . . a republican form of government"

14  and "protection against invasion." FAC at ¶¶ 167, 196–97. Due to the shotgun

15  nature of Plaintiffs' pleadings, it is difficult to identify with specificity exactly

16  which allegations of fraud are intended to be paired with each of the causes of

17  action—in violation of Rule 9(b). *See Teamsters Local 617 Pension and Welfare*

18  *Funds v. Apollo Group, Inc.*, 633 F.Supp.2d at 763, 783 (D. Ariz. 2009), *vacated in*

19  *part on other grounds*, 690 F.Supp.2d 959 (D. Ariz. 2010).

20        The breadth and severity of this alleged scheme of fraud is hard to overstate.

21  As alleged by Plaintiffs, "[t]his situation is intolerable in light of evidence of vote

22  irregularities that *are widespread enough that they could have changed the outcome*

23  *of the November 2020 election for the candidate Plaintiffs* . . . ." FAC at ¶ 160

24  (emphasis added); *see also* FAC at ¶ 11 ("The potential for result-changing

25  irregularities *became actuality in November 2020*.") (emphasis added).

26  Conspicuously, Plaintiffs never make reference to their congressional election

27  results. But unequivocally, they were *not* of the sort alluded to by Plaintiffs—those

28  "contests decided by margins of very few votes," wherein State Defendants' actions

"create[d] an open invitation to submit illegal ballots after election day to overturn reported election results."  FAC at ¶ 94.  Far from it.

In the head-to-head general election, Plaintiffs received vote shares that ranged from 23.2% to 46.5%.  State Defs.' RJN at 40–41, 58–69, Ex. 6.  Their margins of defeat ranged from 28,747 votes in Plaintiff Raths' loss to Representative Katie Porter, to 165,238 votes in Plaintiff Gorman's loss to Representative Jimmy Panetta.  *Id.* at 40–41, 62, 67.  The total vote margin across all thirteen races was 1,362,307.  *Id.* at 40–41, 58–69.  Even assuming the most favorable conditions for Plaintiffs—that every fraudulent vote took the form of a changed ballot that had initially been cast for the Plaintiff—more than 680,000 fraudulent votes would have to have been counted in order for the election outcome to have been changed for all Plaintiffs.  This is what Plaintiffs' allegations amount to.

For such massive election fraud to go unchecked, myriad election officials, their staff and volunteers, and government leaders would need to be active, willing participants.  And indeed, that is what Plaintiffs allege, albeit less directly.  But obscuring the true nature of their allegations does not change the reality that Plaintiffs' claims are grounded in fraud, and that their allegations are not pleaded with sufficient particularity to provide State Defendants with the notice required by satisfy Rule 9(b).[7]

Having "allege[d] a unified course of fraudulent conduct" on the part of State Defendants and relied upon that course of conduct to support each of their causes of

---

[7] It is precisely this alleged scheme that Plaintiffs turn to for support in their request for the appointment of special masters.  Federal Rule of Civil Procedure 53(a) governs the circumstances for appointment of a master.  State Defendants do not consent to Plaintiffs' request.  *See* Fed. R. Civ. P. 53(a)(1)(A).  Therefore, Plaintiffs must establish "some exceptional condition" to justify such an appointment.  Fed. R. Civ. P. 53(a)(1)(B)(i).  Plaintiffs attempt to do so by alleging the existence of fraud sufficient to have changed the 2020 election results.  FAC at ¶ 160.  But as demonstrated above, for this allegation to even be remotely plausible, upwards of *at least* 680,000 votes—nearly 4% of all votes counted in the 2020 election—would need to be fraudulent.  If this is Plaintiffs' allegation, the FAC fails on Rule 9(b).  And if it is not, then Plaintiffs have failed to allege any "exceptional condition" to justify the appointment of special masters.

1  action, Plaintiffs' FAC is grounded in fraud.  *See Vess*, 317 F.3d at 1103.  Despite

2  this, they have failed to plead these allegations with sufficient particularity.  *See*

3  Fed. R. Civ. P. 9(b); *Stack*, 903 F.Supp., at 1367.  Accordingly, the FAC should be

4  dismissed in its entirety.  *See Vess*, 317 F.3d at 1107; *Bowyer*, 2020 WL 7238261,

5  at *13.  And even if Plaintiffs have only "allege[d] some fraudulent and some non-

6  fraudulent conduct," the noncompliant allegations must be stripped from the FAC.[8]

7  *Id.* At 1105.

8  ### III.  PLAINTIFFS OTHERWISE FAIL TO STATE A CLAIM

9       As just explained, Plaintiffs' claims fail because they are subject to the

10  pleading requirements of Rule 9(b), and fail to satisfy the pleading requirements of

11  that Rule.  But even if Plaintiffs' claims were not subject to Rule 9(b), they would

12  (for the reasons given below) still fail to state a claim.

13  ### A.  Elections Clause Claim

14       The Elections Clause of the United States Constitution states that "[t]he

15  Times, Places, and Manner of holding Elections for Senators and Representatives,

16  shall be prescribed in each State by the Legislature thereof."  U.S. Const., Art. I,

17  § 4, cl. 1.  In their first cause of action, Plaintiffs allege that "Defendants have

18  violated the Elections Clause by usurping the California State Legislature's

19  authority to set the manner of elections."  FAC at ¶ 167.  In so stating, Plaintiffs

20  appear to be referring to only two of the challenged actions—Defendant Newsom's

21  issuance of Executive Orders N-64-20 and N-67-20, and the Secretary of State's

22  issuance of the emergency regulations regarding signature verification, ballot

23  processing, and ballot counting.[9]  Even assuming that Plaintiffs have alleged a

24  sufficiently particularized injury under the Elections Clause, which they have not,

25          [8] If possible—although it may be difficult given Plaintiffs' shotgun pleading.
*See Teamsters Local 617*, 633 F.Supp.2d at 783.

26

27       [9]  A contradiction here is worth noting.  Plaintiffs simultaneously assert that Defendants Newsom and Weber have "usurped" the Legislature's Elections Clause authority by issuing orders and regulations related to the election, and ask this

28  Court to declare duly enacted elections legislation (AB 60, 306, 860, 1461, and 1921; SB 29, 397, 450, 503, and 523; and California Elections Code § 3020) to be unconstitutional.

this claim fails.  Nothing in these orders or emergency regulations impermissibly interferes with the time, places, and manner of conducting the election.

As an initial matter, Plaintiffs do not dispute that both the Governor's executive orders and the Secretary of State's emergency regulations were issued in adherence with the state statutory authority provided by the Legislature.  Governor Newsom's orders were issued under the broad authority granted by the California Emergency Services Act, see Cal. Gov't Code § 8550 et seq., and in particular Government Code sections 8567, 8571, and 8627.  During times of a state emergency—such as the COVID-19 pandemic—the Governor has explicit authority to "make, amend, and rescind orders and regulations necessary to carry out the provisions of this chapter."  Cal. Gov't Code § 8567(a); *see also id.* § 8627.  He also has authority to suspend regulatory statutes and statutes relating to state business.  *Id.* § 8571.  Even so, the orders that Defendant Newsom issued mandating the mailing of a VBM ballot to all registered California voters were subsequently enacted into law by the Legislature through SB 860.

The emergency regulations were issued pursuant to three state sources of authority and one federal source.  California Government Code section 12172.5, which outlines the duties of the Secretary of State, explicitly authorizes the Secretary to "adopt regulations to assure the uniform application and administration of state election laws."  Cal. Gov't Code § 12172.5(d).  California Elections Code sections 3026 and 14314 state that "[t]he Secretary of State shall promulgate regulations establishing guidelines for county elections officials relating to the processing" of both VBM ballots and provisional ballots.  Cal. Elec. Code §§ 3026, 14314.  And finally, federal law mandates that "[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used by the State."  52 U.S.C. § 21081(a)(6).  The Secretary of State included clear references to the

18

1   relevant sources of authority for each of the emergency regulations.  *See* State

2   Defs.' RJN at 4–19, Ex. 2

3       This state-law legislative authority is fatal to Plaintiffs' Elections Clause

4   claim.  "The dominant purpose of the Elections Clause was to empower Congress

5   to override state election rules, not to restrict the way States enact legislation."

6   *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2672

7   (2015).  In this context, as elsewhere, "it is characteristic of our federal system that

8   States retain autonomy to establish their own governmental processes."  *Id.* at 2673.

9   Accordingly, for purposes of the Elections Clause (or the analogous Electors

10  Clause), the term "Legislature" does "not mean the representative body alone," but

11  rather refers to "the exercise of lawmaking authority," so long as it is "performed in

12  accordance with the State's prescriptions for lawmaking."  *Id.* at 2666, 2668 & n17.

13  This requirement was satisfied here.

14      Nor (contrary to Plaintiffs' position) is there any other inconsistency between

15  the State Defendants' actions and state election law.  Plaintiffs allege that some of

16  the emergency regulations "directly contradict a number of state statutes intended to

17  ensure that VBM ballots are legally cast."  FAC at ¶ 80.  In evaluating a motion to

18  dismiss under Rule 12(b)(6), the Court need not accept the truth of legal assertions

19  cast as factual allegations, *see e.g.*, *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir.

20  2011), and should not do so here.  Plaintiffs' "factual" allegations on this topic are

21  better viewed as (inaccurate) legal assertions—in essence, legal arguments that the

22  Secretary of State violated state election laws and, in doing so, ran afoul of the

23  Elections Clause.  For instance, Plaintiffs allege that California Code of

24  Regulations, title 2, section 20991(b)(9) "allows the voter to submit virtually any

25  piece of paper as a VBM ballot," and that this regulation "contravene[s] [California

26  Elections Code] § 13200, which provides that ballots not printed according to

27  statutory specifications cannot be cast or counted and [California Elections Code] §

28  13002, which requires watermarking of printed ballots."  FAC at ¶ 90.  Aside from

the fact that Plaintiffs' do not actually allege that any voter did, in fact, vote in such a manner, the cited sections specifically regulate the *printing* and *purchasing* of ballots; they are not intended to address situations of nonconforming ballots.  And Plaintiffs fail to mention the portion of the regulation that states that "[i]f the voter's choice(s) can be determined, the ballot shall be duplicated pursuant to Election Code section 15210 to reflect the voter's choices and processed as if cast by the voter."  Cal. Code Regs., tit. 2, § 20991(b)(9).  California Elections Code section 15210 requires that "any ballot that is torn, bent, or otherwise defective shall be corrected so that every vote cast by the voter shall be counted by the automatic tabulating equipment," including through the creation of a "true duplicate copy."  Cal. Elec. Code § 15210.  The emergency regulation is therefore consistent with state law.

As another example, Plaintiffs allude to the "strict procedures to be followed for alternative ballots when a polling place exhausts its supply of ballots," alleging that the "required use of official ballots is further reinforced by [California Elections Code] § 14299."  FAC at ¶ 90.  What the Elections Code actually states is that in such situations, voters may cast "his or her vote immediately using an alternative procedure established prior to the election."  Cal. Elec. Code § 14299(b).  The statute does not state any guidelines for the "alternative procedure," besides mandating that it be approved by the Secretary of State.  *Id.* § 14299(c).

Plaintiffs have failed to allege a cognizable Elections Clause claim sufficient to survive a Rule 12(b)(6) motion.  Both the Governor and the Secretary of State possess statutory authority to issue the orders and regulations that Plaintiffs challenge.  Moreover, the "contradictions" that Plaintiffs allege between state election law and the emergency regulations simply are not, in fact, contradictions.  Aside from the alleged fraud scheme already discussed above, Plaintiffs present no other basis for finding that State Defendants have "usurped" the Legislature's authority under the Elections Clause, and the claim should be dismissed.

### B.   Equal Protection and Due Process Claims

On both their equal protection and due process claims, Plaintiffs allege constitutional violations based on their vote dilution theory.  FAC at ¶¶ 174–75, 189–90.  Yet despite voluminous case law analyzing the Fourteenth Amendment, Plaintiffs do not cite to a single case that endorses their approach—nor could they, because it does not exist.  Plaintiffs also allege differential treatment of voters, based both upon their county of residence and chosen voting method.  FAC at ¶¶ 176–78.  This theory similarly fails to survive even the barest of legal scrutiny.

As to their equal protection claim, Plaintiffs allege a diminution in value of certain votes.  FAC at ¶ 174.  But the supposed cause of this "injury"—State Defendants' "[intentional failure] to ensure that only legally cast VBM ballots were" counted in the election, see FAC at ¶ 175—does not involve any classification or disparate treatment among voters.  Rather, this alleged impact affects *every vote equally*: no vote would have greater or lesser weight on the basis of any discernable classification.  *Cf. Citizens for Fair Representation v. Padilla*, 815 F. App'x. 120, 1234 (9th Cir. 2020) (rejecting standing in equal protection claim raised on the basis of vote dilution).  Plaintiffs' "conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment." *Bowyer*, 2020 WL 7238261, at *5 (quoting *Bognet*, 980 F.3d at 355).

Plaintiffs further attempt to ground their equal protection claim on the allegation that State Defendants "appl[ied] disparate rules in different counties, causing the votes of some California citizens to be treated differently from those of others."  FAC at ¶ 176.  Yet Plaintiffs offer no support for this allegation, and they in fact challenge the emergency regulations that were promulgated for the explicit purpose of ensuring consistency in vote counting throughout the state.  *See* State Defs.' RJN at 5, Ex. 2.  Plaintiffs also allege differential treatment of voters based upon their voting method, arguing that those who prefer to vote in person were

"disproportionately burden[ed]" because while polling places closed at 8 p.m. on

Election Day, "mail boxes" were allegedly available until 11:59 p.m. and "drop

boxes" were unmonitored, so that "nothing prevented VBM voters from voting the

day after election day by dropping ballots in such boxes." *See* FAC at ¶¶ 154–58,

176–78; Notice of Errata, ECF No. 81.  In fact, VBM ballots mailed through the

postal service were required to be *postmarked* on or before Election Day, which

would not happen were a voter to place the ballot in a mail box after postal office

business hours.  And the drop boxes were "locked and covered or otherwise made

unavailable" at 8 p.m. on Election Day.  *See* 2 CCR 20136.

Even assuming the truth of Plaintiffs' allegations, such facts do not even

approach the level of an unconstitutional burden on voting.  The Ninth Circuit

addressed a similar issue in 2018, in the context of a challenge to the Voter's

Choice Act ("VCA").  Appellants in *Short v. Brown* sought a preliminary injunction

against enforcement of the new law, which established a county-by-county structure

that allowed voters in some counties to receive a VBM ballot automatically, while

requiring those in other counties to request a ballot.  Affirming the district court's

denial, the Ninth Circuit held that "[t]he VCA does not burden anyone's right to

vote.  Instead, it makes it easier for some voters to cast their ballots by mail . . . . To

the extent that having to register to receive a mailed ballot could be viewed as a

burden, it is an extremely small one, and certainly not one that demands serious

constitutional scrutiny." *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).  The

court continued: "[A]ppellants . . . have not even alleged—let alone introduced

evidence to demonstrate—that the VCA will prevent anyone from voting.  Nor have

the appellants cited any authority explaining how a law that makes it easier to vote

would violate the Constitution." *Id.* at 677–78.

Here, as in *Short*, Plaintiffs make no allegations that the alleged differential

treatment prevented even one person from voting.  Pursuant to some of the

legislation that Plaintiffs challenge as unconstitutional, *every* eligible, registered

voter in California received a VBM ballot for the November 2020 election. *Every* voter had the same choice of either voting by mail or voting in person. Treatment of voters in different counties was more consistent in 2020 than perhaps ever before—and was *certainly* more consistent than under the early VCA framework held to be constitutional in *Short*. Plaintiffs' claim cannot survive any scrutiny.

Turning to due process, Plaintiffs cite a wide array of cases in an attempt to marshal support for their theory. *See* FAC at ¶¶ 182–93. In the end, though, those citations provide little support for Plaintiffs' claim. As a general matter, the right to vote is fundamental, and it is protected by the Fourteenth Amendment. But Plaintiffs have not alleged that they were denied their right to vote, or that their votes were not counted. Again, their claim rests entirely upon their unrecognized theory of vote dilution, by which "fraudulent" votes were cast (with no allegations regarding how many, in which counties, or whether they were for or against Plaintiffs, for example), in turn diminishing the value of Plaintiffs' votes. But "vote dilution," as traditionally conceptualized and recognized by the courts, "refers to the idea that each vote must carry equal weight." *Rucho*, 139 S. Ct. at 2501. And even under Plaintiffs' version of facts, each vote *did* carry equal weight.

Plaintiffs largely rely on quotations from two Supreme Court cases in an attempt to support their theory. *See* FAC at ¶¶ 185–88. The first, *Anderson v. United States*, was a criminal appeal involving defendants who had been convicted under a federal statute for casting fictitious votes for federal, state, and local offices. *See* 417 U.S. 211 (1974). The excerpts that Plaintiffs cite are dicta, and the Court made no holding regarding the applicability of vote dilution as an injury sufficient to establish a violation of due process. *See id.* at 226–27; FAC at ¶¶ 186–87. The second is *Reynolds v. Sims*, a civil rights era case in which Chief Justice Warren authored the opinion holding that Alabama's proposed apportionment plans violated the Equal Protection Clause. *See* 377 U.S. 533 (1964). *Reynolds* is illustrative of exactly what Plaintiffs seem to be missing here—that "vote dilution,"

as understood in the context of the Fourteenth Amendment and civil rights, is when a "favored group has full voting strength," and "[t]he groups not in favor have their votes discounted." *Id.* at 555, n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).  It offers no support for either Plaintiffs' due process or equal protection claims against State Defendants.

Lastly, the FAC is completely unclear regarding which cause(s) of action would support a declaratory judgment finding unconstitutional Assembly Bills 60, 306, 1461, and 1921, and Senate Bills 29, 397, 450, 503, and 523.  *See* FAC at 50, ¶ E.  We address them here on the belief that Plaintiffs are alleging that each of these laws contribute to Plaintiffs' vote dilution theories under their equal protection and due process claims.  Like the appellants in *Short*, Plaintiffs have not "cited any authority explaining how a law that makes it easier to vote would violate the Constitution." *Short*, 893 F.3d at 677–78.  Moreover, SB 503 has not even been passed by the Legislature.  Plaintiffs' request for declaratory relief relating to these statutes should be denied.

### C.   Guarantee Clause Claim

As discussed above, see *supra*, I.C., it is well-established that claims raised under the Guarantee Clause are nonjusticiable political questions.  Accordingly, Plaintiffs' fourth cause of action also fails to state a cognizable claim upon which relief may be granted, and should be dismissed.

### IV.   THE ELEVENTH AMENDMENT BARS PLAINTIFFS' CLAIMS AGAINST GOVERNOR NEWSOM

Finally, even if Plaintiffs' claims were otherwise cognizable, Eleventh Amendment sovereign immunity would bar Plaintiffs' claims against the Governor.

Eleventh Amendment sovereign immunity bars suits against state officials in their official capacities.  *See, e.g.*, *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1111 (9th Cir. 2010); *see also Will v. Michigan State Dep't Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity . . . . is no

different from a suit against the State itself").  No exception to sovereign immunity applies here.  Plaintiffs do not (and could not) allege that Congress has abrogated the State's immunity, or that the State has waived it.  Nor does the *Ex Parte Young* exception to sovereign immunity apply here: that exception requires that "[t]he state official 'must have some connection with the enforcement of the [challenged] act.'" *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)).  "That connection 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (quoting *Coal.*, 674 F.3d at 1134).  But Plaintiffs do not allege that Governor Newsom has any such direct connection to the enforcement of the laws they challenge.  The Governor "is entitled to Eleventh Amendment immunity because his only connection to [the challenged state laws] is his general duty to enforce California law," which is insufficient to invoke *Ex Parte Young*.  *Ass'n des Eleveurs*, 729 F.3d at 943.

Accordingly, the claims against Governor Newsom should be dismissed.

## CONCLUSION

For the foregoing reasons, all claims against State Defendants should be dismissed with prejudice.

Dated:  April 5, 2021                              Respectfully submitted,

MATTHEW RODRIQUEZ
Acting Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General

RYAN A. HANLEY
Deputy Attorney General
*Attorneys for State Defendants*