JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTION INTEGRITY PROJECT CALIFORNIA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SHIRLEY WEBER, California Secretary of State, et al.,<br><br>Defendants. | Case No.  2:21-cv-00032-AB-MAA<br><br>**ORDER GRANTING DEFEDANTS' MOTIONS TO DISMISS [DKT. NOS. 84, 85]** |

Before the Court is Defendants' Rebecca Spencer, Riverside County Registrar of Voters; Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk; Mark A. Lunn, Ventura County Registrar of Voters; Bob Page, San Bernardino County Registrar of Voters; Courtney Bailey-Kanelos, Sacramento County Registrar of Voters; Tim Dupuis, Registrar of Voters for the County of Alameda; Deborah Cooper, Contra Costa County Registrar of Voters; Shannon Bushey, Registrar of Voters for the County of Santa Clara; Joe Paul Gonzalez, San Benito County Clerk-Auditor-Recorder-Registrar of Voters; Gail Pellerin, Santa Cruz County Registrar of Voters; James A. Kus, County Clerk/Register of Voters for the County of Fresno;

1.

Neal Kelley, Registrar of Voters for the County of Orange, and Claudio Valenzuela, Registrar of Voters for Monterey County ("County Defendants") Motion to Dismiss (Dkt. No. 84, "County Motion") and Defendants' Secretary of State Dr. Shirley Weber, Governor Gavin Newsom, and Acting Attorney General Matthew Rodriguez ("State Defendants" and together with County Defendants, "Defendants") Motion to Dismiss (Dkt. No. 85, "State Motion," and together with the County Motion, "Motions").  Plaintiffs Election Integrity Project California Inc. ("EPICa") and James P. Bradley, Aja Smith, Eric Early, Alison Hayden, Jeffrey Gorman, Mark Reed, Buzz Patterson, Mike Cargile, Kevin Cookingham, Greg Raths, Chris Bish, Ronda Kennedy, Johnny Nalbandian ("Candidate Plaintiffs" and together with EPICa, "Plaintiffs") opposed both Motions, (Dkt. No. 88, "Opp'n"), and Defendants replied. (Dkt. Nos. 90, "County Reply", Dkt. No. 92, "State Reply").  Plaintiffs filed a sur-reply.  (Dkt. No. 101, "Plaintiff Sur-Reply").  The Court heard oral argument on May 14, 2021 and took the matter under submission.  Dkt No. 97.  For the following reasons, the Court **GRANTS** the Motions.

## I. BACKGROUND

### a. Factual Background

Plaintiffs are EPICa, a non-profit corporation and thirteen congressional candidates.  Defendants are California's Governor, Secretary of State, Attorney General, and the Registrar of Voters for thirteen counties.  The case arises from Defendants' allegedly unconstitutional election processes, both during the 2020 election and in future elections.  Plaintiffs allege that California's "unconstitutional statutes, regulations, executive orders, and voting practices . . . create an environment in which elections could be manipulated and eligible voters of all political viewpoints disenfranchised." (FAC, ¶ 3).  Plaintiffs cite numerous specific concerns including, but not limited to:

- The "near-universal vote-by-mail ('VBM') balloting, while eliminating chain-of-custody and signature verification protections, treating in-person voters differently from VBM voters, and sending ballots to large numbers of ineligible voters." (FAC, ¶ 1).
- "Eviscerated protections on in-person voting" (FAC, ¶ 6).
- "Caus[ing] VBM and in-person voters to be treated differently, causing disproportionate harm to in-person voters" (FAC, ¶ 6).
- "Implement[ing] laws and procedures that automatically add non-citizens to voter rolls and protect against detection and prosecution of noncitizen voting" (FAC, ¶ 6).
- "Fail[ing] to comply with federal laws requiring maintaining accurate voter rolls, allowing deceased persons, non-citizens, non-residents, and other ineligible voters to remain on rolls and receive ballots." (FAC, ¶ 6).
- Emergency regulations in response to COVID-19. (FAC, ¶ 7).
- Failing to permit meaningful observation of vote counting. (FAC, ¶ 9).
- In Contra Costa County, the data tape in one poll center listed 96 votes for President Trump, but the final report listed 95 votes for President Trump. Occurrences such as this apparently happened in at least three other cases. (FAC, ¶ 123).

### b. Procedural Background

On January 4, 2021, Plaintiffs filed this action. (Dkt. No. 1). A day later, Plaintiffs filed an application for a temporary restraining order, seeking preservation of election related materials. (Dkt. No. 21). On January 11, 2021, the Court denied Plaintiffs' application. (Dkt. No. 35). On March 8, 2021, Plaintiffs filed their First Amended Complaint, adding additional plaintiffs and facts, expanding upon legal claims, and amending their prayer for relief. (Dkt. No. 68, "FAC"). In their FAC, Plaintiffs allege injuries under four provisions of the United States Constitution: (1)

the Elections Clause, (2) the Equal Protection Clause, (3) the Due Process Clause, and (4) the Guarantee Clause. (*See* FAC). Thereafter, State and County Defendants moved to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") and 12(b)(6) ("Rule 12(b)(6)"). *See* Motions.

## II. STATE DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation and quotation marks omitted). A court is, however, entitled to consider (1) documents incorporated into the complaint by reference and (2) matters subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may only take judicial notice of facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b).

Here, State Defendants ask the Court to take judicial notice of public records and government documents including press releases and legislative documents all of which are available via a public webpage. *See* Request for Judicial Notice, Dkt. No. 85-2. Plaintiffs did not oppose this request. The Court may take judicial notice of matters of public record, including government documents, press releases, and legislative materials. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 n.5 (9th Cir. 2018) (taking judicial notice of "government documents, court filings, press releases, and undisputed matters of public record"). Accordingly, State Defendants' request is **GRANTED**.

## III.   LEGAL STANDARD

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction. A Rule 12(b)(1) challenge may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction. *See Savage v.*

*Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

## IV. DISCUSSION

This case begins and ends with Article III standing. Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies." U.S. Const. Art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, ─── U.S. ───, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) ("*Spokeo II*"). "[A] plaintiff seeking relief in federal court must first demonstrate … a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam). "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Gill v. Whitford*, 138 S. Ct. 1916, 1923, 201 L. Ed. 2d 313 (2018). To establish standing, a plaintiff has the burden of clearly demonstrating that he or she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. 2197); *accord Kokkonen v. Guardian Life*

5.

*Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo II,* 136 S. Ct. at 1548 (*quoting Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). "When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Id.* The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way." *Raines v. Byrd*, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Rule 12(b)(1).

**A. Plaintiffs' Equal Protection and Due Process Claims**

With respect to Plaintiffs Equal Protection and Due Process claims, Plaintiffs' alleged injury-in-fact is vote dilution—that the value of their votes and the candidates' supporters' votes was diminished by Defendants' various actions. (FAC at ¶¶ 174–75, 188–90.) More specifically, Plaintiffs allege differential treatment between voters in different counties, as well as between VBM and in-person voters. (FAC at ¶¶ 176–78.)

In *Baker v. Carr*, the Supreme Court stated that "[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false

6.

tally." 369 U.S. at 208; *see also Anderson v. United States*, 417 U.S. 211, 227, 94 S. Ct. 2253, 2263–64, 41 L. Ed. 2d 20 (1974) (internal citation omitted) ("Every voter . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). However, this path to standing does not apply whenever a plaintiff believes votes have been diluted. In *Baker*, vote dilution occurred because the Tennessee legislature failed to reapportion legislative districts after over sixty years of population growth and movement. *Baker*, 369 U.S. at 191. This "irrational disregard of the standard of apportionment prescribed by the State's Constitution" led to "a gross disproportion of representation to voting population." *Id.* at 207. Just two years after *Baker*, the Court heard another vote dilution case again premised on unequal legislative districts. *See Reynolds v. Sims*, 377 U.S. 533 (1964). In this case, the Court found key considerations in this vote dilution theory to be whether there was invidious discrimination with "regard to race, sex, economic status, or place of residence," as well as whether "the rights allegedly impaired are individual and personal in nature." *Id.* at 561. Further, vote dilution was defined as "[where a] favored group has full voting strength . . . [and] [t]he groups not in favor have their votes discounted." *Id.* at 555 n.29. Together, *Baker* and *Reynolds* show that in order to show standing, injuries of vote dilution require that certain votes actually be *weighted differently* and that one group's votes be impermissibly granted less value. Otherwise, the asserted constitutional harm is just a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens, [and] that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

The Supreme Court continues to decline to extend standing to plaintiffs asserting objections to state election laws on generalized vote dilution theories. *See Sinkfield v. Kelley*, 531 U.S. 28, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (majority white voters lacked standing to complain of unlawful racial practices to which they

7.

had not been subjected); *Gill v. Whitford*, –– U.S. ––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (citing *Reynolds*, 377 U.S. at 533). Recently, district courts have likewise found that a theory of vote dilution premised on a generalized concern with election administration is not a valid path to standing. *See e.g.*, *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *5 (D. Ariz. Dec. 9, 2020) ("As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud."); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020) (dismissing for lack of standing because voters who suffer the same incremental dilution caused by some fraudulent vote or administrative process have experienced a generalized injury unreviewable by the courts); *Wood v. Raffensperger*, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *4 (N.D. Ga. Dec. 28, 2020) (dismissing plaintiff's theory of vote dilution because allegations of "unlawful or invalid ballots dilute the lawful vote of *every* Georgia citizen.").

Here, Plaintiffs do not show that the Defendants' variations in voting procedure amount to more than a generalized injury. Plaintiffs have not alleged to be part of any disadvantaged group—nor do they claim to be since they purport to be representing the rights of all eligible voters—and Plaintiffs fail to adequately allege that there was a group of voters whose votes were weighted differently than other groups as a result of Defendants' alleged actions. Plaintiffs state that Defendants' actions "treat[ ] in-person voters differently from VBM voters." However, this theory of a potentially harmed group does not withstand scrutiny. Voters who prefer to vote by mail are nothing like the groups with a shared immutable characteristic traditionally protected by law. Alternatively, Plaintiffs also suggest that "[the voting system] endangers many of California's most vulnerable populations, including the young, the elderly, and non-citizens," (FAC at ¶ 1), and "disproportionately burdens the ability of Black and other minority voters to cast their votes, because data shows these communities

8.

have historically relied on in-person voting to a greater degree than other groups." (FAC at ¶ 157.) However, Plaintiffs repeatedly confirm that this lawsuit is not on behalf of vulnerable or minority voters, but rather "eligible voters of all political viewpoints." (FAC at ¶ 3.)

    The Court agrees with Defendants that at base, Plaintiffs' allegations amount to an incremental undermining of confidence in the election results, past and future. Such a generalized grievance is insufficient for standing. Ultimately, and as our sister courts have found, a vote cast by fraud, mailed in by the wrong person, or otherwise compromised during the elections process has an impact on the final tally and thus on the proportional effect of *every* vote, but no single voter is specifically disadvantaged. *See Martel*, 487 F. Supp. 3d at 252. Therefore, Plaintiffs fail to show that the injury was "concrete and particularized."

    Additionally, Plaintiffs' alleged injury fails for lack of actuality and imminence. As stated, for an injury to be sufficiently imminent, it must be "*certainly* impending." *Clapper*, 568 U.S. at 409. "Allegations of possible future injury are not sufficient." *Id.* In their Opposition, Plaintiffs list a variety of cases to support the proposition that a party has standing on the basis that an existing voting system creates a substantial risk of future injury. (*See* Opp'n at 24). These cases dealt with issues such as poll-taxes, a ban on write-in candidates, a durational residency requirement on voters, racially gerrymandered districts, a primary system which counted votes differently depending on county, and whether to count provisional ballots cast in the wrong precinct. Yet, the concerns in these cases were either actual or imminent; they were certainly not conjectural. These past cases are significantly dissimilar from the present allegations of future, potential fraud. Assuming all allegations to be true, the Court is still left to speculate whether the present voting system will lead to concrete and particularized vote dilution which results in a specific group having their votes weighted differently. Will these emergency policies remain in place once the

9.

COVID-19 pandemic subsides?  Even if these policies continue will they actually lead to fraud?  Will that fraud impact specific, individual voters?  Therefore, an actual and imminent injury is not shown because the FAC relies on conjecture that this injury will continue to inflict harm.

Accordingly, Plaintiffs have not alleged a concrete and particularized injury that is both actual and imminent, and thus, have not adequately alleged an injury-in-fact sufficient for standing.

The Court will also consider whether the separate plaintiff groups have a specialized basis for standing, separate from the California voters for whom these claims are brought.  First, the Candidate Plaintiffs are congressional candidates who lost their respective races in the November 2020 election.  The Candidate Plaintiffs fail to allege any personal stake as they have failed to assert that the outcome of their individual contests would have changed absent the alleged voting irregularities or errors.  Additionally, for the same reasons discussed above, alleging that the Candidate Plaintiffs plan to be candidates in future congressional elections where they suspect a possibility of future vote dilution is not sufficiently concrete to support standing.  Again, "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409.  Second, EPICa does not demonstrate organizational standing separate and apart from the voters they represent.  To demonstrate organizational standing, plaintiffs must demonstrate that the injury caused a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  A key factor is whether the Plaintiff expended resources that "would not otherwise have expended." *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015).  Courts however do not allow plaintiffs to "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly

impending." *Clapper*, 568 U.S. at 402. EPICa claims that the widespread opportunities for fraud have caused, and will continue to cause, the organization "to expend significant additional resources to facilitate observation of voting practices and document obstruction and irregularities." (FAC, at ¶ 59). Again, this alleged increased likelihood of fraud is speculative. For instance, and as stated above, EPICa does not know definitively whether the expanded VBM and other emergency procedures are a permanent part of California's voting system or simply a temporary COVID-19 policy. Therefore, neither Candidate Plaintiffs nor EPICa have specialized standing for their Equal Protection and Due Process claims separate from the represented voters.

Accordingly, Plaintiffs Equal Protection and Due Process claims must be dismissed.

**B. Elections Clause Claim**

Plaintiffs' FAC also alleges that Defendants violated the Elections Clause by "usurping the California State Legislature's constitutional authority to set the manner of elections." (FAC, ¶ 147.) Defendants argue that Plaintiffs do not have standing to assert such a claim. The Court agrees with Defendants.

The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. Art. I, § 4, cl. 1. The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations. *Colegrove v. Green*, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). The Supreme Court has held that private citizens do not have standing to assert a claim under the Elections Clauses absent a "particularized stake in the litigation." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (claims that are "plainly undifferentiated and common to all members of the public" are generalized grievances

11.

that do not confer standing).

Plaintiffs do not adequately allege such a stake. Plaintiffs vote dilution claims underlying their Elections Clause claim are the same generalized grievances underlying their Equal Protection and Due Process claims. Where, as here, the injury alleged by plaintiffs is that Defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance*, 549 U.S. at 442, 127 S.Ct. 1194. Plaintiffs' failure to allege any concrete injuries in this matter are fatal to their Election Law claim. Accordingly, Plaintiffs' Election Law claim must be dismissed.

**C. Guarantee Clause Claim**

Finally, Plaintiffs' FAC alleges that Defendants violated the Guarantee Clause "by implementing laws, regulations, orders and voting practices, and conducting elections, so as to deny California and its citizens, including Plaintiffs, a republican form of government." (FAC, ¶ 196.) Defendants argue again that Plaintiffs do not have standing assert such a claim. The Court agrees again.

Article IV, Section 4 of the United States Constitution states: "The United States shall guarantee to every State in this Union a Republican Form of Government." The Supreme Court has repeatedly stated that a claim arising under this clause is non-justiciable as it is considered a political question. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506, 204 L. Ed. 2d 931 (2019) ("This Court has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim."). Despite this approach clearly articulated by the Court, Plaintiffs cite a First Circuit decision which suggests that in certain extreme situations the Guarantee Clause could become a vehicle to achieve standing. *See* Opp'n, at 45; *Largess v. Supreme Jud. Ct. for State of Massachusetts*, 373 F.3d 219, 229 (1st Cir. 2004) ("Perhaps, in unusual and extreme cases, such as the establishment of

a monarchy by a state in place of a republican form of government, individuals could utilize the federal courts to enforce the Guarantee Clause. "). Plaintiffs contend that the recent "essentially unlimited power" by the Governor and the Secretary of State is sufficiently extreme to qualify. (Opp'n, at 45). While Plaintiffs appear to hold concerns regarding California's system of democracy, the Court is not convinced nor do Plaintiffs adequately allege that the emergency policies at issue break from a republican form of government.

Accordingly, the Guarantee Clause claim is not justiciable and must be dismissed.

## V. CONCLUSION[1]

For the foregoing reasons, Defendants Motion to Dismiss all claims is **GRANTED.** This entire action is therefore dismissed, with prejudice, for lack of subject matter jurisdiction.

Dated: June 14, 2021

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

---

[1] Because the Court finds there is no standing and thus no subject matter jurisdiction pursuant to Rule 12(b)(1), it need not decide Defendants' other grounds for dismissal.