Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
Julianne Fleischer, Esq. CA Bar No. 337006
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:   (951) 600-2733
Facsimile:   (951) 600-4996
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTION INTEGRITY PROJECT® CALIFORNIA, INC; JAMES P. BRADLEY, MARK REED; BUZZ PATERSON; MIKE CARGILE; RONDA KENNEDY,<br><br>     Plaintiffs,<br><br>  v.<br><br>SHIRLEY WEBER, CALIFORNIA SECRETARY OF STATE; ROB BONTA, CALIFORNIA ATTORNEY GENERAL; RIVERSIDE COUNTY REGISTRAR OF VOTERS REBECCA SPENCER; LOS ANGELES COUNTY REGISTRAR OF VOTERS DEAN C. LOGAN; VENTURA COUNTY REGISTRAR OF VOTERS MICHELLE ASCENCION; SAN BERNARDINO COUNTY REGISTRAR OF VOTERS STEPHENIE SHEA; MONTEREY COUNTY REGISTRAR OF VOTERS GINA MARTINEZ; SACRAMENTO | Case No.  2:21-cv-32-AB-MAA<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

COUNTY REGISTRAR OF
VOTERS HANG NGUYEN;
ALAMEDA COUNTY REGISTRAR
OF VOTERS TIM DUPUIS;
CONTRA COSTA COUNTY
REGISTRAR OF VOTERS
KRISTIN CONNELLY; SANTA
CLARA COUNTY REGISTRAR OF
VOTERS SHANNON BUSHEY;
SAN BENITO COUNTY
REGISTRAR OF VOTERS
FRANCISCO DIAZ; SANTA CRUZ
COUNTY REGISTRAR OF
VOTERS TRICIA WEBBER;
FRESNO COUNTY REGISTRAR
OF VOTERS JAMES A. KUS;
ORANGE COUNTY REGISTRAR
OF VOTERS BOB PAGE; KERN
COUNTY REGISTRAR OF
VOTERS AIMEE ESPINOZA; SAN
LUIS OBISPO REGISTRAR OF
VOTERS ELAINA CANO,

          Defendants.

Plaintiffs state for their Second Amended Complaint against Defendants as follows:

## NATURE OF THE ACTION

1.     Our Constitutional Republic is founded on the sacred right of all eligible citizen to cast an equal vote to determine who will represent them in government. The Constitution of the United States guarantees this right through the Equal Protection and Due Process Clauses of the Fourteenth Amendment and, in the case of Federal congressional elections, through the Elections Clause. (Art. I, § 4, cl. 1).  No right is more sacred than the right to vote, as it involves "matters close to the core of our constitutional system." *Carrington v. Rash,* 380 U.S. 89, 96 (1965).

2.     Over the past three decades, Defendants have systematically eroded these rights by an onslaught of unconstitutional statutes and emergency regulations, which, taken together, have led to widespread election irregularities across California counties. California has inexplicably chosen a path that jeopardizes election integrity and undermines ballot security by legalizing unrestrained and unrestricted ballot harvesting, eliminating chain of custody, solidifying vote-by-mail ("VBM"), gutting signature verification requirements, and failing to maintain accurate lists of eligible voters.

3.     Specifically, California laws, regulations, and guidelines have:

A.     Eliminated absentee ballots and solidified universal VBM, a less-secure balloting process that does not require voters to present identification to request a ballot;

B.     Legalized unrestrained and unrestricted ballot harvesting by removing mandates regarding chain of custody, unleashing the potential exploitation of vulnerable populations such as non-citizens, college students, and senior citizens;

C.     Allowed counties to treat VBM and in-person votes differently, resulting in disproportionate harm to in-person voters; and

D.     Failed to comply with federal laws requiring the maintenance of accurate voter rolls, allowing deceased persons, non-residents, duplicates, and other ineligible registrants to remain on rolls and receive ballots.

4.     In 2020, California implemented new "emergency" election regulations without public comment or legislative authority of the State and many of its counties, often under the pretext that they were necessary due to COVID-19.  These "emergency" regulations are still in effect today and do not require counties to apply uniform and secure signature verification and ballot remaking procedures.

5.     California's current laws and regulations lack uniform and robust procedures and have thus granted county officials considerable discretion in implementation of election laws and procedures.  Consequently, widespread

irregularities have occurred across California counties, culminating in the 2020 election, when California implemented universal VBM and lax signature verification requirements.

6.     In the 2020 election cycle, the Election Integrity Project California (EIPCa) collected over 600 affidavits from citizen observers who observed ballots left unsecured, election workers spending inadequate time observing signatures, and election workers remaking ballots and running them through vote machines with no oversight and outside of the purview of citizen observers.

7.     EIPCa has continued to collect thousands of sworn affidavits from trained volunteer observers, citizen observers, witnesses, and from people who moved to other states attesting to similar irregularities during 2021 and 2022.

8.     The irregularities that continue to arise across California counties are the result of California's lack of uniform and secure election vote-counting procedures, including universal VBM, lax signature verification requirements, and a lack of chain of custody. Although the Defendant County Registrars implement their own procedures, their lack of uniform and secure procedures can be traced to California's voting laws and regulations. The situation is exacerbated by the lax maintenance of voter lists that allows potentially ineligible persons to vote.

9.     Thus, Plaintiffs seek to enjoin California's election laws and regulations and to declare the current election laws, regulations, and procedures unconstitutional. Plaintiffs will seek all available discovery methods, including an audit.

10.     This nonpartisan lawsuit seeks to restore confidence and integrity in California's election process. The remedies sought are essential in ensuring the integrity of future elections for all citizens. Election integrity and transparency are critical for the enfranchisement of all eligible voters, regardless of party affiliation or political view.

# **PARTIES**

## I.  **Plaintiffs**

11.  Plaintiff Election Integrity Project California, Inc. (EIPCa) is a California non-profit public benefit corporation committed to defending the civil rights of U.S. citizens to fully participate in the election process under Federal and state law. EIPCa is a non-partisan organization qualified under § 501(c)(3) of the Internal Revenue Code. As a non-partisan organization, EIPCa does not participate in any political campaign, nor does it endorse any candidate for public office. EIPCa focuses on the voting process, so that every vote is lawfully cast and accurately counted. EIPCa believes that the electoral process is the cornerstone of self-governance and the preservation of our Constitutional Republic. EIPCa takes no position on which candidate should prevail in a fair, honest, and transparent election. Candidates for public office, regardless of their political party affiliation, who seek genuine election integrity in our Constitutional Republic could cooperate with EIPCa in questioning and investigating election procedures. That cooperation does not constitute an endorsement by EIPCa of any particular candidate. Findings of defects or illegalities in election procedures have independent nonpartisan significance, whether or not any particular findings ultimately affect the outcome of an election.

12.  EIPCa's efforts are statewide. Since 2010, EIPCa has operated in 43 California counties, constituting over 85% of California's population. Specifically, EIPCa operates in the counties listed in this lawsuit.

13.  EIPCa accomplishes its mission by, among other things, education, research, legislative advocacy regarding the civil rights of U.S. citizens to fully participate in the election process, and investigations into the defects and illegalities in elections.

14.  Additionally, EIPCa accomplishes its mission through observation of election procedures. Volunteer citizen observers for EIPCa agree to exercise their civil rights to observe election procedures under the guidance and for the benefit of EIPCa's

research. Volunteers generally undergo extensive training on California election procedures and issues. Volunteers then schedule their time to observe with their county coordinator who staffs the county hotline to address issues that are called in from the county level volunteers. Volunteers agree that what they observe is confidential and for the benefit of EIPCa and may be used for legal procedures. EIPCa does not require membership dues but many volunteers choose to donate funds to EIPCa. Overall, these volunteers are dedicated to EIPCa and anticipate that EIPCa will use their observations to advocate for greater election integrity. Their personal connection and commitment are far more profound than those of most members of nonprofit organizations, such as a recreational hiker who pays annual dues to become a member of the Sierra Club.

15.   EIPCa is directly harmed by California's voting laws, regulations, and procedures. In EIPCa's early years, elections were a single day, with two weeks of provisional and absentee ballot processing. This schedule required less than thirty days of work by EIPCa – including training of citizen observers, observation of election day, and a roughly two-week observation period of provisional and absentee ballot processing. EIPCa spent the remainder of the year engaged in research regarding the state and county voter rolls; research of the voting machines; research of state and federal election law; legislative advocacy; and other educational efforts.

16.   Since California expanded VBM, gutted signature verification requirements, and limited chain of custody, EIPCa has diverted its resources from most of their programs to almost exclusively election observation efforts. Similarly, EIPCa has refused its voter list research to urgent monitoring and reporting of thousands of suspected ineligible registrants who will be mailed ballots in upcoming elections. Again, EIPCa has had to divert its attention to observation efforts because of the current laws and regulations in place.

17.   Since 2020, EIPCa now commits a minimum of three months to their election observation program, including observation of a now 60-day long election season. The expansive work listed above is critical to EIPCa's mission. However, given

EIPCa's limited resources and California's election laws and procedures, EIPCa only has the capacity to focus on election process observation efforts and pre-election list analyses.

18.    Plaintiff James P. Bradley is a resident and registered voter in Orange County.

19.    Plaintiff Mark Reed is a resident and registered voter in Madera County.

20.    Plaintiff Buzz Patterson is a resident and registered voter in Ventura County.

21.    Plaintiff Michael Cargile is a resident and registered voter in Los Angeles County.

22.    Plaintiff Ronda Kennedy is a resident and registered voter in Ventura County.

## II.    Defendants

23.    Defendant Shirley Weber is the Secretary of State of the State of California. Defendant Weber is named in her official capacity. During many of the events alleged herein, Alex Padilla was serving as California's Secretary of State. However, on or about January 18, 2021, he resigned his position as Secretary of State to take up an appointment to the U.S. Senate.   Defendant Weber replaced former Secretary of State Padilla.

24.    Defendant Rob Bonta ("Bonta") is the Attorney General of the State of California.  Defendant Bonta is named in his official capacity.

25.    Defendant Rebecca Spencer ("Spencer") is the Registrar of Voters for Riverside County, California. Defendant Spencer is named in her official capacity.

26.    Defendant Dean C. Logan ("Logan") is the Registrar of Voters for Los Angeles County, California. Defendant Logan is named in his official capacity.

27.    Defendant Michelle Ascencion ("Ascencion") is the Registrar of Voters for Ventura County, California. Defendant Ascencion is named in her official capacity.

28.     Defendant Stephenie Shea ("Shea") is the Registrar of Voters for San Bernardino County, California. Defendant Shea is named in her official capacity.

29.     Defendant Gina Martinez ("Martinez") is the Registrar of Voters for Monterey County, California. Defendant Martinez is named in her official capacity.

30.     Defendant Hang Nguyen ("Nguyen") is the Registrar of Voters for Sacramento County, California. Defendant Nguyen is named in her official capacity.

31.     Defendant Tim Dupuis ("Dupuis") is the Registrar of Voters for Alameda County, California.  Defendant Dupuis is named in his official capacity.

32.     Defendant Kristin Connelly ("Connelly") is the Registrar of Voters for Contra Costa County, California. Defendant Connelly is named in her official capacity.

33.     Defendant Shannon Bushey ("Bushey") is the Registrar of Voters for Santa Clara County, California. Defendant Bushey is named in her official capacity.

34.     Defendant Francisco Diaz ("Diaz") is the Registrar of Voters for San Benito County, California. Defendant Diaz is named in his official capacity.

35.     Defendant Tricia Webber ("Webber") is the Registrar of Voters for Santa Cruz County, California. Defendant Webber is named in her official capacity.

36.     Defendant James A. Kus ("Kus") is the Registrar of Voters for Fresno County, California. Defendant Kus is named in his official capacity.

37.     Defendant Bob Page ("Page") is the Registrar of Voters for Orange County, California. Defendant Page is named in his official capacity.

38.     Defendant Aimee Espinoza ("Espinoza") is the Registrar of Voters for Kern County, California. Defendant Espinoza is named in her official capacity.

39.     Defendant Elaina Cano ("Cano") is the Registrar of Voters for San Luis Obispo County, California. Defendant Cano is named in her official capacity.

40.     Defendants are empowered with expansive authority to administer the election laws of the State of California. Specifically, the Secretary of State is statutorily delegated the "chief elections officer of the state" to "administer the provisions of the Elections Code." Cal. Gov't Code § 12172.5. The Secretary of State holds the authority

to "adopt regulations to ensure the uniform application and administration of state election laws." Cal. Gov't Code § 12172.5. The Secretary of State's role includes promulgating "regulations establishing guidelines for county elections officials related to the processing of vote by mail ballots," Elections Code § 3026, and authorizing regulations relating to processing of provisional ballots. 2 C.C.R §§ 20992, 20993.

41.     The County Registrar of Voters "hav[e] jurisdiction over elections within any county, city, or district within the state." Cal. Elec. Code § 320. The County Registrar of Voters' general powers and duties are set forth in Cal. Gov't Code §§ 26801; 26802. The County Election Boards are executive agencies that carry out legislative mandates, and their duties concerning the conduct of elections are ministerial, acting upon information received from the Secretary of State. *Felt v. Waughop*, 193 Cal. 498, 504, 225 P. 862, 864 (1924).

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction under 28 U.S.C. 1331, which provides, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

43.     This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States and the United States Congress.  See *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

44.     Jurisdiction to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

45.     This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorneys' fees and costs under

46.     Venue is proper under 28 U.S.C. 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" within the Central District of California as some Plaintiffs and Defendants reside in the Central District.

47.    In addition, EIPCa conducts a significant amount of its observation efforts in the Central District of California, and its volunteer citizen observers reside and vote in the Central District of California.

## FACTUAL ALLEGATIONS

**I.    California Has Systemically Undermined the Integrity of California's Elections through Decades of Unconstitutional Laws.**

48.    Over the years, California has passed election laws, orders, and regulations under the guise of increasing voter participation. Although the goal is laudable, these laws and regulations have systemically undermined election integrity and enabled pervasive irregularities. For instance, these laws and regulations expanded VBM, gutted signature verification requirements, eliminated chain of custody, and legalized unrestrained and unrestricted ballot harvesting and therefore the exploitation of vulnerable populations.

49.    Cumulatively, these changes in the law and election procedures have allowed voter rolls to encompass large numbers of deceased persons, non-residents, duplicates, and other potentially ineligible registrants who, nonetheless, receive VBM ballots and who have often voted in elections according to state elections data.

50.    The changes in the law to send VBM ballots to all registered voters created a process where known ineligible voters (including deceased persons, non-citizens, and non-residents) were sent ballots. For instance, one voter in Alameda County reported receiving a VBM ballot for the 2020 election for her deceased husband.

51.    In 1993, Congress enacted the National Voter Registration Act ("NVRA") 52 U.S.C. § 20501, et seq. with the stated purposes of: (1) "increase[ing] the number of eligible citizens who register to vote"; (2) "enhance[ing]" their "participation … as voters in elections for Federal office"; (3) "protect[ing] the integrity of the electoral process"; and (4) "ensur[ing] that accurate and current voter registration rolls are maintained." *Id*., § 20501(b). Goals 1 and 2 were to be realized, in part, by allowing voter registration through state departments of motor vehicles ("DMVs"). Goals 3 and

4 were embodied in Section 8, which requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or a change in the residence of the registrant and specifies a procedure for doing so.

52.     California, however, has failed to comply with Section 8 of the NVRA, interpreting its requirement to remove ineligible voters from voter rolls as permissive, rather than mandatory. In other words, California massively expanded its voter rolls through DMV registration but failed to remove ineligible voters.[1] California's New Motor Voter Program made DMV registration automatic. This allows for duplicated registrations and non-citizen registrations.

53.     In 1998, California exacerbated the problems created by ineligible voters on its rolls by eliminating the absentee balloting process. With absentee ballots, voters had to present identification and apply for a ballot. The VBM balloting process automatically sends ballots to registrants prior to every election and does not require verification that the voters are eligible to vote, residents of California, or deceased. Since 1998, approximately 75% of voters in California regularly received permanent VBM ballots even before the most recent "emergency" orders.  In many cases, this was not the voter's choice. Two Presidential Election Commissions (2001 and 2005) have determined that VBM ballots do not satisfy five requirements for fair and honest elections and facilitate election manipulation and fraud.

54.     In 2002, the Federal government passed the Help America Vote Act (HAVA), which required the establishment of a statewide voter database. California was one of the last states to come into compliance with this mandate, only doing so in 2016 after the California Advisory Committee to the U.S. Commission on Civil Rights called for a hearing as a result of EIPCa providing voter roll research and observation

---

[1] In 2018, EIPCa entered into a settlement with the Los Angeles County Registrar and former Secretary of State Padilla that, among other things, required removal of 1.5 million inactive registrants from the voter list due to their failure to comply with Section 8 of the NVRA. That settlement is not at issue in this case.

documentation from the 2012, 2013 (special election), and 2014 elections. Even then, there were issues with California's compliance with HAVA, including the manner in which the contract was awarded (no-bid, non-competitive award), the poor reputation of the company awarded the contract, the lack of transparency with regard to the database certification, and EIPCa's revelations of serious and potentially disqualifying defects in the database (which continue even now).

55.     In 2012, California passed Senate Bill (SB) 397, allowing online voter registration without effective controls against ineligible registrations. In its first month, 6,080 duplicate registrations through the new online system were recorded in just nine counties, 113 of whom appear to have voted twice in the November 2012 election.

56.     In 2016, California passed SB 450, otherwise known as the Voter's Choice Act, which eliminated neighborhood precinct voting and reduced the number of in-person polling places. The bill no longer required a voter, who received a VBM ballot but sought to vote in person, to surrender the VBM ballot at the voter's home precinct and clearly mark it as "surrendered."  Instead, an electronic system was put in place, which purportedly keeps track of invalidated VBM ballots belonging to in-person voters.

57.     In 2020, EIPCa observers documented election workers telling in-person voters to simply throw their VBM ballots and envelopes into trash cans with no invalidating markings. It is unclear whether any of these discarded ballots could have been subsequently removed from the trash, filled out, and counted in the vote totals.

58.     Also in 2016, California passed Assembly Bill (AB) 1921, allowing an unlimited number of VBM ballots to be turned in by anyone, regardless of relationship to the voter. This bill eliminated mail ballot chain of custody and legalized wholesale ballot harvesting, by which one person can collect an unlimited number of ballots and turn them in. Because of the extreme potential for fraud, this practice is restricted or prohibited in most states and considered a felony in many. In states where ballot harvesting is allowed, voter fraud operations have been uncovered, including cash

payments for votes and ballot harvesters preying upon and deceiving vulnerable populations like the elderly, minority voters, non-citizens, and young voters.

59.    In 2017, California further eroded election integrity by passing SB 286, under which voters are no longer required to state their name and address aloud and have it repeated by election workers when voting in person as was previously required under California Elections Code § 14216. The bill further facilitates voter impersonation since voter ID is not required.

60.    In 2018, California passed SB 759 as urgency legislation (*i.e.*, effective immediately), requiring counties to contact all voters whose VBM ballots are considered for rejection, so they can "cure" their signatures. This law has significant unintended consequences. For example, verification by a voter is done by downloading a form online or responding with a form sent in the mail. A voter may therefore never see the original ballot envelope and may verify a fraudulent signature. Although the law requires the curing notice to be sent no later than eight days prior to certification and be returned no later than two days before certification, former Secretary of State Padilla violated California law and issued an advisory in November 2018 that the practice can and should continue up to the date of certification.

61.    AB 306 further weakened ballot chain of custody and opened the door to organized ballot harvesting by prohibiting disqualification of a ballot solely because the person returning it does not provide their name, relationship to the voter, or signature.

62.    In 2019, California passed a raft of new voting legislation, including AB 963 and AB 1036, which instituted complex programs on high school and college campuses with the goal of increasing registration and voting by students, whether eligible to vote or not. California also passed SB 72, which instituted same-day voter registration at all polling places, placing undertrained, under-supervised, and at times overwhelmed election workers with unreliable computer systems in the position of determining voter eligibility. Finally, California passed SB 523, which extended the

"curing" process for missing or challenged VBM ballot envelope signatures from eight days after election day to two days before certification.

## II.    California Continues To Pass Unconstitutional Laws And Issue Unconstitutional Regulations In 2020 and Beyond.

63.    On June 18, 2020, California passed AB 860, directing county officials to mail a ballot to every active-status registrant voter.

64.    As a result, every active-status registrant on California's voter rolls were mailed a VBM ballot. Millions of VBM ballots for the 2020 general election were placed in the U.S. Mail with no means to ensure that a particular ballot was actually received by the intended recipient, or that the intended recipient was alive, a resident of California, or otherwise eligible to vote. EIPCa data research shows that hundreds of thousands of ballots were sent to the last known address of individuals showing no electoral activity for 12-40 years. EIPCa's post-election analysis showed that 12 individuals voted by mail in 2020 after having no voting activity for over 30 years.

65.    Emergency regulations issued by former Secretary of State Padilla for the 2020 general election further eviscerated the standards for the validation of VBM ballots. Secretary of State Weber readopted these regulations, and they remain in effect today.

66.    On September 28, 2020, after an unpublicized public comment period of only five days, former Secretary of State Padilla adopted new "emergency" regulations. *See CC/ROV* 20226 (Sept. 29, 2020). These regulations include California Code of Regulations ("CCR") §§ 20910, 20960-20962, and 20980-20985. Initially, these emergency regulations were intended to be effective through July 28, 2021. Secretary of State Weber readopted the regulations in 2021 and 2022, and they remain effective today.

67.    These regulations do not require that counties across California apply uniform, meaningful, and robust vote-counting procedures. For instance, subsection (b) of 2 CCR § 20960 provides that the "comparison of a signature shall begin with the

basic presumption that the signature on the petition, the vote-by-mail identification envelope, signature verification statement, unsigned ballot statement, or provisional ballot envelope is the voter's signature." In 2021, the California Legislature codified subsection (b) into law through SB 503, as reflected in California Elections Code § 3019.

68. Section 3019 does not require county officials to find an exact match when comparing VBM signatures with those on record on the election database.

69. Neither California Elections Code § 3019 nor 2 CCR § 20960 require counties to require election workers to verify a specific number of points of comparison. Examples include: the slant of the signature; whether the signature is printed or in cursive; the size, proportions, or scale of the signature; individual characteristics such as how the t's are crossed or how the i's are dotted; line direction; spacing between letters; and letter formations.

70. Subsection (g) of 2 CCR § 20960 also dictates criteria for evaluation of signature matches that justify finding a favorable comparison (i.e. match) of two signatures that clearly do not match. Particularly egregious is the justification that the voter's signature style might have changed over time. This provision legitimizes acceptance of virtually any signature without subjecting clear mis-matching signatures to the safeguard of the curing process.

71. The effect of the foregoing provisions in nullifying any possibility of meaningful signature verification is compounded by subsection (j) of 2 CCR § 20960, which requires that a signature "shall only be rejected if two different elections officials unanimously find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record." In 2021, the California Legislature codified this subsection into law through SB 503.

72. When combined with the standards of 2 CCR § 20960(g) set forth above, the beyond a reasonable doubt standard of § 20960(j) justifies the acceptance of

virtually any signature on a VBM ballot return envelope, again, without subjecting clearly mis-matching signatures to the safeguard of the curing process.

73.   The adjustment of standards for signature matching of VBM ballot return envelopes is patently gratuitous given that California Elections Code § 3019(d) provides a meaningful opportunity for a voter to cure the rejection of a signature match by requiring notice to the affected voter and the opportunity to submit verification of the rejected signature.

74.   The enacted emergency regulations also nullify rejections based on computer signature recognition technology, requiring that election workers evaluate any rejection manually under the virtually nonexistent standards of 2 CCR § 20960.

75.   The enacted emergency regulations also promote fraud by allowing the submission of multiple ballots in a single VBM ballot return envelope. Subsections (b)(10) and (b)(11) of 2 CCR § 20991 allow multiple ballots to be stuffed into a single VBM return envelope, provided there is an equal number of signatures on that envelope. This conflicts with the requirement that the signature and other information included by the voter on the outside of a VBM envelope be confirmed by a declaration under penalty of perjury. Cal. Elec. Code § 3011.

76.   The acceptance of multiple ballots in a single VBM return envelope authorized by 2 CCR § 20991(b)(10) and (11) also eliminates the protection provided by the barcode on the envelope, which is used to track whether a particular voter has submitted a VBM ballot. Moreover, without the barcode to scan for the extra signatures, the already harried reviewers have no reasonable means of summoning each voter registration affidavit signature for purposes of comparison.

77.   Even if it were practicable to conduct signature comparisons for multiple signatures on a single VBM return envelope – which for the reasons set forth above it is not – the signature reviewer has no means of knowing if there is a signature for each ballot included in the envelope. Signatures are verified before the envelope is opened.

78.     The acceptance of multiple ballots in a single VBM return envelope also creates intractable practical problems for determining which votes have been legally cast. If after opening a VBM ballot return envelope there are more ballots in the envelope than signatures on the envelope, there is no means of determining which of the multiple ballots an election worker should reject, assuming any efforts were made to make this comparison. The same would hold true if one or more signatures on the VBM envelope were rejected (which for the reasons set forth above, would rarely occur under the standards set forth in 2 CCR §§ 20960 and 20961); there would be no way to determine which ballot should not be counted.

79.     The emergency regulations also require the acceptance of VBM ballot envelopes with no reliable indication that the ballot was cast on or before election day. This is reflected in subsection (b)(8) of 2 CCR § 20991, which provides that a VBM ballot must be accepted when a "vote-by-mail ballot identification envelope has no dated postmark, the postmark is illegible, and there is no date stamp for receipt from a bona fide private mail delivery service, but the voter has dated the vote-by-mail ballot identification envelope or the envelope otherwise indicates that the ballot was executed on or before Election Day."

80.     Moreover, the legislature amended California Elections Code § 3020 to provide that, "any vote by mail ballot cast under this division shall be timely cast if it is received by the voter's elections official via the United States Postal Service or a bona fide private mail delivery company no later than seven days after election day. . . ."

81.     Thus, under the California Elections Code and the emergency regulations, VBM ballots that cannot reliably be determined to have been cast on or before election day are nevertheless required to be accepted up to seven days after election day. This creates an open invitation to submit illegal ballots after election day to overturn reported election results, especially election contests decided by margins of very few votes.

SECOND AMENDED COMPLAINT

82.     The enacted emergency regulations further promote fraud by granting election workers wide discretion to determine the intent of the voter during the ballot duplication process. 2 CCR § 20982 allows duplication of ballots that are "not marked as provided by law." Subsection (c) 2 CCR § 20982 allows ballots with improper marks to be counted if the election worker determines that the improper ballot mark represents "a voter's choice." Subsection (e) of 2 C.C.R. § 20982 allows ballots where more than one candidate is marked for the same office to be counted if the "voter's choice can be clearly determined."

83.     Defendant Weber (as Alex Padilla before her), in her official capacity as Secretary of State, has managed California's vote by mail and signature verification process through emergency regulations, bypassing the legislative process. The California legislature has enacted portions of these regulations into law.

84.     These regulations and laws have transformed election day from a one-day process to a multi-week process and have given County officials considerable latitude and discretion in enforcement of vote-counting and signature verification procedures.

## III.    EIPCa Warns Secretary of State about Serious Irregularities with Voter Rolls Prior to the 2020 Election.

85.     On March 1, 2020, prior to the primary election, EIPCa sent a letter to former Secretary of State Padilla warning him that "[w]e have identified in the [State of California's voter registration] file over 22,000 Californians that appear to be registered twice, some registered three or four times. Of these, we estimate that almost 5,000 duplicated registrants have been mailed two or more VBM ballots this election." EIPCa noted that duplicate voting was likely to result and witnessed voting records indicating early double voting in the upcoming primary. On April 7, 2020, the Secretary of State responded that its office had confirmed 13 EIPCa-reported suspected double voters had indeed voted twice.

86.     On April 28, 2020, EIPCa sent former Secretary of State Padilla statutory notice pursuant to 52 U.S.C. § 20510(b) of violations of Section 8 of the NVRA, 52

U.S.C. § 20507. This notice was accompanied by an Excel findings report detailing each irregular registration. The notice highlighted over 458,000 likely ineligible registrants who would be mailed ballots for the November election and an additional 24,000 duplicated registrants who would each be mailed two or more ballots unless corrected. The notice included supporting evidence that the state has over 1 million more registered voters than eligible citizens, per official government data.

87.     On July 11, 2020, EIPCa warned former Secretary of State Padilla that EIPCa had identified large numbers of ineligible registrants on California's voter rolls, including "13,456 California registrants who match a California Department of Public Health (CDPH) Death Index record" (327 of whom were 105+ years old), and 106,315 other registrants who appear to be ineligible for a variety of reasons, such as having moved out of the state or being below the minimum age to vote.  California's failure to comply with the NVRA's requirement to cancel registrations of ineligible voters is a major contributor to these issues.

88.     On October 17, 2020, EIPCa sent another letter and Excel report to the Secretary of State stating that it had identified almost 440,000 likely ineligible registrants who had been mailed a ballot for the November 2020 election. The total included 416,000 who had been registered for 12+ years but who had not voted in 12-40 years. Also included were over 3,300 registrants still on the rolls who closely matched a California death record and almost 20,000 who had been mailed two to four ballots because they each had two or four registrations. The letter requested the Secretary to work with the counties to ensure only lawfully-cast ballots are counted.

89.     EIPCa's estimates of ineligible registrants are conservative and significantly underestimate the full extent of the problem. For example, if a name and birthdate appearing on the voter roll is shared by both a deceased and a living person, EIPCa assumes the name belongs to the living person and does not include that name within its count of deceased voters, even though it is possible that the name on the voter

roll refers to the deceased person. Further, EIPCa does not include in its analysis names that are particularly common within the population (e.g., John Smith, Jose Gonzalez).

90.     EIPCa received responses to its letters downplaying EIPCa's concerns and refusing to remedy the identified problems.

**IV.   California's Voting Laws, Regulations, And Procedures Caused Widespread Irregularities In The 2020 Election And Beyond.**

**A.     Citizen Observers Were Obstructed from Meaningfully Observing Vote Collection and Tabulation.**

91.     Secretary of State Weber implemented guidance[2] regarding the rights and responsibilities of election observers that grant local election officials' broad discretion in determining the parameters of observation of the election process. The Secretary's guidance allows local election officials to determine the distance at which observers can observe and how observers may pose questions and challenges during the observation process. The guidelines also allow local elections officials to ask observers to leave the premises. The wide discretion granted to county officials via regulations and rules implemented by the Secretary of State are leading to expansive irregularities, as reflected in incident reports from EIPCa observers.

92.     EIPCa provides non-partisan training to citizen observers across the State of California regarding how to observe the election process at polling locations and vote centers, as well as ballot processing and vote tabulation consistent with their rights under California law. These EIPCa-trained observers provide incident reports to EIPCa, signed under penalty of perjury, regarding any irregularities they witness. Unaffiliated citizens also report irregularities to EIPCa signed under penalty of perjury.

---

[2] Secretary of State Weber's most recent guidelines issued to the Counties pertaining to observer rights and responsibilities is available at: https://elections.cdn.sos.ca.gov/ccrov/2022/september/22233jl.pdf. Nearly identical guidelines were issued in the 2020 and 2021 elections. Secretary Weber has proposed that her rules and guidelines pertaining to the rights and responsibilities of election observers be codified at Chapter 8.2 to Division 7 of Title 2 of the California Code of Regulations. A vote on these regulations is impending.

93.     Over the past few years, EIPCa has received thousands of incident reports signed under penalty of perjury establishing that EIPCa-trained observers were not allowed sufficiently close access to see the signatures on VBM ballots with sufficient clarity to determine if established procedures were being followed. Observation distances were too great. Observers were limited, at times, to a few minutes of observing. In some cases, observation was provided through remote video access which precluded the ability of observers to challenge whether established procedures were being followed. In some counties, observers were not allowed to observe the remaking of military, damaged, or defective ballots.

94.     Below is a sampling of the ways in which Secretary Weber's lack of robust election procedures resulted in obstructed observation on a county-by-county basis:

95.     **Alameda County**:

During the 2020 election, an EIPCa citizen observer was informed by multiple county employees that no observers were allowed to observe vote processing and counting at all due to COVID-19.

96.     **Fresno County**:

Throughout Fresno County, EIPCA citizen observers during the 2020 election were kept in confined areas too far from vote processing and counting activities to effectively observe them. Former Registrar Orth told citizen observers at the Orange Cove Library that they "needed to stay in [their] area and observe!" Former Registrar Orth did not believe observers needed to be close enough to hear what was going on.

In 2020, at Reedley Precinct 13, citizen observers were forced to remain in an observer area which was approximately 35 feet back from check-in and in the back of the room. According to EIPCa-trained observers, it was difficult to see and hear what was going on.

In 2020, at Orange Cove Precinct 14, citizen observers were required to stay in a confined area behind tables approximately 50 feet from vote processing and counting activities. It was difficult to see or hear.

On multiple occasions during the 2021 recall election, EIPCa-trained observers at the Fresno County Processing Center were told that the center was not processing ballots. They were surprised to learn that the workers were in fact actively processing ballots without observation.

During the 2021 recall election, EIPCa-trained observers were prohibited from observing signature verification processes. A supervisor explained to one observer that this was to "honor voter privacy."

97. **Kern County**:

When observing the signature verification process for the 2021 recall election, citizen observers were kept between 15 to 50 feet from signature verification workers, making it impossible to see the signature verification process. Signatures were processed so quickly it was difficult for observers to follow along. At the Kern County Registrar of Voters office, six monitors covered the observation window, rendering observation of ballot processing significantly limited or impossible.

In 2021, workers at the Kern County Registrar of Voters Office made it difficult for citizen observers to observe and displayed hostility towards the EIPCa observers. EIPCa-trained observers were directed not to speak while on the premises, even though their discussions pertained to the assignment at hand in a nondisruptive manner. EIPCa-trained observers were kept outside the elections department for increasing periods of time, without access to the observation area while ballot processing was occurring.

98. **Los Angeles County**:

During the 2020 election, a citizen observer was told by a head poll worker at Vasquez High School that "it was illegal for [her] to be [there]" as a poll observer after the polls closed.  The citizen observer was forced to leave five minutes before the doors to the voting center closed.

Throughout the past few years, observers have noted that they were not able to adequately observe the ballot remaking process.

99. **Monterey County**:

EIPCa-trained observers were separated from the election officials processing ballots by thick glass, making it impossible to hear the process. They were more than ten feet away from the election officials' desks, making it virtually impossible to see what they were doing.

100. **Orange County**:

During the 2020 election, EIPCa-trained observers were provided with computer "observation screens" on which to view ballot processing activities. However, observers were kept far away from these screens, making observation of details like signatures impossible to verify. One citizen observer resorted to viewing the screens with binoculars but was still too far away to see signatures clearly.

Observation screens were also turned off with varying or no explanation while the count continued. EIPCa-trained observers were unable to view or object to signature matches and the processing of conditional ballots because these screens were off.

The Registrar of Voters informed EIPCa-trained observers that it had halted "first pass" ballot counting at 5:00 p.m. However, counting took place again later in the evening without the knowledge or observation of observers. This would never have been discovered but for a EIPCa-trained observer who logged into the Remote Observing System at 6:30 p.m. and was "stunned" to see the video "was an active and live viewing of 'first pass' signatures" going on.

101. **Riverside County**:

EIPCa-trained observers during the 2020 election were prevented from observing the ballot remaking process. When an observer raised this concern with an election official, he told the observer there would be no changes to the process to enable observers to see ballots being remade. A temporary elections assistant in Riverside who

23

took part in the remaking of ballots reported that she observed no method of accountability for the remaking of ballots that would ensure the voter's original choice was accurately marked on the new ballot. The employees sat across from each other without view of what the other person was doing. Ballot remaking occurred in the back of the room, far from where citizen observers could see because tall carts obstructed the view.

102. **Sacramento County**:

An EIPCa-trained observer during the 2020 election was positioned more than six feet from the counting desks. The desks were also surrounded by plexiglass, making it nearly impossible to see ballot marks.

In 2021 and 2022, citizen observers were not allowed to adequately observe the ballot remaking process.

103. **Santa Clara County**:

During the 2020 election, an EIPCa-trained observer in Santa Clara reported that, "Observers were not allowed into the tabulation room to observe counting. Observers watched from conference room over zoom link, but camera was filming from the doorway/outside the room." As such, observers had limited view on the operation and could not readily object.

In 2020, an observer was not allowed into the room where the duplication of ballots were occurring and could therefore not see or hear what was going on.

104. **Ventura County**:

In 2020, Ventura County allowed only a limited number of citizen observers to observe ballot processing and vote tabulation in person, and they were directed to stand outside the vote tabulation center in the hall and observe through the window, approximately 20 feet away from the process. Ventura County also set up a limited number of streaming cameras to allow citizen observers to observe remotely, but they provided limited view of the facility and did not show the activity on computer screens.

Throughout the past few years, EIPCa-trained observers have also reported not being able to adequately observe the ballot remaking process.

**B.   Despite Obstacles to Observation, Widespread Irregularities Were Reported in Thousands of Sworn Affidavits.**

105.   Despite the inadequate observation measures implemented by Defendant County Registrars, EIPCa-trained observers and non-affiliated citizens still observed a vast number of VBM and processing irregularities, which are documented in thousands of sworn affidavits collected by EIPCa.

106.   The lack of uniform and secure vote counting procedures caused disparate results across counties. For instance, Solano County runs all signatures through a machine for an initial review. Election workers look for an overall signature characteristic match, which includes more than three points of comparison. Any rejected signature gets at least three reviews, including by a machine, line staff, and supervisor.

107.   Placer County manually reviews all signatures looking for at least three points of comparison. The signature verification process is slow, in-depth, and methodical. On information and belief, citizens in these counties did not report incidents of election workers approving ballots that did not match the signatures on file.

108.   However, the Defendant County Registrars implemented inadequate procedures, as demonstrated in thousands of affidavits. These affidavits demonstrate that signature verifications for VBM ballots for all elections since November 2020 were not meaningfully or uniformly conducted. As massive numbers of VBM ballots flooded vote counting centers, their signatures were visually checked at the rate of one signature pair every one to four seconds. In some cases, four signature comparisons were conducted simultaneously using images projected on computer monitors at the rate of one to four seconds per screen.

SECOND AMENDED COMPLAINT

109.   California's laws and regulations do not require county registrars to use a machine to verify signatures. 2 CCR 20961. The laws and regulations also do not require counties calibrate their signature verification technology to a specific error rate. *Id.* Some counties, like Los Angeles County, use a higher error rate so more signatures pass the machine run.

110.   These inadequate procedures resulted in election workers in these counties approving VBM ballots that did not match the signature samples on record. Some election workers even counted ballots with no signatures or signatures that did not match the identity of the voter.

111.   Furthermore, California's laws and regulations do not require counties apply the same standard when determining the intent of a voter. 2 CCR 20982. Some counties use machine technology while other counties use arbitrary manual standards or a hybrid model to determine the intent of a voter during the ballot remaking process.

112.   Some counties, such as those listed in this lawsuit, have only one team verifying the intent of the voter whereas counties like Siskiyou County have multiple teams verifying the intent of the voter. The first team reads the ballot and then ensures it is being read correctly. In the second team, the first person marks a blank ballot with a black ball point pen or a black gel ink pin while another person watches the first person to ensure the marking matches what is read out loud. A multiple two-person team is more accurate because it provides additional oversight and accountability.

113.   The following incident reports reflect a small fraction of reports received by EIPCa relating to ballot remaking, signature verification, and chain of custody:

114.   **Alameda County**:

In 2020, one EIPCa-trained election worker observed election workers duplicating ballots without any input from the voter. The observer found this odd, as those who voted via voting machine were given a chance to change or correct their ballots, while those who voted by mail or provisional ballot were not given a chance to change or correct their ballot.

115. **Contra Costa County**:

In 2020, a voter had his ballot envelope signed by another person with <u>a different name</u>, and the county accepted the signature because no signature matching was taking place.

A citizen who was voting during the 2020 election observed a poll worker instruct another voter how to vote on certain ballot items that the voter had left blank because the voter knew nothing about them, per her own admission. The poll worker provided her this guidance without solicitation.

During the 2021 election, an EIPCa-trained observer challenged signatures which were verified despite more discrepancies between the signatures than common elements. Two supervisors ignored the observers concerns, informing the citizen observers that the election worker comparing signatures was "experienced" despite clear differences between the compared signatures.

116. **Fresno County**:

At Fresno County's Clovis Center, a supervisor informed an EIPCa-trained observer during the 2020 election that the ballots for the first day of early voting had been left inside a vote tallying machine "unattended in a locked room overnight," and that it was his understanding this practice would continue every night until the final closing of the voting center.

Multiple EIPCa-trained observers and voters reported that vote center ballot box counters were not daily reset to zero as required by law.

At Betty Rodriquez Regional Library, the lead supervisor informed an EIPCa-trained observer during the 2021 recall election that ICS machines were not locked up overnight and were kept in the room where voting took place. The lead supervisor told an observer that when she arrived at the vote center in the morning, the doors to the voting room were unlocked and open overnight.

117. **Kern County**:

During the 2021 recall election, election officials did not perform meaningful signature matching of signatures on VBM ballot envelopes with those on record. Multiple citizen observers reported that election workers were verifying signatures that didn't have the same name. One ballot read "I don't know name" and was verified. Signatures with no comparable characteristics and with multiple, significant, and obvious incomparable characteristics were also verified.

On one occasion, the signature history of a challenged signature showed three different signatures for a single voter. The signature on the envelope was verified as valid even though it did not match the signatures on record.

Election workers were also accepting signatures before all signature history populated on the computer screen. EIPCa-trained observers saw election workers verify "inactive voter" signatures, as well as ballots with no signature at all.

At the Kern Registrar of Voters, multiple EIPCa-trained observers during the 2021 election witnessed a worker performing signature verification on ballots that were challenged on the first pass. The worker rapidly approved approximately 95% of challenged signatures. According to the EIPCa observers, of the signatures approved by the worker, approximately 1/3 of signatures were an extreme mismatch, 1/3 were acceptable, and another 1/3 needed closer examination.

118. **Los Angeles County**:

During the 2020 election, multiple EIPCa-trained observers at voting centers saw "many workers with open bags, big purses and other stuff around desks" in violation of security procedures, noting that "[b]allots could easily have been taken."

An EIPCa-trained observer at Los Angeles County's Claremont Center witnessed two different women drop off multiple ballots without voter signatures. Nevertheless, the ballots were counted by election officials for the 2020 general election.

Even where signature comparison was done, it was not done effectively. During the 2020 election, an EIPCa-trained observer watched a worker comparing signatures

four at a time (as in other listed counties) and spending five seconds or less per each set of four. The observer saw over 40 signatures that did not match. Only a few were flagged. Another observer observed 95 signatures that should have been challenged but were not, including "[m]any [that] had no signature or a total mismatch." (*Emphasis added*.)

Across Los Angeles County, multiple in-person voters for the 2021 recall election were told upon checking in at the vote center that they had already voted. Other individuals report receiving VBM ballots for individuals who did not live at their address.

Also, during the 2021 recall election, EIPCa-trained observers reported that the automatic signature verification machines at the vote centers were functioning at such a rapid speed that observation was nearly impossible. Observers noted that these machines flagged very few ballots, despite observers noting clear discrepancies in the signatures.

119. **Monterey County**:

Voters in Salinas who voted in person for the 2020 election were advised that a provisional ballot must be used. A mail carrier in the Salinas Post Office informed a voter that his superiors had instructed him to "cram all the ballots into a mailbox" even if he knew many of the voters at the address did not live there.

120. **Orange County**:

Election officials did not perform meaningful signature comparison of signatures on VBM ballot envelopes with those on record during the 2020 election. Signatures were displayed four at a time on computer screens and remained on the screen for only a few seconds, leaving no actual time for signature matching to occur or for observers to object. Ballots with signatures that did not appear to match were counted. Another election official informed an EIPCa-trained observer that Former Registrar Kelley had modified a ballot processing rule that previously required signature pairs to be examined for 12 seconds each.

The status of VBM envelope signatures that were challenged by EIPCa-trained observers was changed from "challenged" to "good" without meaningful review by election officials. During ballot processing, an election official announced over the public address system that observers were challenging too many signatures and that the election officials would not have time to get through all of them.

At the meeting of the League of Women Voters of Central Orange County on November 16, 2020, Kelley expressed surprise about the changes regarding signature verification because the new instruction essentially amounted to a directive that "basically all ballots were to be considered valid unless there was substantial proof otherwise."

121. **Riverside County**:

In 2020, an EPCa-trained observer witnessed ballots put into boxes that were never sealed and then put into an election official's car in which another unidentified individual was riding.

A temporary assistant at the Registrar of Voters during the 2020 election was assigned to accept drive-in VBM ballots curbside. She "observed temp. employees taking ballots without checking for signatures or if the person was dropping off for others.  No effort was made to check for their signature and their relationship to the person."

Throughout the past few years, on information in belief, the election workers only apply a two-point match when verifying signatures. The rule of thumb is to verify signatures if "it generally looks the same." It has been reported that some election workers rush through the signature verification process without comparing the ballots with the signature samples on record.

122. **Sacramento County**:

An EIPCa-trained observer during the 2020 election reported that he saw, on multiple occasions, a ballot marked for both Biden and Trump, but with the Trump indicator having an "x" through it. The observer mentioned this to the adjudicators,

who refused to elevate the issue to supervisors, concluding, without evidence, the voter had just changed his or her mind. On another date, the same citizen observer again saw a ballot marked for both Trump and Biden, with the Trump indicator having an "x" through it, and the ballot being counted for Biden.

Throughout the past three election cycles, individuals have observed election workers rushing through the signature verification process without researching additional comparison signatures on record.

During the primary in 2022, a staff member on the signature verification team was challenging numerous signatures and was berated by the supervisor as challenging too many signatures. Then, the supervisor fired a majority of the signature verification staff for no cognizable reason. This did not make sense at the time because it was the busiest the county had been and a lot of VBM ballots were arriving.

123. **San Bernardino County**:

An election official at the San Bernardino Registrar of Voters informed a citizen during the 2020 election that, "not all of the ballots will be counted because California is such a Democrat state," in response to the citizen's inquiry as to why her in-person ballot had not already been counted.

An EIPCa-trained observer also observed that there were more than 400 voters on the rolls than the night before (after polls had closed). No explanation was found for this increase.

124. **San Luis Obispo County**:

During the 2020 election, multiple EIPCa-trained observers reported one person dropping off multiple VBM ballots. One observer noticed an individual dropping off five VBM ballots. Another observer watched a man return a VBM ballot on behalf of another individual while refusing to sign the VBM envelope. The election worker placed the envelop into a box with all other accepted ballots.

During the 2020 election, EIPCa-trained observers and voters across San Luis Obispo County reported irregularities with VBM and precinct ballots. Multiple

observers and voters reported that election workers were telling individuals who showed up to vote in person to vote on their VBM ballot. Election workers assured people that the VBM ballot was "the same as the precinct ballot" even though the ballots were handled and counted two separate ways.

One EIPCa-trained observer saw a man receive a precinct ballot even though he had not returned his VBM ballot. Another observer saw individuals filling out precinct ballots despite the county already receiving that voters VBM ballot. Upon questioning, the precinct inspector stated that election officials were instructed not "to turn anyone away, nor argue with any voter, and that the registrar would figure it out later."

125. **Santa Clara County**:

On November 2, 2020, an EIPCa-trained observer arrived at the Santa Clara Registrar of Voters at 7:02 a.m. and found the double entrance doors and side doors leading to ballot processing area open and unattended. An employee arrived at 7:08 a.m. and said that the area was not supposed to be open. No supervisor or other employee was found in the area and the unopened doors were not explained.

In the November 2020 election, an EIPCa-trained observer observed workers rushing through the signature verification process and comparing four ballots with only one signature sample at a time. On information and belief, these practices continued in 2021 and 2022.

During the 2020 election, several individuals reported receiving multiple VBM ballots or receiving VBM ballots after they moved or already voted.

126. In 2021, EIPCa collected around 3,000 incident reports demonstrating widespread irregularities and a lack of uniform and secure vote counting procedures, including signature verification and ballot remaking, in the counties listed above.

127. In 2022, EIPCa received around 1,300 incident reports which identified similar problems, such as counties not applying uniform and adequate vote counting procedures, including signature verification and ballot remaking.

SECOND AMENDED COMPLAINT

128.   The irregularities that have transpired over the past few years are the result of California's election laws, regulations, and procedures – namely – universal VBM, CCR §§ 20910, 20960-20962, 20980-20985, SB 503, and California Elections Code § 3019. Since California gutted signature verification requirements and solidified VBM, EIPCa has received more incident reports – as reflected above – demonstrating that election workers do not adequately vet and verify ballots.

129.   Because California ratified universal VBM into law and because the Secretary of State continues to apply the same regulations, the same issues that transpired in 2020 continued in 2021 and 2022 with roughly the same rate of incident reports.

**C.**   **In-Person Voters Were Subject to Unequal Treatment Compared to VBM Voters, Disproportionately Burdening In-Person Voters.**

130.   Under California law, in-person voters can only vote if they are in line at the time the polls close, which is usually 8 p.m.

131.   In 2020, under former Secretary of State Padilla's guidance, VBM voters could legally vote by dropping off ballots in mailboxes until 11:59 p.m. and still have their ballots postmarked on election day and therefore counted.

132.   Further, because ballots were not picked up from mailboxes until well into the day after the election and because the mailboxes were unmonitored, nothing prevented VBM voters from voting the day after election day by dropping ballots in such boxes.

133.   EIPCa has recorded such late voting and ballot pickups.

134.   This difference in timing, which allots at least four additional hours for VBM voters to vote, allows VBM voters to vote even after poll results are being announced, whereas in-person voters cannot.

135.   California Elections Code § 3020 also allows counties to accept VBM ballots after election day that cannot reliably be determined to have been cast on or

before election day. Such unequal treatment disproportionately affects people who prefer to vote in person.

136.   In 2020, EIPCa collected information revealing that around 596 Nevadans voted in California, including, specifically, the counties listed above. EIPCa has also collected information showing 180 individuals voted in both Nevada and California, and 72 voted in California even though they were deceased. Counties listed in this lawsuit, like Los Angeles, reported more irregularities.

137.   Almost 124,000 more votes were counted in the 2020 election than registrants with voting histories for that election. Kern County, Riverside County, Orange County, and Los Angeles County recorded higher discrepancies by percentage between VBM votes counted and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County.

138.   The cause of this discrepancy is due to universal VBM and counties, including Defendant County Registrars, not ensuring their voter rolls are updated. These irregularities will continue because the Defendants do not require uniform procedures as it relates to maintaining accurate voter rolls and ensuring only eligible voters are on the voter rolls. In fact, these patterns and practices have continued through 2021 and 2022.

139.   These irregularities specifically harm Plaintiffs and other in-person voters whose votes are diluted by ineligible VBM votes in their respective counties.

140.   Furthermore, as demonstrated above, election workers do not adequately vet VBM ballots as the influx of ballots flood election centers. The failure to adequately vet VBM ballots dilutes the votes of lawful in-person voters.

141.   Laws that disadvantage in-person voters inherently disadvantage minority voters because data shows these communities have historically relied upon in-person voting to a greater degree than other groups. *See League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (2014); *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (2016).

142.   California's election laws and regulations, including California Senate Bill 503, the laws concerning universal VBM, and the regulations governing signature verification have caused the dilution of in-person votes like Plaintiffs and African American voters like Plaintiff Ronda Kennedy.

**V.     An Audit and Special Master Are Needed to Identify the Full Extent of the Alleged Irregularities and the Effects of California's Unconstitutional Laws and Regulations.**

143.   Despite several elections marred by lack of citizen oversight and policies and procedures that created massive opportunities for both error and fraud, California has provided no meaningful access to the VBM ballots and envelopes.

144.   In fact, Secretary of State Weber has issued guidance to county election officials mandating destruction of election materials after the retention period.

145.   This situation is intolerable in light of widespread evidence of vote irregularities, which shows that election outcomes could have been changed and citizens disenfranchised throughout the state.

146.   Evidence must be preserved and made available to qualified experts, so that an audit can be conducted to determine the extent and effect of the alleged irregularities. Given the historically low rejection rate for signatures since the November 2020 election, such an audit should include, among other things, a review of the signatures on VBM ballots against the signatures on file. It should also include all ballots where election officials selected the voter's intent, including all "remade" and "adjudicated" ballots.

147.   Further, one or more special masters should be appointed to oversee the audit, as well as the conduct of the upcoming elections. Elections that took place in March 2021, September 2021, March 2022, and November 2022 were similarly affected. Indeed, former Secretary of State Padilla's emergency regulations are still in effect (as adopted by Secretary of State Weber), and the Legislature has taken steps to codify some such regulations into law as described above.

148.   By providing this transparency and oversight, all eligible voters can be given assurance that they will be fully enfranchised in California's forthcoming elections.

### FIRST CAUSE OF ACTION

**Denial of Equal Protection: 14th Amendment of U.S. Constitution; 42 USC 1983**

149.   Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 148 of this Complaint as if fully set forth herein.

150.   The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

151.   Defendants have violated the Equal Protection Clause by implementing laws, regulations, and procedures that diminish the value of in-person voters, including EIPCa's observers and Plaintiffs in their respective counties.

152.   Defendants have further violated the Equal Protection Clause by applying nonuniform laws, regulations, and procedures that treat voters, including Plaintiffs and EIPCa's observers, differently than voters in other counties, including those not listed in this lawsuit.

153.   Plaintiffs have suffered damages through the diminution in value of their votes by reason of Defendants' violation of the Equal Protection Clause.

154.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the Court enjoins Defendants' violation of the Equal Protection Clause.

155.   Plaintiffs are entitled to damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating or restraining the Defendants' violation of the Equal Protection Clause.

## SECOND CAUSE OF ACTION

**Denial of Due Process: 14th Amendment of U.S. Constitution; 42 USC 1983**

156.   Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 155 of this Complaint as if fully set forth herein.

157.   The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *See Harper*, 383 U.S. at 663; *see also Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (The Fourteenth Amendment protects "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)); *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

158.   The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

159. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have

them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

160. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

161. "The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), aff'd due to absence of quorum, 339 U.S. 974 (1950)).

162. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct can violate the Fourteenth Amendment by leading to the diminution in value of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

163. Defendants have violated the Due Process Clause by implementing laws, regulations, and procedures that diminish the value of in-person voters, including EIPCa's observers and Plaintiffs in their respective counties.

164. Defendants have further violated the Due Process Clause by applying nonuniform laws, regulations, and procedures that treat voters, including Plaintiffs and

EIPCa's observers, differently than voters in other counties, including counties not listed in this lawsuit.

165.   Plaintiffs have suffered damages through the diminution in value of their votes by reason of Defendants' violation of the Due Process Clause.

166.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the Court enjoins Defendants' violation of the Due Process Clause.

167.   Plaintiffs are entitled to damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating or restraining the Defendants' violations of the Due Process Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against Defendants as follows:

1.   An order directing Defendants to preserve for inspection and an audit all VBM ballots, VBM ballot envelopes, RAVBM ballots, remade or duplicated ballots, adjudicated ballots, and other documents used to cast votes in all elections since the November 2020 election;

2.   An order directing Defendants to preserve for inspection and an audit all voting machines, software, peripherals (including flash drives and other memory storage), computers, reports generated, and other data and equipment used to cast, examine, count, tabulate, modify, store or transmit votes or voting data since the November 2020 election;

3.   The appointment of one or more special masters to oversee the evidence preservation and audit process;

4.   The appointment of one or more special masters to oversee and monitor the accuracy of vote counting in California's upcoming elections;

5.   A declaratory judgment that the following are unconstitutional on their face and as applied:

(a)   California Assembly Bill 860;

(b)   California Assembly Bill 37;

SECOND AMENDED COMPLAINT

(c)     California Senate Bill 503;

(d)     California Senate Bill 397;

(e)     California Senate Bill 450;

(f)     California Code of Regulations §§ 20910, 20960, 20961, 20962, 20980, 20981, 20982, 20983, 20984, 20985; 20990, 20991, 20992;

(g)     California Elections Code § 3000.5;

(h)     California Elections Code § 3019;

(i)     California Elections Code § 3020; [3]

6.     A declaratory judgment declaring Defendants' lack of uniform and secure vote counting, laws, regulations, and procedures a violation of the Equal Protection Clause and Due Process Clause to the Fourteenth Amendment;

7.     Injunctive relief preventing the Defendants from enforcing and/or applying a lack of uniform and secure vote counting laws, regulations, and procedures;

8.     Damages;

9.     Nominal damages;

10.    Plaintiffs' costs of suit;

11.    Reasonable attorneys' fees; and

12.    Such other relief as is just and proper.


DATED: February 21, 2023                    ADVOCATES FOR FAITH AND FREEDOM


                                            /s/ Mariah Gondeiro
                                            By:   Mariah Gondeiro
                                                  Attorneys for Plaintiffs

---

[3] This lawsuit challenges all bills and future bills that have or will expand VBM and all regulations that have or will not provide uniform requirements regarding observation, signature verification, ballot remaking, and voter rolls.