1

# JS-6

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| ELECTION INTEGRITY PROJECT CALIFORNIA, INC., et al, | Case No. 2:21-cv-00032-AB-MAA |
| Plaintiffs, | **ORDER GRANTING DEFEDANTS' MOTIONS TO DISMISS [DKT. NOS. 162, 163-1]** |
| v. | |
| SHIRLEY WEBER, California Secretary of State, et al., | |
| Defendants. | |

18

     Before the Court is Defendants' Secretary of State Dr. Shirley Weber and

19

Attorney General Rob Bonta ("State Defendants") Motion to Dismiss (Dkt. No. 163-

20

1, "State Mot.) and Defendants' Tim Dupuis, Registrar of Voters for the County of

21

Alameda; Kristin Connelly, Registrar of Voters for Contra Costa County; James A.

22

Kus, County Clerk/Registrar of Voters for the County of Fresno; Aimee Espinoza,

23

Auditor-Controller/County Clerk/Registrar of Voters for Kern County; Dean C.

24

Logan, Los Angeles County Registrar-Recorder/County Clerk; Gina Martinez,

25

Registrar of Voters for the County of Monterey; Bob Page, Registrar of Voters for the

26

County of Orange; Rebecca Spencer, Riverside County Registrar of Voters; Hang

27

Nguyen, Sacramento County Registrar of Voters; Francisco Diaz, San Benito County

28

1  Clerk-Recorder-Registrar of Voters; Stephenie Shea, Registrar of Voters for San
2  Bernardino County; Elaina Cano, Clerk-Recorder-Registrar of Voters for San Luis
3  Obispo County; Shannon Bushey, Registrar of Voters for the County of Santa Clara;
4  Tricia Webber, Santa Cruz County Registrar of Voters; and Michelle Ascencion,
5  Ventura County Registrar of Voters ("County Defendants") Motion to Dismiss (Dkt.
6  No. 162, "County Mot."), collectively ("Motions").

7      Plaintiffs Election Integrity Project California Inc. ("EIPCa") and James
8  Bradley of Orange County, Mark Reed of Madera County, Buzz Patterson of Ventura
9  County, Michael Cargile of Los Angeles County, and Ronda Kennedy of Ventura
10  County ("Voter Plaintiffs") (collectively "Plaintiffs") filed a combined opposition to
11  the Motions, (Dkt. No. 167, "Opp."). Defendants filed separate replies. (Dkt. Nos.
12  168, "County Reply", Dkt. No. 169, "State Reply"). The Court heard oral argument on
13  May 12, 2023 and took the matter under submission. (Dkt No. 174.) For the following
14  reasons, the Court **GRANTS** the Motions.

15  **I.  BACKGROUND**

16      **a.  Procedural Background**

17      On January 4, 2021, Plaintiffs filed this action. (Dkt. No. 1.) On March 8, 2021,
18  Plaintiffs filed their First Amended Complaint alleging injuries under four provisions
19  of the United States Constitution: (1) the Elections Clause, (2) the Equal Protection
20  Clause, (3) the Due Process Clause, and (4) the Guarantee Clause. (Dkt. No. 68,
21  "FAC"). Thereafter, State and County Defendants moved to dismiss all claims
22  pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") and 12(b)(6)
23  ("Rule 12(b)(6)"). (Dkt. Nos. 84, 85.) The Court granted State and County
24  Defendants' Rule 12(b)(1) motion for lack of jurisdiction. (Dkt. 111.) Plaintiffs
25  appealed the Court's ruling and the Ninth Circuit held that EIPCa had sufficiently
26  alleged organizational standing, did not address the standing of the individual
27  plaintiffs, and affirmed the dismissal of Plaintiffs' Guarantee Clause Claims. (Dkt.
28  121.) On February 21, 2023, Plaintiffs filed their Second Amended Complaint

alleging injuries under two provisions of the United States Constitution: the Equal

Protection Clause and the Due Process Clause. (Dkt. No. 132, "SAC".)

### b. Factual Background

Plaintiffs are Election Integrity Project California (EIPCa) and five registered

voters: James Bradley of Orange County, Mark Reed of Madera County, Buzz

Patterson of Ventura County, Michael Cargile of Los Angeles County, and Ronda

Kennedy of Ventura County (collectively "Voter Plaintiffs"). (SAC ¶¶ 11, 18-22.)

Voter Plaintiffs were originally mentioned in the FAC as candidates but are *now*

alleged to be registered voters. (*Compare* FAC ¶¶ 23, 28-30, 34 *with* SAC ¶¶ 18-22.)

Plaintiffs assert equal protection and due process violations related to Defendants'

various election laws, implementation, and administration of elections.

Defendants are California Secretary of State, Attorney General, and the

Registrar of Voters for fifteen counties. (SAC ¶¶ 23-24, 25-39.) This case arises from

Defendants' allegedly unconstitutional election laws and processes, both during the

2020 election, 2021 and 2022 and in future elections. (*See* SAC ¶¶ 63-84 (alleging

that California passed unconstitutional laws and regulations), 104-129 (alleging

county by county practices), 130-142 (alleging unequal treatment).)

Plaintiffs allege that California's "unconstitutional statutes and emergency

regulations . . . taken together, have led to widespread election irregularities across

California counties." (SAC ¶ 2.) Plaintiffs claim that California's laws, regulations,

and guidelines, "solidified universal VBM [vote-by-mail], a less-secure balloting

process that does not require voters to present identification to request a ballot,"

"[l]egalized unrestrained and unrestricted ballot harvesting by removing mandates

regarding chain of custody, unleashing the potential exploitation of vulnerable

populations such as non-citizens, college students, and senior citizens," "[a]llowed

counties to treat VBM and in-person votes differently, resulting in disproportionate

harm to in-person voters; and" "[f]ailed to comply with federal laws requiring the

maintenance of accurate voter rolls, allowing deceased persons, non-residents,

3.

duplicates, and other ineligible registrants to remain on rolls and receive ballots." (SAC ¶ 3.) Plaintiffs also claim, "California's current laws and regulations lack uniform and robust procedures and have thus granted county officials considerable discretion in implementation of election laws and procedures" (*Id.* ¶ 5.) Plaintiffs allege widespread election irregularities across California counties, specifically "citizen observers . . . observed ballots left unsecured, election workers spending inadequate time observing signatures, and election workers remaking ballots and running them through vote machines with no oversight and outside of the purview of citizen observers." (*Id.* ¶¶ 5-7.) "Plaintiffs seek to enjoin California's election laws and regulations and to declare the current election laws, regulations, and procedures unconstitutional." (SAC ¶ 9.) Plaintiffs claim that "Secretary Weber's lack of robust election procedures resulted in obstructed observation" of the elections. (*See* SAC ¶¶ 91-104.)

With respect to the Equal Protection claim, Plaintiffs allege, "Defendants have violated the Equal Protection Clause by implementing laws, regulations, and procedures that diminish *the value of in-person voters*, including EIPCa's observers and Plaintiffs in their respective counties." (SAC ¶ 151 (emphasis added).) "Defendants have further violated the Equal Protection Clause by applying nonuniform laws, regulations, and procedures *that treat voters, including Plaintiffs and EIPCa's observers, differently than voters in other counties*, including those not listed in this lawsuit." (*Id.* ¶ 152 (emphasis added).) Plaintiffs allege that they "have suffered damages through the diminution in value of their votes by reason of Defendants' violation of the Equal Protection Clause." (*Id.* ¶ 153.) Plaintiffs allege that they have "no adequate remedy at law and will suffer irreparable harm unless the Court enjoins Defendants' violation of the Equal Protection Clause." Finally, Plaintiffs claim they "are entitled to damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating or restraining the Defendants' violation of the Equal Protection Clause." (*Id.* ¶ 155.)

1      With respect to Plaintiffs' Due Process claim, Plaintiffs allege "Defendants

2  have violated the Due Process Clause by implementing laws, regulations, and

3  procedures that diminish the value of in-person voters, including EIPCa's observers

4  and Plaintiffs in their respective counties." (SAC ¶ 163.) Additionally, Plaintiffs

5  allege Defendants further violated the Due Process clause by "applying nonuniform

6  laws, regulations, and procedures that treat voters, including Plaintiffs and EIPCa's

7  observers, differently than voters in other counties, including counties not listed in this

8  lawsuit." (*Id.* ¶ 164.) Plaintiffs seek an injunction, damages, declaratory relief,

9  temporary and permanent relief invalidating or restraining Defendant's alleged

10  violations of the Due process clause. (*See id.* ¶¶ 166-167.)

11  **II. LEGAL STANDARD**

12      Federal Rule of Civil Procedure ("Rule") 8 requires a plaintiff to present a

13  "short and plain statement of the claim showing that the pleader is entitled to relief."

14  Fed. R. Civ. P. 8(a)(2). The statement must provide enough detail to "give the

15  defendant fair notice of what the . . . claim is and the grounds upon which it rests."

16  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355

17  U.S. 41, 47 (1957)). The complaint must be "plausible on its face," that is, the

18  "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

19  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

20  (quoting Twombly, 550 U.S. at 570). The plausibility standard is not equivalent to a

21  probability requirement, but it does require that "[f]actual allegations . . . be enough to

22  raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

23      Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-

24  matter jurisdiction. A Rule 12(b)(1) challenge may be either facial or factual. *Safe Air*

25  *for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the

26  court may dismiss a complaint when the allegations of and documents attached to the

27  complaint are insufficient to confer subject-matter jurisdiction. *See Savage v.*

28  *Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In

1  this context, all allegations of material fact are taken as true and construed in the light

2  most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of*

3  *Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). In contrast, when a court evaluates a

4  factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy

5  itself as to the existence of its power to hear the case." *Safe Air for Everyone*, 373 F.3d

6  at 1039 ("In resolving a factual attack on jurisdiction, the district court may review

7  evidence beyond the complaint without converting the motion to dismiss into a

8  motion for summary judgment.").

9      Under Rule 12, a defendant may also move to dismiss a pleading for "failure to

10  state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Generally,

11  the Court is limited to the allegations in the complaint and documents attached. *In re*

12  *NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). When ruling on the

13  motion, "a judge must accept as true all of the factual allegations contained in the

14  complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court is "not

15  bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556

16  U.S. at 678 (2009) (internal quotation marks omitted). Nor does it "accept as true

17  allegations that contradict matters properly subject to judicial notice or by exhibit."

18  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.) (citing *Mullis v. U.S.*

19  *Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987), *opinion amended in part on denial of*

20  *reh'g*, 275 F.3d 1187 (9th Cir. 2001)). If the court concludes that a 12(b)(6) motion

21  should be granted, the "court should grant leave to amend even if no request to amend

22  the pleading was made, unless it determines that the pleading could not possibly be

23  cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

24  2000) (*en banc*) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

25  **III.   REQUEST FOR JUDICIAL NOTICE**

26      "As a general rule, a district court may not consider any material beyond the

27  pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d

28  668, 688 (9th Cir. 2001) (citation and quotation marks omitted). A court is, however,

1    entitled to consider (1) documents incorporated into the complaint by reference and

2    (2) matters subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

3    U.S. 308, 322 (2007). A court may only take judicial notice of facts that are "not

4    subject to reasonable dispute." Fed. R. Evid. 201(b).

5           Here, County Defendants ask the Court to take judicial notice of exhibits 1 and

6    2, the memorandum issued by the Ninth Circuit in this case and County Defendants'

7    Answering brief submitted on appeal. (*See generally* Request for Judicial Notice

8    ("RJN"), Dkt. No. 162-1.) Likewise, County Defendants request judicial notice of

9    Exhibits 3 through 10, which are state or county government documents, matters of

10   public record, and information maintained on and obtained from government websites.

11   (*See id.*) On reply, County Defendants request judicial notice of Exhibits A through D,

12   which are state government documents and matters of public record. (*See* Reply RJN,

13   Dkt. No. 168-1.) Plaintiffs did not oppose these requests.

14          The Court may take judicial notice of matters of public record, including

15   government documents, press releases, and legislative materials. *DeHoog v.*

16   *Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 n.5 (9th Cir. 2018) (taking judicial

17   notice of "government documents, court filings, press releases, and undisputed matters

18   of public record"); *see also Lee*, 250 F.3d at 688-89. Accordingly, County

19   Defendants' requests are **GRANTED**.

20      **IV.    DISCUSSION**

21          **a.  *12(b)(1) motion***

22          County and State Defendants argue that Voter Plaintiffs lack standing and that

23   the Ninth Circuit did not disturb this Court's conclusion that the candidate Plaintiffs

24   had not alleged sufficient facts to demonstrate injury-in-fact. (County Mot. at 9-10,

25   State Mot. at 6-7 (quoting ECF No. 121 at 5-6 ("Because EIPCa has standing, we do

26   not need to reach the question of whether any other plaintiff has standing to reverse

27   the district court's judgment."))). Defendants further argue that voter plaintiffs cannot

28   show injury in fact, traceability, or redressability. (County Mot. at 7-11, State Mot. at

1   5-10.) Defendants argue that voter Plaintiffs' alleged injury is only a generalized

2   grievance insufficient for standing. (State Mot. at 9, County Mot. at 8-9.)

3       Plaintiffs oppose, arguing that since the Ninth Circuit already held that EIPCa

4   has organizational standing, this Court should disregard Defendants' arguments

5   regarding standing. (Opp. at 5.) Plaintiffs also argue that the voter plaintiffs have

6   alleged sufficient facts for each element of standing. (Opp. at 5-12.) In reply, State

7   Defendants argue that *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013), stands

8   for the proposition that on appeal, the Court of Appeals need not consider each

9   individual plaintiff's standing before ruling on the merits of a claim for injunctive

10  relief, where that court has determined that at least one plaintiff has standing. (State

11  Reply at 2.) State Defendants further argue that "the 'standing for one is standing for

12  all' approach does not prohibit a district court from analyzing a plaintiff's standing

13  even if it finds that another plaintiff has sufficient standing" and that the "standing for

14  one is standing for all approach might be limited to appellate review." (*Id.* at 3, citing

15  *Challenge v. Moniz*, 218 F. Supp. 3d 1171, 1179 (E.D. Wash. 2016) (internal

16  quotations omitted) (citing *Nat'l Ass'n of Optometrists & Opticians LensCrafters v.*

17  *Brown*, 567 F.3d 521, 523 (9th Cir. 2009))).

18      The Court in *Townley* explained that because the Plaintiffs sought injunctive

19  relief and not damages "in an injunctive case this court need not address standing of

20  each plaintiff if it concludes that one plaintiff has standing." *Townley*, 722 F.3d at

21  1133 (quoting *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc.*, 567 F.3d at

22  522 (9th Cir. 2009)). Although there were eleven plaintiffs, since only one plaintiff

23  needed standing to seek injunctive relief, the Court grouped similar plaintiffs and

24  analyzed whether each group had standing to request injunctive relief. *Id.* at 1133-

25  1136. The Court ultimately found that no group had standing. *Id.* at 1136. "[T]he

26  general rule applicable to federal court suits with multiple plaintiffs is that once the

27  court determines that one of the plaintiffs has standing, it need not decide the standing

28  of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), *as amended* (Mar.

8.

8, 1994) (citing *Carey v. Population Services Int'l*, 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022). Here, the Ninth Circuit has already found that EIPCa has standing to seek injunctive relief. (Dkt. 121.) Since one plaintiff has standing to seek injunctive relief, this Court need not decide whether the remaining voter plaintiffs have standing.  Therefore, the Court proceeds with its analysis of Defendants' 12(b)(6) motion to dismiss.

### b.  12(b)(6) Motion

***Anderson-Burdick Framework for Challenged Laws***

Laws that impose burdens on the right to vote are not automatically subject to strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 432 (1992). "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)) (citing *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 213-14 (1986)). "When a state election law provision imposes only reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson*, 460 U.S. at 788). However, when first and fourteenth amendment rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

The Ninth Circuit has "repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir.

2011) (citation and alterations omitted)). The Ninth Circuit has further noted that its "respect for governmental choices in running elections has particular force where . . . the challenge is to an electoral system, as opposed to a discrete election rule." *Id.* at 1114.

### *The Challenged Laws & Regulations*

State Defendants argue the laws that Plaintiffs challenge individually (*see* SAC at 39-40) do not severely burden the right to vote and therefore strict scrutiny does not apply. State Defendants argue that the appropriate test to analyze the challenged laws and regulations is the *Anderson-Burdick* test. (State Mot. at 11.) Other than calling State Defendants' first argument a red herring, Plaintiffs do not substantively address State Defendants' argument that the laws individually do not burden the right to vote. (Opp. at 13.) "[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment" with respect to that issue. *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (quoting *Sportscare of America, P.C. v. Multiplan, Inc.*, No. 2:10–4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011)). Since Plaintiffs did not respond to this argument, they have waived the issue. Accordingly, the Court proceeds to analyze whether the laws impose burdens on Plaintiffs' right to vote.

Plaintiffs challenge four groups of laws: (1) Assembly Bills 860 (2020) and 37 (2021), and Elections Code sections 3000.5 and 3020; (2) Senate Bill 503 (2021) and Elections Code section 3019; (3) California Code of Regulations sections 20910, 20960, 20961, 20962, 20980, 20981, 20983, 20984, 20985, 20990, 20991, and 20992.1; and (4) Senate Bills 397 (2012) and 450 (2016). (*See* SAC at 39-40, Prayer 5.)[1]

---

[1] In a footnote to their SAC, Plaintiffs also attempt to challenge "all bills and future bills that have or will expand VBM and all regulations that have or will not provide uniform requirements regarding observation, signature verification, ballot remaking, and voter rolls." (SAC at 40, n.3.) This request is improper as future bills are not

10.

### (1) Assembly Bills (AB) 860 (2020) and 37 (2021)

State Defendants point out that Elections Code sections 3000.5 and 3020 were added to the Elections Code by AB 860 and both subsequently amended by AB 37. Section 3000.5 established the statewide practice of mailing a VBM ballot to all registered voters in advance of each election. *See generally* Cal. Elec. Code § 3000.5 (amended 2021). Section 3020 regulates the time for return of VBM ballots and established a seven-day window for an election official to *receive* via the United States Postal Service or a bona fide private mail delivery company a VBM ballot and have the VBM ballot "timely cast," so long as the ballot is postmarked on or before Election Day. Cal. Elec. Code § 3020(b) (amended 2021); *see also* SAC ¶ 80. The Court agrees that neither of these laws "severely burden" Plaintiffs' voting rights. Both laws are generally applicable and expand the opportunity for *all* registered voters to cast their votes by mail.

### (2) Senate Bill (SB) 503 (2021) and Elections Code Section 3019

Second, Plaintiffs challenge SB 503 and Elections Code section 3019. State Defendants argue that Elections Code section 3019, amended in 2021 by SB 503, established statewide standards for signature verification of VBM ballots.[2] (State Mot. at 13.) State Defendants further argue that section 3019 provides at least five standards apply when comparing a signature on a VBM identification envelope with the voter's registration record. (State Mot. at 13.) Importantly, there is a presumption that the signature on a VBM identification envelope is the voter's signature, and two officials must agree that a signature does not match. *See generally* Cal. Elec. Code § 3019 (a)(2) (amended 2022). Finally, when a ballot is rejected based on the signature, the

before the Court.

[2] Elections Code section 3019 was also amended by AB 2967 in 2022. The Court reviews the 2021 challenged version of § 3019, SB 503. However, the amendments to section 3019 in AB 2967 did not make changes that affect the Court's analysis.

voter must be given an opportunity to cure the ballot, as specified in the section. Cal. Elec. Code § 3019(d). Here, factors to consider when verifying signatures as well as procedures for curing signatures do not burden the right to vote, and do not burden Plaintiffs' right to vote.

### (3) Challenges to California Code of Regulations

Third, Plaintiffs challenge California Code of Regulations sections 20910, 20960, 20961, 20962, 20980, 20981, 20983, 20984, 20985, 20990, 20991, and 20992. (SAC at 39-40, Prayer 5.) State Defendants argue that none of these regulations burden the right to vote. (State Mot. at 15-16.)

State Defendants argue that section 20910 merely states the applicability of the chapter. (State Mot. at 15.) Indeed, California Code of Regulations section 20910 provides, "The regulatory purpose of this Chapter is to ensure uniform application and practices for elections officials related to . . . signature verification on local and statewide election-related petitions, vote-by-mail identification envelopes, and provisional ballot envelopes." Cal. Code Regs. tit. 2, § 20910(a). It also provides, "the regulatory purpose of this Chapter is to provide uniform vote counting standards for consistent application of ballot processing and counting throughout the state. The regulations set forth in this Chapter shall apply to ballots cast in elections held pursuant to the California Elections Code." Cal. Code Regs. tit. 2, § 20910(b). This regulation just explains the purpose of the chapter; it does not burden the right to vote.

State Defendants argue that California Code of Regulations sections 20960-20962 do not burden the right to vote. (State Mot. at 15.) State Defendants argue that Section 20960 details the process for signature verification (in conjunction with Elections Code section 3019). (State Mot. at 15.) Here, Regulation section 20960 provides:

> [f]or signature verification, the elections official must compare the signature . . . to the voter's signature(s) in the voter's registration record. In addition, the elections official must compare the signature on a voted vote-by-mail envelope and a voted provisional ballot envelope to the voter's signature(s) in the voter's registration record prior to counting a

12.

1    ballot.

2    Cal. Code Regs. tit. 2, § 20960(a). In addition, it also provides parallel regulations that

3    follow and expand upon California Elections Code section 3019(a)(2). *See* Cal. Code

4    Regs. tit. 2, § 20960(b)-(*l*). As noted above, factors to consider when verifying

5    signatures do not burden Plaintiffs' right to vote but instead expand the right to vote.

6          State Defendants further argue that Section 20961 provides that if signature

7    verification technology is used and a ballot is rejected, election officials shall

8    subsequently conduct a manual comparison. (State Mot. at 15.) Indeed, "[If] the

9    technology rejects the signature, the elections official shall utilize the provisions of

10   Elections Code section 3019 and Section 20960 to manually compare the signature."

11   Cal. Code Regs. tit. 2, § 20961. State Defendants next argue that section 20962 relates

12   to yearly trainings for elections officials and staff who are responsible for the

13   signature verification process. (State Mot at 15, citing Cal. Code Regs. tit. 2, § 20962.)

14   Here, these regulations do not burden Plaintiffs' right to vote.

15         State Defendants argue that sections 20980-20985 concern uniform vote

16   counting standards. (State Mot. at 15.) Indeed, "the purpose of this article [,

17   specifically sections 20980-20985,] is to provide standards to define the circumstances

18   under which 'marking' of a ballot constitutes a vote and when a vote will or will not

19   count for each category of voting system certified and in use in California." Cal. Code

20   Regs. tit. 2, § 20980. Section 20981 provides definitions for use in the article. Cal.

21   Code Regs. tit. 2, § 20981. This regulation does not burden Plaintiffs' right to vote.

22         State Defendants point out that section 20982 lays out general vote counting

23   standards, under which improperly marked ballots may be counted so long as "it is

24   clear that" the improper mark "represents the voter's choice." (State Mot. at 15.) The

25   regulation also includes how to deal with overvotes, undervotes, hesitation marks,

26   write-in candidates, as well as certain marking that represent a voter's choice. Cal.

27   Code Regs. tit. 2, § 20982. The Court agrees that this regulation does not burden

28   Plaintiffs' right to vote.

13.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, State Defendants argue that sections 20983, 20984, and 20985 all outline similar standards that are to be used with particular types of voting systems. (State Mot. at 16.) Here, section 20983 provides regulations for "[w]hen optical scan technology is used to count the votes on a ballot." Cal. Code Regs. tit. 2, § 20983. Section 20984 provides "[a] paper ballot shall be subject to the standards in the section applicable to the voting system on which it is processed" and further provides, "[w]hen paper ballots, or voting responses on paper other than a ballot, are counted by the hand and eye, the provisions of Section 20983 shall apply." Cal. Code Regs. tit. 2, § 20984. Finally, section 20985 provides standards that apply when "direct recording electronic (DRE) technology is used to cast and count the votes on a ballot." Cal. Code Regs. tit. 2, § 20985. These regulations do not burden Plaintiffs' right to vote.

The remaining challenged regulations are sections 20990, 20991, and 20992 and these regulations pertain to processing vote-by-mail and provisional ballots. *See generally* Cal. Code Regs. tit. 2, §§ 20990-20992. State Defendants argue that these regulations do not burden the right to vote because the regulations prevent a scenario in which different county election officials develop and administer different standards for what qualifies as a valid signature or ballot mark. (State Mot. at 16.)

In their opposition, Plaintiffs argue that none of the regulations require election officials run ballots through a machine, calibrate their signature verification rate to a specific error rate, or apply a specific number of points of comparison. (Opp. at 13, citing SAC ¶¶ 69-70, 106-09.) In reply, State Defendants argue that Plaintiffs' discontent with the regulations does not address the State's argument that the laws themselves are consistent, politically neutral, and provide statewide standards for administering elections and counting ballots. (State Reply at 8-9.)

Here, as noted above, none of the challenged regulations burden Plaintiffs' right to vote. The challenged regulations provide a framework for elections officials to follow when they are verifying signatures and counting votes; a framework which was

14.

wholly missing in *Bush*, 531 U.S. at 106. Plaintiffs have not shown that these regulations burden their right to vote.

### Challenges to Senate Bills (SB) 397 (2012) and 450 (2016)

Fourth, Plaintiffs challenge SB 397, passed in 2012, and SB 450, passed in 2016. (State Mot. at 14-15; s*ee* SAC ¶¶ 55, 56, Prayer at 5.) Plaintiffs allege that SB 397 implemented online voter registration in California, but did not allege the relevant Elections Code section. (*See* SAC ¶ 55.) State Defendants cite Elections Code section 2196 as the result of SB 397. (State Mot. at 14.) State Defendants argue that SB 450, also known as the Voter's Choice Act, established a system under which voters in certain counties would be automatically mailed a VBM ballot, and would be permitted to return the ballot at any ballot dropoff location in the county, rather than just one specific precinct location. (State Mot. at 14.) State Defendants point out that the Ninth Circuit has already found that SB 450 does not burden the right to vote. Indeed, after going through the *Anderson-Burdick* framework, the Ninth Circuit found:

> The [Voter's Choice Act ("VCA")] does not burden anyone's right to vote. Instead, it makes it easier for some voters to cast their ballots by mail, something that California voters already can do. As for voters outside the counties that have opted in to the all-mailed system, their access to the ballot is exactly the same as it was prior to the VCA's enactment. To the extent that having to register to receive a mailed ballot could be viewed as a burden, it is an extremely small one, and certainly not one that demands serious constitutional scrutiny.

*Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

Plaintiffs oppose arguing that *Short* is distinguishable because Plaintiffs challenge AB 860, a bill requiring county officials to send a ballot to every active-status registrant voter, in combination with regulations governing signature verification and ballot remaking and practices concerning the maintenance of voter rolls. (Opp. at 14.)

Here, allowing individuals to register to vote online does not restrict Plaintiffs' right to vote and instead expands the right to vote. Moreover, the Ninth Circuit has found that SB 450, also known as the Voter Choice Act, does not burden the right to vote. *Short*, 893 F.3d at 677. While Plaintiffs challenge various other regulations,

Plaintiffs have not shown that the other challenged regulations burden their voting rights.

### *Application of Anderson-Burdick*

Here, the laws and regulations challenged by Plaintiffs are generally applicable and do not burden Plaintiffs' right to vote. In addition, Plaintiffs did not meaningfully address the State's contention that the laws do not burden the right to vote. Here, the regulations provide election officials with guidance as to what constitutes a valid vote and how to verify signatures on ballots, among other things. The laws individually and together function to *expand* the methods by which people may vote as well as to ensure that all ballots or signatures are not rejected for arbitrary reasons.

"When a state election law provision imposes only reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S at 434 (quoting *Anderson*, 460 U.S. at 788). State Defendants argue that the challenged laws and regulations survive constitutional scrutiny because they serve important government interests. (State Mot. at 21.) Specifically, State Defendants argue that the State's interest in: increasing voter turnout and voluntary participation in the democratic process by issuing all registered voters a vote-by-mail ballot; modernizing election process by allowing online voter registration; protecting the public's confidence that their votes will be counted in the state's elections via statewide standards for signature verification, vote counting, and providing a process for ballot curing; and by setting a window for the timely receipt of VBM ballots. (*Id.*) Indeed, the Courts have found that such interests are sufficient under the *Anderson-Burdick* test. *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (increasing voter turnout and specific interest in incremental election-system experimentation sufficient); *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191-193, 197 (2008) (noting that the state has a valid interest in modernizing election

procedures and safeguarding voter confidence). Since the challenged laws do not burden Plaintiffs' right to vote, the State Defendants' proffered interest in the law is sufficient. Accordingly, Plaintiffs have failed to state a claim against State Defendants.

***Plaintiffs' Second Amended Complaint Does Not State Equal Protection or Due Process Claims***

There are two "separate strands of equal protection doctrine: suspect classifications and fundamental rights." *Short v. Brown*, 893 F.3d 671, 678 (9th Cir. 2018). The right to vote is a fundamental right. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). In the context of voting, the Equal Protection Clause prohibits a state from "diluti[ng] . . . the weight of the votes of certain . . . voters merely because of where they reside[]." *Reynolds*, 377 U.S. at 557. Specifically, "[w]ith respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live." *Id.* at 565.

Courts have found that garden-variety election irregularities, such as inadequate responses to illegal crossover voting, counting some illegally cast votes, and mechanical and human errors in counting votes do not violate the due process clause. *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (June 23, 1998) (collecting cases). Indeed, "[t]he Constitution is not an election fraud statute[.]" *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986). "[S]ection 1983 does not provide a right of action for garden variety election irregularities." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) (quoting *Griffin v. Burns,* 570 F.2d 1065, 1076 (1st Cir. 1978)) (internal quotations omitted). However, "when election irregularities transcend[] garden variety problems, the election is invalid." *Bennett*, 140 F.3d at 1226.

17.

#### A. Plaintiffs' theory of vote dilution through voter fraud is not cognizable

State Defendants argue that Plaintiffs' theory is not cognizable. (State Mot. 17-18.) State Defendants point out that the case law on vote dilution does not support Plaintiffs' theory of harm. (State Mot. at 17.) State Defendants note that "courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud." *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020).

Plaintiffs rely on *Gray v. Sanders,* 372 U.S. 368 (1963), *Reynolds v. Simms*, 377 U.S. 533 (1964), *Roman v. Sincock*, 377 U.S. 695, 707-12 (1964), *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 653 (1964), *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969), as well as *Bush v. Gore*, 531 U.S. 98 (2000) for their vote dilution claims. (Opp. at 14-16.) Plaintiffs argue that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. However, the Court agrees that these cases do not support Plaintiffs' vote dilution claims.

In *Gray*, Georgia gave "every qualified voter one vote in a statewide election; but in counting those votes" Georgia used "the county unit system which in end result weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties." *Gray v. Sanders*, 372 U.S. 368, 379. Under Georgia's county unit system, "[o]ne unit vote in Echols County represented 938 residents, whereas one unit vote in Fulton County represented 92,721 residents. Thus, one resident in Echols County had an influence in the nomination of candidates equivalent to 99 residents of Fulton County." *Id.* at 371. One person, one vote means that a state cannot weigh votes for,

> [o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to *have an equal vote*— whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be *in that geographical unit*. This is required by the Equal Protection Clause of the

> Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions.

*Gray v. Sanders*, 372 U.S. 368, 379-80 (1963) (double emphasis added). The Supreme Court noted that the State's weighing of votes was improper because under the Constitution, the "only weighing of votes" that is permissible in representation is "the allocation of Senators irrespective of population and the use of the electoral college in the choice of a President" and that once the qualification of voters have been set, voters must have equal voting power. *Id.* at 380.

*Reynolds* concerned vote dilution due to Alabama's failure to reapportion districts after 60 years. *Reynolds v. Sims*, 377 U.S. 533, 569-70 (1964). The right to vote "suffers substantial dilution . . . (where a) favored group has full voting strength . . . (and) (t)he groups not in favor have their votes discounted.'" *Id.* at 555 n.29, (quoting *South v. Peters*, 339 U.S. 276, 279 (Douglas, J., dissenting).) Indeed, "[c]onsistent failure by the Alabama Legislature to comply with state constitutional requirements as to the frequency of reapportionment and the bases of legislative representation resulted in a minority strangle hold on the State Legislature. Inequality of representation in one house added to the inequality in the other." *Id.* The Supreme Court held "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Id.* at 568. Likewise, the "Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577.

*Roman v. Sincock*, 377 U.S. 695 (1964) and *WMCA, Inc. v. Lomenzo*, 377 U.S. 633 (1964) were decided on the same day as *Reynolds v. Sims*. With respect to the *Roman*, the Supreme Court agreed with the district court and found "the Delaware

19.

legislative apportionment constitutionally invalid" for violating the equal protection clause in failing to apportion "the seats in its bicameral legislature" "substantially on a population basis." *Roman*, 377 U.S. at 708. With respect to the second companion case, the Supreme Court found that the district court "erred in upholding the constitutionality of New York's scheme of legislative apportionment" because "[n]either house of the New York Legislature . . . will be apportioned sufficiently on a population basis." *WMCA, Inc.*, 377 U.S. at 653. Finally, in *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) the Supreme Court struck down on equal protection grounds a law that "discriminate[d] against the residents of the populous counties of the State in favor of rural sections" in the formation of a new political party and the placement of its candidates on the ballot.

All of the vote dilution cases that Plaintiffs rely on demonstrate that individuals cannot be given more *representation* in state government by virtue of their residence. As the Supreme Court noted in *Gray*, with respect to the weighing of votes, the "only weighing of votes" that is permissible in representation is "the allocation of Senators irrespective of population and the use of the electoral college in the choice of a President" and that once the qualification of voters have been set, voters must have equal voting power. *Gray v. Sanders*, 372 U.S. 368, 380 (1963). "Overweighting and overvaluation of the votes of those living *here* has the certain effect of dilution and undervaluation of the votes of those living *there*. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically." *Reynolds v. Sims*, 377 U.S. 533, 563 (1964) (double emphasis added). The weighing or diluting of votes under the Supreme Court's one-person, one vote cases focus on the systems that provide voters representation, not on allegedly fraudulently cast votes.

While the denial of the right to vote and the dilution of vote are both constitutional injuries, vote dilution and the denial of the right to vote occur in different contexts. *See Short v. Brown*, 893 F.3d 671, 678-679 (9th Cir. 2018)

20.

(explaining that *Gray* and *Reynolds* stand for the narrow proposition "that a state may not allocate representation differently based on a voter's county of residence"). While Plaintiffs claim that their claims involve vote dilution, the vote dilution is from fraudulently cast votes. (*See* Opp. at 15.) Plaintiffs fail in their attempts to rely on the Supreme Court's vote-dilution case law to support the notion that fraudulently cast votes dilute Plaintiffs' votes. *Accord Short v. Brown*, 893 F.3d 671, 678 (9th Cir. 2018) (distinguishing *Reynolds* and *Gray*). Likewise, the companion cases that were decided on the same day as *Reynolds* do not support Plaintiffs' vote dilution claims. Accordingly, Plaintiffs' vote dilution claims based on potential or actual voter fraud are noncognizable.

## B. This case is not analogous to Bush v. Gore

County Defendants argue that Plaintiffs case is not like *Bush v. Gore*. (County Mot. at 22-23.) County Defendants also argue that the standards used in *Bush* was infirm compared to California's robust signature verification standouts. Plaintiffs oppose, relying on *Bush v. Gore*, and cases applying *Bush* to support their equal protection vote-dilution claim. (*See* Opp. at 14-17.) Plaintiffs argue that under *Bush*, a lack of robust and uniform election procedures inherently leads to an equal protection violation. 531 U.S. at 106-07. In reply, County Defendants argue that *Bush* is not analogous (County Reply at 10) and that *Black* and *Common Cause* are distinguishable and demonstrate that Plaintiffs have failed to state a claim. (County Reply at 11-13.)

The Court agrees that *Bush* is not analogous. *Bush* involved the infamous punch-card ballots, specifically "ballot cards designed to be perforated by a stylus but which, either through error or deliberate omission, have not been perforated with sufficient precision for a machine to register the perforations." *Bush v. Gore*, 531 U.S. 98, 105 (2000). *Bush* dealt with an election *recount* process ordered by the Florida Supreme Court *without any standards on how to proceed*. *Id.* at 103. The equal

21.

protection and due process violations in *Bush* stemmed from a lack of standards, the arbitrary treatment of ballots, and the resulting unequal evaluation of ballots. *Id.* at 105-106. "The formulation of uniform rules to determine [voter] intent . . . is practicable and . . . necessary." *Id.* at 105-06. Here, Plaintiffs cannot baldly claim that the State lacks uniform voting laws and regulations while at the same time seeking to overturn such laws. (*See* Opp. at 13, SAC at 39-40.) In addition, the Supreme Court expressly limited *Bush* to its facts. *Id.* at 105, 109 (noting "consideration [was] limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities"). Since the State of California has laws governing signature verification and ballot counting, *Bush* is distinguishable and not applicable.

Common Cause and *Black* rely on *Bush*, but those cases also involved the punch-card ballots. *Common Cause* involved a challenge to the use of different voting procedures, specifically unreliable punch-card voting ballots and did not involve equal protection claims. *Common Cause S. Christian Leadership Conf. of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106, 1108 (C.D. Cal. 2001). There, Plaintiffs alleged that the use of such systems in counties with high racial minority population made it more likely that *the right to vote would be denied, and would also be denied on the basis of race. Id.* at 1107. Here, Plaintiffs do not assert or allege that the ballots they use to vote are of the sort that it is likely that their right to vote will be denied. In addition, Plaintiffs do not allege that their right to vote will be denied on the basis of race.

Black is an out-of-circuit case involving a challenge to punch card voting systems. *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002). *Black* also provided that it was "certainly mindful of the limited holding of *Bush*" but nevertheless "believe[d] that situation presented by this case is sufficiently related to the situation presented in Bush that the holding should be the same." *Id.* at 899. Relying on its reading of *Bush*, the Court defined vote dilution "the higher probability

of that vote not being counted as a result of the voting systems used." *Id.* at 895, 898-899; *but see Reynolds v. Sims*, 377 U.S. 533, 555, n.29 (1964) (quoting *South v. Peters*, 339 U.S. 276, 279 (Douglas, J., dissenting.) "The right to vote "suffers substantial dilution . . . (where a) favored group has full voting strength . . . (and) (t)he groups not in favor have their votes discounted.'") The *Bush* Court did not define vote dilution, did not state that the votes of Floridians were being diluted, and instead provided basic propositions on the right to vote. *Bush v. Gore*, 531 U.S. 98, 105 (2000). Likewise, the *Bush* Court found equal protection violations because of the lack standards in place to discern voter intent resulting in the disparate treatment of ballots, including partial recount totals, and differential treatment of ballots based on manual or machine recounts. *Bush v. Gore*, 531 U.S. 98, 105-09 (2000).

Here, *Black* is distinguishable in that it involved a coalition of African American and Latino voters challenging their counties' use of a punch-card voting system akin to what was used in Florida for the 2000 presidential election. *Id.* at 891-93. Plaintiffs alleged,

> jurisdictions that employ either punch-card voting systems or provide optical scan without error notification experience a higher percentage of residual votes than those jurisdictions that use optical scanning equipment with error notification (a residual vote is a ballot that does not contain a permissible vote). Therefore, Plaintiffs conclude that individuals living in punch card jurisdictions have a greater *statistical probability of not having their votes counted.* Finally, Plaintiffs argue that the counties with the punch-card system have larger populations of minorities than do counties using other voting systems, and thus use of those less accurate machines has a disparate impact on minority voters.

*Id.* at 894 (emphasis added). In contrast, while one plaintiff here is African American (SAC ¶¶ 22, 142), Plaintiffs do not represent African American or Latino voters. (*See* SAC ¶ 10 "Election integrity and transparency are critical for the enfranchisement of all eligible voters, regardless of party affiliation or political view.") Moreover, while the Court in *Black* incorrectly described the harm alleged by African American and

1   Latino Plaintiffs as vote dilution, the actual harm alleged was a statistical probability

2   that they would be denied their right to vote. *Id.* at 894. Since Plaintiffs do not claim

3   that their votes have not or will not be counted, *Black* is inapplicable.

4   ### C. Plaintiffs' allegations do not demonstrate differential treatment

5   For the reasons explained below Plaintiffs' SAC fails to state a claim for equal

6   protection and due process violations.

7   ### 1. Disparate treatment allegations

8   Plaintiffs' allegations concerning allegedly disparate treatment between VBM

9   voters and in person voters are in paragraphs 130-142 of the SAC. County Defendants

10  argue that Plaintiffs' allegations that in-person and VBM voters are treated differently

11  because VBM voters have more time to vote and VBM ballots are allegedly less

12  scrutinized, SAC ¶¶ 130-42 fail to state an equal protection claim. (County Mot. at

13  18.) County Defendants argue that Plaintiffs have not actually alleged distinct groups

14  of voters because all registered voters are mailed a VBM ballot, and any voter can

15  choose to be an in-person voter or a VBM voter. (County Mot. at 18-19.) Both State

16  and County Defendants argue that Plaintiffs' allegations regarding additional time for

17  VBM voters to vote are not well-pled because Plaintiffs misstate the law and

18  judicially noticeable documents contradict Plaintiffs' allegations. (State Mot. at 19,

19  County Mot. at 19.) County Defendants argue that judicially noticeable exhibits

20  demonstrate that the Secretary of State made no such guidance. (*See* RJN Ex. 8-10.)

21  Here, Plaintiffs allege "in 2020, under former Secretary of State Padilla's

22  guidance, VBM voters could legally vote by dropping off ballots in *mailboxes* until

23  11:59 p.m. and still have their ballots *postmarked* on election day and therefore

24  counted." (SAC ¶ 131 (double emphasis added).)[3] Since the Secretary of State made

25  no such guidance, (s*ee* RJN Ex. 8-10), the Court disregards Plaintiffs allegation

26

27

28  [3] It is unclear how the California Secretary of State would have the authority to tell the United States Postal Service *how to postmark* the mail pieces that USPS processes.

1    regarding the Secretary of State's guidance. *Sprewell v. Golden State Warriors*, 266

2    F.3d 979, 988 (9th Cir. 2001) (the court need not accept as true allegations "that

3    contradict matters properly subject to judicial notice").

4          In a related argument, State Defendants contend that VBM ballots mailed

5    through the postal service are required to be postmarked on or before Election Day,

6    which would not happen if a voter were to place their ballot in a mailbox after postal

7    office business hours, citing California Elections Code section 3020(b). Plaintiffs did

8    not respond to this argument. The Court notes that a postmark is defined as "[a]n

9    official mark put by the post office on an item of mail to cancel the stamp and to

10   indicate the place and date of sending or receipt." (POSTMARK, Black's Law

11   Dictionary (11th ed. 2019).) California Elections Code section 3020(b)(1), "any vote

12   by mail ballot cast under this division shall be timely cast if it is received by the

13   voter's elections official via the United States Postal Service or a bona fide private

14   mail delivery company no later than seven days after election day and . . . (1) The

15   ballot is *postmarked on or before election day* or is time stamped or date stamped by a

16   bona fide private mail delivery company on or before election day." Cal. Elec. Code §

17   3020 (b)(1) (emphasis added). Here, the postmark cancels out the stamp, but neither

18   party points to allegations in the complaint indicating that the VBM ballots require

19   stamps.

20         State Defendants further argue that ballot *drop boxes* are required to be "locked

21   and covered or otherwise made unavailable" at 8 p.m. on Election Day, citing 2 Cal.

22   Code Regs. § 20136(e). However, Plaintiffs do not make allegations related to ballot

23   drop boxes. (SAC ¶¶131-132 (allegations concerning *mailboxes*).) Here, while

24   Plaintiffs allege that EIPCa has recorded late voting and late ballot pickups from

25   mailboxes (SAC ¶ 133), this allegation does not lead to the conclusion that such votes

26   were improperly counted or improperly postmarked for election day when they were

27   mailed the following day. Plaintiffs also allege that "California Elections Code § 3020

28   also allows counties to accept VBM ballots after election day that cannot reliably be

                                           25.

1  determined to have been cast on or before election day." (SAC ¶135.) This allegation

2  misstates California Elections Code section 3020(b)(2), which provides that if the

3  ballot's postmark is illegible, has no date, or lacks a postmark and was delivered via

4  USPS or a bona fide private mail delivery company, the VBM ballot will be timely if

5  it is received no later than seven days after election day, "is date stamped by the

6  elections official upon receipt" and is signed and dated by the voter on or before

7  election day. Cal. Elec. Code § 3020 (b)(2). Since this allegation contradicts the stated

8  requirements of the law, the Court disregards it. *See Iqbal*, *supra*, 556 US at 681

9  (courts do not accept legal conclusions as true).

10       In opposition, Plaintiffs argue that in-person voters were subject to unequal

11  treatment compared to VBM voters. (*See* Opp. at 6, 7-8 (responding to standing

12  arguments).) In support, in relevant part, Plaintiffs cite paragraphs 136-140.[4]

13       In paragraph 136, Plaintiffs allege that Nevadans voted in California's election.

14  However, this allegation does not demonstrate favorable treatment to VBM voters.

15  (*See* SAC ¶ 137.) Next, Plaintiffs allege that "[a]lmost 124,000 more votes were

16  counted in the 2020 election than registrants with voting histories for that election

17  [with] Kern County, Riverside County, Orange County, and Los Angeles County

18  record[ing] higher discrepancies by percentage between VBM votes counted and

19  VBM registrants with voting histories than non-defendant counties like Butte County

20  and Glenn County." (SAC ¶ 137.) This allegation also does not demonstrate favorable

21  treatment of VBM voters. To the extent that Plaintiffs are attempting to equate lack of

22  voter history with fraud (*see* SAC ¶ 138), such an inference is not supported. Plaintiffs

23  allege that "[t]hese irregularities specifically harm Plaintiffs and other in-person voters

24  whose votes are diluted by ineligible VBM votes in their respective counties" and the

25  "failure to adequately vet VBM ballots dilutes the votes of lawful in-person voters."

26

27  [4] While Plaintiffs also cite paragraphs 18-22, 105-128, 136-140, 151, and 163, only
    paragraphs 136-140 are in the portion of the SAC concerning alleged preferential
28  treatment of VBM voters. (Opp. at 8.)

26.

(SAC ¶ 139, 140.) County and State Defendants argue that to the extent that any invalid or fraudulent VBM ballots were counted, the harm of those invalid votes does not tend to propound to lawful in-person voters as compared to lawful VBM voters. (*See* County Mot. at 19, State Mot. at 18.) Plaintiffs did not address this argument in their opposition.

Here, the Court agrees invalid VBM votes would harm both voters regardless of whether they voted by mail or in person. Accordingly, Plaintiffs have failed to demonstrate disparate treatment. In addition, Defendants have demonstrated that Plaintiffs' allegations concerning differential treatment of voters based on VBM as compared to in-person voting are not plausible. Therefore, Plaintiffs have failed to state an equal protection claim based on preferential treatment of VBM voters.

### 2. *Observer allegations*

County Defendants argue that Plaintiffs election-observer allegations do not affect Plaintiffs' voting rights. (County Mot. at 20-21.) County Defendants further argue that Plaintiffs' observer-related allegations seek to create speculation that Californians' right to vote is impaired, without well-pled allegations drawing a logical inference between obstruction of observation and vote dilution. Plaintiffs did not address this argument in their opposition and have waived the issue. Indeed, while Plaintiffs allege in paragraphs 93-104 that EIPCa election observers were obstructed from viewing vote collection and counting, these allegations only serve to cast doubt on the integrity of California's elections. Since these allegations are speculative and do not affect Plaintiffs' voting rights, the Election-observer-obstruction allegations do not support a showing of either an equal protection violation or a due process violation.

### 3. *Due Process Arguments and Alleged Election Irregularities*

The Court addresses County Defendants' election irregularities arguments and due process arguments together since Plaintiffs' due process opposition arguments rely on election irregularities. (*See* Opp. at 17-18)

1   County Defendants argue that under *Soules v. Kauaians for Nukolii Campaign*

2   *Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) (citation omitted) there is no section

3   1983 "right of action for 'garden variety election irregularities.'" (County Mot. at 14.)

4   County Defendants further argue that under *Soules*, "[o]nly a pervasive error which

5   undermines the 'organic processes' of the ballot is sufficient to trigger constitutional

6   scrutiny." *Id.* (citation omitted). With respect to the due process claim, County

7   Defendants argue that Plaintiffs must allege that voters in different counties were

8   subject to statistically significant inaccuracies in vote tabulation without a rational

9   basis. (County Mot. at 17.)

10   Plaintiffs oppose, arguing that election irregularities are authorized by state law

11   because the laws allow election officials to impose varying degrees of flawed

12   procedures on portions of the electorate. (Opp. at 17.) Plaintiffs also argue that their

13   due process claims are similar to *Black* because Plaintiffs challenge California's

14   election laws, regulations, and procedures that allow county election officials to

15   implement vote counting procedures with varying error rates. (Opp. at 18.) Plaintiffs

16   contend that the challenged procedures, as in *Black*, disproportionately harm portions

17   of the electorate depending on where they reside noting that the Counties have failed

18   to maintain accurate voter rolls and have applied signature verification systems that

19   fail to adequately vet invalid signatures. (Opp. at 18, citing SAC ¶¶ 105-29, 136-39.)

20   Plaintiffs cite cases related to error rates to support their due process claim, and argue

21   that *Griffin v. Burns*, 570 F.2d 1065, (1st Cir. 1978) is instructive, because *Black*

22   relied on it. (*See* Opp. at 17-18.)

23   In reply, County Defendants Plaintiffs allegations are not like those in *Black*

24   and point out that there are no allegations in the SAC that County Defendants'

25   allegedly different signature verification processes allowed invalid ballots to be

26   counted at a constitutionally significant order of magnitude higher than in comparison

27   counties. (County Reply at 14.) Furthermore, County Defendants contend that there is

28   no constitutional harm arising from: counting ballots validly cast by inactive voters

28.

(*see* SAC ¶¶ 64, 117); ballot duplication to ensure that a damaged or unreadable ballot is properly tabulated (*see* SAC ¶ 114); voters having another person return their ballot (*see* SAC ¶¶ 118, 124); or the application of uniform vote count standards designed to consistently ascertain voter intent (*see* SAC ¶ 122). (County Reply at 15.)

Here, the Court agrees that Plaintiffs must show pervasive error which undermines the organic processes of the ballot to establish a constitutional violation based on election irregularities. *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988). Plaintiffs rely on the same allegations throughout the complaint in support of their due process claim. (*See* Opp. at 18, citing SAC ¶¶ 105-29, 136-39.) However, after going through the *Anderson-Burdick* framework, the Court found above that the laws at issue do not burden Plaintiffs' right to vote.

"[A]n election is a denial of substantive due process if it is conducted in a manner that is fundamentally unfair. *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (June 23, 1998) (citing *Soules*, 849 F.2d at 1183-84). In addition, "[m]ere fraud or mistake will not render an election invalid." *Id.* at 1226. "[G]arden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." *Id.* at 1226 (collecting cases). A sample of situations that demonstrate garden variety election irregularities are situations where there was: (1) allegedly inadequate state response to illegal cross-over voting, (2) mechanical and human error in counting votes, (3) negligent vote counting, and (4) counting some illegally cast votes. *Id.* (*citing Curry v. Baker*, 802 F.2d 1302, 1316 (11th Cir. 1986); *Bodine v. Elkhart County Elec. Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986); *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980); *Pettengill v. Putnam County R–1 School Dist.*, 472 F.2d 121, 122 (8th Cir. 1973)).

With respect to election irregularities, County Defendants argue that the allegations do not demonstrate constitutional violations and instead demonstrate that the County is following the law. (*See* County Mot. 22-25.) County Defendants

29.

1  contend that Plaintiffs' allegations do not show that county variations have or will
2  harm plaintiffs. (County Mot. at 23.) County Defendants also argue that to the extent
3  there were variations in practices by county officials, these differences reflect the
4  discretion afforded to counties as subdivisions of the State to operate effective and fair
5  elections within the framework of state and federal election law and such differences
6  represent the ordinary, practical variation among counties of different sizes. (County
7  Mot. at 22, see RJN Exs. 3-5 (detailing voter registrations by county in 2020, 2021,
8  and 2022).) County Defendants contend that Plaintiffs cannot show an equal
9  protection violation by comparing County Defendants' practices to those of non-
10  defendant Placer, Solano, and Siskiyou because the variation is expected since those
11  counties are much smaller than County Defendants. (County Mot. at 23-24.) Plaintiffs
12  did not address this argument in their opposition, and have waived the issue.

13       The Court agrees that differences in speed of signature verification reflect the
14  sizes of the counties. Indeed, in November 2020, Placer, Solano, and Siskiyou
15  counties had 270,599, 259,161, and just 29,240 registered voters. (RJN Ex. 3.)
16  Meanwhile, only four County Defendants had fewer than 400,000 registered voters,
17  five had more than a million registered voters, and Los Angeles County had almost six
18  million. (*Id.*)

19       County Defendants identified allegations related to ballot duplication, signature
20  verification, and uniform vote count standards as insufficient because these allegations
21  demonstrate that County Defendants were adhering to the election laws. (*See* Mot. at
22  24-25.) With respect to ballot duplication, County Defendants argue that duplication
23  requires election workers to ascertain the voter's intent pursuant to the uniform vote
24  count standards in Cal. Code Regs. tit. 2, §§ 20980-85. County Defendants argue that
25  Alameda County correctly duplicated ballots "without any input from the voter," since
26  voters are not present during the duplication process. (*See* SAC ¶ 114.) County
27  Defendants also argue that Plaintiffs' allegations regarding how Sacramento County
28

tabulated votes when one mark was crossed out are consistent with uniform vote count standards. (SAC ¶ 122.)

In opposition, Plaintiffs argue that California gives election workers wide discretion to determine the intent of the voter during the duplication process, citing California Code of Regulations sections 20980-20985. (Opp. at 13.)

Here, Plaintiffs contention that California gives election workers wide discretion to determine the intent of the voter during the duplication process in unsupported. As explained above, California Code of Regulations sections 20980-20981 provide the purpose and the definitions of the regulations related to uniform vote counting standards. Cal. Code Regs. tit. 2, §§ 20980-20981. Sections 20983-20985 do not use the word discretion. Cal. Code Regs. tit. 2, §§ 20983-20985. Likewise, section 20982 provides "general standards shall apply in the counting of all ballots and votes, regardless of the voting system used, for both the initial count and for any recount" and does not mention the word discretion. Cal. Code Regs. tit. 2, § 20982. Section 20982 does not require input from the voter, and the Court agrees with County Defendants that input from the voter is not required during duplication. Cal. Code Regs. tit. 2, § 20982. With respect to crossed-out marks, "[a] mark is considered valid when it is clear that it represents the voter's choice and is the technique consistently used by the voter to indicate their selections." Cal. Code Regs. tit. 2, § 20982 (c). "Such marks may include, but are not limited to, properly filled-in voting position targets, checkmarks, X's, circles, completed arrows, or any other clear indication of the voter's choice, such as the word 'yes' next to a candidate's name or a voting position target for a ballot measure." Cal. Code Regs. tit. 2, § 20982 (c)(1). "*Conversely, a mark crossed out by the voter, or the word 'no' next to a candidate's name or a voting position target for a ballot measure shall not be considered to be a valid vote but will, instead, be deemed an indication that the voter did not choose to cast a vote for that candidate or measure*." Cal. Code Regs. tit. 2, § 20982 (c)(2) (emphasis added). Here, the allegations concerning voter intent and ballot duplication

1   demonstrates compliance with the regulations and do not demonstrate election

2   irregularities.

3       Plaintiffs also argue that they have alleged that the challenged laws, regulations,

4   and practices enabled widespread irregularities, as evidenced by thousands of sworn

5   affidavits. (Opp. at 13, citing SAC ¶¶ 41, 63-74, 80-82, 105-129, 136-40.) Plaintiffs

6   contend unlawful votes were counted in past elections. (Opp. at 16, citing SAC ¶¶

7   105-29, 136-40.) Plaintiffs argue that they have alleged that some Defendant County

8   Registrars applied procedures that enabled election officials to count ballots without

9   signatures, mis-matching signatures, or ineligible ballots. (Opp. at 16, citing SAC ¶¶

10  115, 117-18, 120, 122, 136-39.)

11      In reply, County Defendants contend that Plaintiffs have not alleged that voters

12  in defendant counties were statistically more likely than voters in other counties have

13  their votes diluted by ineligible votes. (County Reply at 12.) County Defendants argue

14  Plaintiffs fail to allege any detail concerning the scope of "ineligible" votes that were

15  counted and contend that allegations that a small number of ballots across fifteen (of

16  58) counties processing millions of ballots were counted with mismatched signatures

17  (e.g., SAC ¶¶ 115, 117, 118, 120) do not amount to well-pled allegations that County

18  Defendants were statistically significantly more likely to count invalid ballots, thereby

19  diluting the votes in those counties. (County Reply at 12.)

20      The Court reviews Plaintiffs' cited paragraphs to determine whether Plaintiffs

21  have alleged election irregularities that demonstrate that the election was conducted in

22  such a way that was fundamentally unfair, or if Plaintiffs' allegations amount to

23  garden variety election irregularities. For the reasons explained below, the allegations

24  demonstrate garden variety irregularities.

25

26      Paragraph 41 relates to the County Defendants' actions as executive arms of the

27  state in conduction elections. (SAC ¶ 41.) In paragraphs 63-74 and 80-82, Plaintiffs

28  make allegations related to the challenged statutes and regulations and to show

32.

1    election irregularities. However, as explained above, these laws and regulations do not

2    burden Plaintiffs' right to vote. The laws expand access to the ballot. Therefore, these

3    allegations do not support either an equal protection violation or a due process

4    violation.

5          In paragraphs 105-112, Plaintiffs make allegations related to "VBM and

6    processing irregularities" (SAC ¶105) specifically signature verification (SAC ¶¶ 106-

7    110) and voter intent. (SAC ¶¶ 111-112.) In paragraphs 113-125, Plaintiffs make

8    specific allegations related to certain defendant counties[5], however, many of those

9    paragraphs demonstrate garden variety irregularities. Plaintiffs allege officials in

10   Kern, Los Angeles, and San Luis Obispo counties potentially counted ballots without

11   signatures. (SAC ¶¶ 117, 118, 124.) However, "[m]ere fraud or mistake will not

12   render an election invalid." *Bennett*, 140 F.3d at 1226.  Moreover, allegations

13   concerning security of ballots (SAC ¶¶ 116 (Fresno), 121 (Riverside), 125 (Santa

14   Clara)) or the number of people on the voter rolls (SAC ¶ 123 (San Bernardino)) are

15   irrelevant because Plaintiffs do not claim that ballots were stolen, such that their right

16   to vote was denied.

17         Plaintiffs also allege ineligible ballots were counted, specifically, that a person

18   may have voted twice in San Luis Obispo County, and that nonresidents and dead

19   individuals voted in 2020. (SAC ¶ 124.) In paragraphs 136-138, Plaintiffs' allegations

20   detail Nevadans improperly voting in California, dead people voting, and 124,000

21   voters without a voting history voting in 2020. Plaintiffs contend that the failure to

22   adequately vet VBM ballots harm Plaintiffs and other in-person voters "whose votes

23   are diluted by *ineligible* VBM votes" in their respective counties. (SAC ¶¶ 139-140

24   (emphasis added).)

25

26   _____

27   [5] The following Counties are listed as allegedly having election irregularities:
     Alameda, Contra Costa, Fresno, Kern, Los Angeles, Monterey, Orange, Riverside,
     Sacramento, San Bernardino, San Luis Obispo, and Santa Clara.

28

1    Here, the Court does not read ineligible ballots to mean ineligible voter
2    registrations. Plaintiffs make allegations throughout the second amended complaint
3    about ineligible *voter registrations* specifically duplicate registrations, individuals
4    who are still registered to vote despite death, minors, and individuals who are not
5    residents of California. (*See* SAC ¶¶ 85-87, 138-39.) As the County points out,
6    Plaintiffs did not bring claims against any Defendant under the National Voter
7    Registration Act and Plaintiffs have not explained how the number of people on the
8    voter rolls affect or abridge Plaintiffs' voting rights or Plaintiffs' ability to vote.
9    (County Reply at 7.)

10    Finally, the allegations that demonstrate irregularities are the allegations related
11    to nonresidents and dead individuals voting (SAC ¶ 136), as well as potential double
12    voting (SAC ¶ 124). However, these allegations demonstrate the sort of garden variety
13    election irregularities that do not rise to the level of a constitutional violation. *Bennett*,
14    140 F.3d at 1226 (citing *Pettengill v. Putnam County R–1 School Dist.*, 472 F.2d 121,
15    122 (8th Cir. 1973)). To the extent that any invalid or fraudulent VBM ballots were
16    counted, the harm from those invalid votes would extend to both lawful in-person
17    voters as well as lawful VBM voters. Since Plaintiffs do not allege election
18    irregularities that transcend garden variety problems, Plaintiffs have failed to state a
19    claim based on a due process violation. Since the Court finds that Plaintiffs have
20    failed to state a claim, the Court does not reach County Defendants' laches or Rule
21    9(b) arguments.

22    **V. CONCLUSION**

23    When an amendment to a complaint would be futile, dismissal may be ordered
24    with prejudice. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). For the reasons
25    explained above, any amendment to the complaint would be futile. Plaintiffs have not
26    demonstrated differential treatment and have not alleged facts that support
27    constitutional claims.
28    //

34.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Accordingly, the 12(b)(6) Motions to dismiss for failure to state a claim are GRANTED. The SAC is dismissed WITH PREJUDICE.

Dated: July 18, 2023

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

35.