**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ELECTION INTEGRITY PROJECT CALIFORNIA, INC.; JAMES P. BRADLEY; MARK REED; BUZZ PATTERSON; MIKE CARGILE; RONDA KENNEDY, <br><br> *Plaintiffs-Appellants*, <br><br> v. <br><br> SHIRLEY WEBER, California Secretary of State; ROB BONTA, California Attorney General; SHANNON BUSHEY; FRANCISCO DIAZ; TIM DUPUIS; KRISTIN CONNELLY; JAMES A. KUS; DEAN C. LOGAN; GINA MARTINEZ; BOB PAGE; REBECCA SPENCER; HANG NGUYEN; MICHAEL JIMENEZ; TRICIA WEBBER; MICHELLE ASCENCION; ELIANA CANO; AIME ESPINOZA, <br><br> *Defendants-Appellees*. | No. 23-55726 <br><br> D.C. No. 2:21-cv-00032-AB-MAA <br><br><br> OPINION |

2        ELECTION INTEGRITY PROJECT CA, INC. V. WEBER

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted February 5, 2024
Pasadena, California

Filed August 15, 2024

Before:  Kim McLane Wardlaw, Michelle T. Friedland, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Wardlaw

---

## SUMMARY[*]

---

### Elections

The panel affirmed the district court's dismissal for failure to state a claim of a lawsuit brought by Election Integrity Project California, Inc., and 10 former political candidates challenging the California Secretary of State's certification of the results of the November 2020 general election and seeking to declare unconstitutional California's vote-by-mail election system.

The panel rejected plaintiffs' claim that state and county officials impermissibly diluted the voting power of in-person voters and voters of certain counties by inadvertently

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

counting some invalid vote-by-mail ballots. A vote dilution claim requires a showing of disproportionate voting power for some voters over others, and plaintiffs have not made—and could not make—that showing based on the facts alleged. Assuming that California officials have inadvertently counted some invalid vote-by-mail ballots in the past, the effect that counting such ballots had on the relative voting power of all votes was the same, regardless of voting method or geography.

The panel rejected plaintiffs' claim that California laws and regulations governing the wide expanse of California's election administration system, and defendant counties' practices under these rules, violate the Equal Protection Clause by failing to adhere to the minimum requirement for nonarbitrary treatment of voters. Citing *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), the panel held that California's election rules and county officials' practices pursuant to those rules satisfied the rudimentary requirements of equal treatment and fundamental fairness.

The panel rejected plaintiffs' claim that alleged irregularities in California's elections from 2020 through the present violate their due process rights. The allegations of the complaint failed to plausibly demonstrate the scale of massive disenfranchisement, or complete lack of integrity, necessary to state a claim under the Due Process Clause.

Finally, the panel held that the district court did not abuse its discretion by denying plaintiffs a further opportunity to amend their complaint.

## COUNSEL

Mariah Gondeiro (argued), Gondeiro Law PC, San Jose, California; Julianne E. Fleischer, Advocates For Faith and Freedom, Murrieta, California; for Plaintiffs-Appellants.

Meghan Strong (argued) and John D. Echeverria, Deputy State Attorneys General; Anthony R. Hakl, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; California Department of Justice, San Francisco, California; Mary E. Hanna-Weir (argued), Deputy County Counsel, Tony Lopresti, County Counsel, ,Douglas M. Press, Kim H. Hara, and Nicholas Defiesta, Office of the County Counsel, County of Santa Clara, San Jose, California; Joseph W. Ellinwood, Deputy County Counsel, County Counsel's Association of California, Sacramento, California; Robert P. Parrish, Deputy County Counsel, Lisa A. Travis County Counsel and Janice M. Snyder Assistant County Counsel Office of the County Counsel, Sacramento, California; Raymond S. Lara, Deputy County Counsel, Donna Ziegler, County Counsel, Office of the County Counsel, County of Alameda, Oakland, California; Rebecca Hooley, Assistant County Counsel, Thomas L. Geiger, County Counsel, Office of the Contra Costa County Counsel, Martinez, California; Kyle R. Roberson, Deputy County Counsel, Daniel C. Cederborg County Counsel, Office of the County Counsel, County of Fresno, Fresno, California; Eva W. Chu, Senior Deputy County Counsel, Dawyn R. Harrison, County Counsel, Los Angeles Office of the County Counsel, Los Angeles, California; Marina S. Pantchenko, Deputy County Counsel, Leslie J. Girard, County Counsel, Monterey County Counsel, Salinas, California; Rebecca S. Leeds, Senior Deputy County

Counsel, Leon J. Page, County Counsel, Orange County
Counsel's Office, Santa Ana, California; Laura L. Feingold,
Principal Assistant County Counsel, Tom Bunton, County
Counsel, San Bernardino Office of the County Counsel, San
Bernardino, California; Melissa C. Shaw, Assistant County
Counsel, Jason M. Heath, County Counsel, Office of the
Santa Cruz County Counsel, Santa Cruz, California; Jason
Canger, Deputy County Counsel; Matthew Smith, Assistant
County Counsel, Tiffany N. North, County Counsel;
Ventura Office of the County Counsel, Ventura, California;
Marshall S. Fontes, Chief Deputy County Counsel, Margo
A. Raison, County Counsel, Office of the Kern County
Counsel, Bakersfield, California; Stephanie K. Nelson,
Deputy County Counsel, Minh Tran County Counsel, Office
of the Riverside County Counsel, Riverside, California;
Amanda Uhrhammer, Deputy County Counsel, Barbara
Thompson, County Counsel, Office of the San Benito
County Counsel, San Benito, California; Ann Duggan,
Deputy County Counsel, Rita L. Neal, County Counsel, San
Luis Obispo Office of the County Counsel, San Luis Obispo,
California; for Defendants-Appellees.

## OPINION

WARDLAW, Circuit Judge:

On January 4, 2021, two days before the Vice President of the United States was set to preside over a joint session of the United States Congress to certify the results of the 2020 general election, Election Integrity Project California, Inc. ("EIPCa") and 10 candidates who had lost their races for political office filed this lawsuit seeking to decertify the results of the 2020 election in California due to alleged irregularities and to declare unconstitutional California's vote-by-mail election system. After two and a half years of litigation, including a previous appeal to this court, the district court entered an order dismissing the plaintiffs' claims. The district court concluded that even if all of the plaintiffs' allegations were true, the plaintiffs failed to state plausible claims of constitutional violations in the administration of California's elections. We agree, and we affirm the district court's order dismissing the plaintiffs' claims without leave to amend.

## I. BACKGROUND

### A. The Lawsuit

On January 4, 2021, plaintiffs (collectively, "EIPCa"), filed this lawsuit challenging the California Secretary of State's certification of the results of the November 2020 general election in California. EIPCa sought a court order decertifying the results of the November 2020 general election, declaring numerous California election laws and regulations unconstitutional, and permitting experts chosen by EIPCa to conduct a complete audit of the 2020 election. The lawsuit named as defendants the California Secretary of

State and the State Attorney General, along with the Registrars of Voters for thirteen counties, all sued in their official capacities.[1]

EIPCa then amended its complaint. The First Amended Complaint ("FAC") added three new plaintiffs to the case, each of whom had lost their congressional races in the November 2020 general election. The FAC maintained the same legal claims, allegations, and relief sought as the original complaint, though it no longer included a request for a court order decertifying the results of the November 2020 general election. In its place, the FAC added a request for the appointment of a special master to oversee the administration of California's elections.

The defendants moved to dismiss EIPCa's claims for lack of jurisdiction and for failure to plausibly state a claim under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted those motions, concluding that the court lacked jurisdiction over EIPCa's lawsuit. EIPCa appealed, and we affirmed in part and vacated in part the district court's order, remanding the case to the district court for further proceedings. *Election Integrity Project Cal., Inc. v. Weber*, No. 21-56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022).[2]

---

[1] Defendant Registrars of Voters represent Alameda County, Contra Costa County, Fresno County, Los Angeles County, Monterey County, Orange County, Riverside County, Sacramento County, San Benito County, San Bernardino County, Santa Clara County, Santa Cruz County, and Ventura County. The Registrars of Voters of Kern County and San Luis Obispo County were named as defendants to the lawsuit at a later date.

[2] In EIPCa's previous appeal, we determined that EIPCa satisfies the jurisdictional requirements for organizational standing and we declined

Returning to the district court, EIPCa again amended its complaint. The Second Amended Complaint ("SAC"), the version now before us, was filed on February 21, 2023. The SAC identifies as plaintiffs EIPCa and five individuals previously listed in the FAC as unsuccessful congressional candidates. It also adds two more County Registrars to the named defendants. *See supra* note 1.

In the SAC, EIPCa removed its claims under the Elections and Guarantee Clauses of the federal Constitution, asserting only violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. SAC at ¶¶ 149–67, *Election Integrity Project Cal., Inc. v. Weber*, No. 2:21-cv-00032 (C.D. Cal. Feb. 21, 2023), ECF No. 132. It also removed the allegations it made in the first and second versions of the complaint related to the use of Dominion and Smartmatic voting machines. All other allegations and claims in the prior versions of the complaint generally remain unchanged in the SAC.

The SAC alleges that California's adoption of a "universal vote-by-mail" election system—by which officials mail ballots to all active, registered voters in advance of each election—has caused a systematic erosion of voter rights and "widespread election irregularities across

---

to reach whether any other plaintiff has standing. *Election Integrity Project Cal., Inc. v. Weber*, No. 21-56061, 2022 WL 16647768, at \*2 (9th Cir. Nov. 3, 2022) (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc)). We also affirmed the district court's dismissal of the plaintiffs' claims under the Guarantee Clause, which guarantees to the States a republican form of government, finding that those claims presented nonjusticiable political questions. *Id.* (citing *Rucho v. Common Cause*, 588 U.S. 684, 716–19 (2019), and *Murtishaw v. Woodford*, 255 F.3d 926, 961 (9th Cir. 2001)).

California counties." *Id.* ¶¶ 2–3A. EIPCa claims that California's election laws and regulations lack "uniform and robust procedures" for maintaining accurate records of registered voters (*i.e.*, "voter rolls"), receiving and processing ballots, verifying voter signatures on mail-in ballots, and accurately counting ballots. *Id.* ¶¶ 5, 8. It further asserts that, due to the State's lack of uniform and robust election administration rules, the Defendant Counties have implemented disparate election administration policies and practices that are themselves insufficiently robust, leading to election irregularities including the counting of some invalid ballots. *Id.* ¶¶ 3C, 3D, 8, 49, 110.

As a remedy for the claimed constitutional violations, EIPCa seeks a court order declaring that nearly two dozen California election administration statutes and regulations are unconstitutional on their face and as applied; an audit of all ballots and voting machines used in all California elections since, and including, the November 2020 general election; and a court appointed special master to oversee the administration of California's elections. SAC at 39–40.

The district court held that the SAC's allegations, even if they were true, failed to demonstrate plausible violations of the equal protection or due process guarantees of the Fourteenth Amendment. Finding that any further amendment to the complaint would be futile, the district court dismissed EIPCa's claims with prejudice and entered judgment for the defendants.

EIPCa timely appealed.

### B. Voting by Mail in California

California has long permitted voters to cast their ballots by mail. A provision permitting absentee voting was first

added to the California Constitution in 1922. *Peterson v. City of San Diego*, 34 Cal. 3d 225, 228 (1983). In 1978, the California Legislature "extended to every registered voter the right to vote by absentee ballot, regardless of the reason for not traveling to the polling place." *Id.* at 229 (citing 1978 Cal. Stat. ch. 77, § 2, p. 213).

In 2016, California enacted the Voter's Choice Act, which authorized counties to "opt in" to a pilot, all-mailed-ballot election system. 2016 Cal. Stat. ch. 832 (codified as amended at Cal. Elec. Code § 4005). Counties that opted in to the pilot program agreed to automatically mail a vote-by-mail ("VBM") ballot to all active, registered voters in advance of every election without requiring voters to request a VBM ballot in advance. Voters would then have the option to vote by mail for any reason or to vote in person.

In response to the public health challenges posed by the COVID-19 pandemic, in 2020 the California Legislature passed a bill requiring all counties in California to implement the all-mailed-ballot election system for the 2020 general election. 2020 Cal. Stat. ch. 4 (codified as amended at Cal. Elec. Code § 3000.5). After the election, the California Legislature made the all-mailed-ballot election system permanent for all counties. 2021 Cal. Stat. ch. 312 (codified at Cal. Elec. Code § 3000.5).

Under the current system, elections officials in each county are directed to mail a VBM ballot and return envelope to all active, registered voters in advance of each election. Cal. Elec. Code § 3000.5. If a registered voter chooses to vote using the VBM ballot, they must complete the VBM ballot, seal it in the return envelope, sign the outside of the return envelope, and timely return it either by mail or in person at a polling place, vote center, or designated

VBM ballot drop-off location. *Id.* §§ 3016.7, 3017(a)(1). Voters may authorize another person to mail or drop off their completed and sealed ballot on their behalf. *Id.* § 3017(a)(2). Multiple VBM ballots may be returned in a single VBM return envelope, provided that each voter who places a ballot in the envelope properly signs the outside of the envelope and elections officials are able to identify each voter and verify each voter's signature. Cal. Code Regs. ("CCR") tit. 2, § 20991(b)(10). When elections officials receive a VBM ballot, they must immediately "enter the return status of that ballot into the statewide voter registration system" to ensure that no other ballots for that voter will be counted in the election. CCR tit. 2, § 20990(a); *see also* Cal. Elec. Code § 3019.7.

If a registered voter chooses to vote in person, they may do so only if they first surrender their VBM ballot, or if an elections official verifies that the VBM ballot has not already been returned and updates the voter's record to ensure that the VBM ballot will not be counted if it is later received by elections officials. Cal. Elec. Code § 3015; CCR tit. 2, § 20990(a). If for any reason a voter does not meet the criteria to cast a ballot in person—for example, if a voter wishes to vote in person but has not yet surrendered their VBM ballot—the voter may cast a "provisional ballot," which will be counted only after elections officials verify that the voter is validly registered and that no other ballot has been or will be counted for the voter in the applicable election. Cal. Elec. Code §§ 3016, 14310; CCR tit. 2, § 20992.

All in-person voters must cast their ballots, and all VBM voters must either return or postmark their ballots, by the close of the polls on election day. Cal. Elec. Code §§ 3020(a), 14212. *But see id.* § 14401 (voters who remain

in line at a polling location or a VBM ballot drop-off site when polls close may stay in line and cast or return their ballot after polls close).

A VBM ballot is valid only if elections officials confirm that the voter's signature on the outside of the return envelope matches the voter's signature(s) on file with the elections office. Cal. Elec. Code § 3019(a)(1), (c)(2). An "exact match is not required for an elections official to determine that a voter's signature is valid." *Id.* § 3019(a)(2)(B). Officials must adhere to a statutory presumption that the signature on the return envelope is the voter's signature, *id.* § 3019(a)(2)(A), and a signature will be rejected only if at least two elections officials "each find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record," *id.* § 3019(c)(2).

Elections officials are permitted to compare the signature on the VBM return envelope with the signature(s) on file for the voter either manually or with signature verification technology. Cal. Elec. Code § 3019(a)(2)(G); CCR tit. 2, § 20961. In either case, any signature that is flagged as not matching the signature(s) on file for the voter must be reviewed manually by at least two elections officials before the signature can be rejected. Cal. Elec. Code § 3019(a)(2)(G); CCR tit. 2, § 20961. When verifying voter signatures, whether manually or with the aid of a machine, officials "shall not review or consider a voter's party preference, race, or ethnicity." Cal. Elec. Code § 3019(a)(2)(D). Officials may consider, but are not limited to considering, a variety of signature characteristics provided in state regulations when determining whether signatures

match. *Id.* § 3019(a)(2)(E); CCR tit. 2, § 20960(f).[3] Before rejecting a signature, officials must also consider a list of potential explanations for discrepancies between signatures, including the possibility of "variation in signature style over time and the haste with which a signature is written." Cal. Elec. Code § 3019(a)(2)(C).[4]

If the signature on the VBM return envelope is rejected, or if the voter fails to sign the outside of the VBM return envelope, elections officials must promptly inform the voter and provide the voter an opportunity to cure the non-conforming ballot by timely signing and returning a voter signature verification form. *See* Cal. Elec. Code § 3019(d)(1)(A), (e)(1)(A). If the voter completes the form and elections officials conclude that that the voter's

---

[3] Characteristics that may be considered include "the slant of the signature, letter formation, and whether the signature is printed or . . . in cursive," Cal. Elec. Code § 3019(a)(2)(E), as well as "[s]ize, proportions, or scale," "[i]ndividual characteristics, such as how the 't's' are crossed, 'i's' are dotted, or loops are made on the letters f, g, j, y, or z," "[s]pacing between the letters," "[l]ine direction," "[l]etter formations," the "[p]roportion or ratio of the letters in the signature," "[i]nitial strokes and connecting strokes," "[s]imilar endings such as an abrupt end, a long tail, or loop back around," the "[s]peed of the writing," the "[p]resence or absence of pen lifts," and whether the name is spelled correctly, CCR tit. 2, § 20960(f).

[4] Officials must also consider that "[e]vidence of trembling or shaking in a signature could be health-related or the result of aging," "[t]he voter may have used a variation of their full legal name," "[t]he voter's signature style may have changed over time," "[a] signature in the voter's registration file may have been written with a[n] . . . electronic signature tool that may result in a thick or fuzzy quality," and "[t]he surface of the location where the signature was made may have been hard, soft, uneven, or unstable." CCR tit. 2, § 20960(g).

signature on the form matches the signature(s) on file for the voter, the voter's VBM ballot may be processed as usual. *Id.*

California election rules also instruct officials how to read and interpret the markings that voters make on their ballots. *See* CCR tit. 2, § 20282; Cal. Elec. Code §§ 15342, 15342.5.    These rules apply to "all ballots and votes regardless of the vote tabulation method used."  CCR tit. 2, § 20282; *see id.* §§ 20283, 20284.  Officials are instructed to accept a voter's mark as a vote "when it is clear that [the mark] represents the voter's choice and is the technique consistently used by the voter to indicate their selections." CCR tit. 2, § 20282(c).  "Such marks may include, but are not limited to, properly filled-in voting position targets, checkmarks, X's, circles, arrows, or any other clear indication of the voter's choice, such as the word 'yes' next to a candidate's name or a voting position target for a ballot measure."  *Id.* § 20282(c)(1).  "Conversely, a mark crossed out by the voter, or the word 'no' next to a candidate's name or a voting position target for a ballot measure shall not be considered to be a valid vote but will, instead, be deemed an indication that the voter did not choose to cast a vote for that candidate or measure."  *Id.* § 20282(c)(2).  A voter's mark will be rejected only if "it is impossible to determine" what the voter intended.  *Id.* § 20282(b).  "A vote for any candidate or ballot measure shall not be rejected solely because the voter failed to follow instructions for marking the ballot."  *Id.*[5]

---

[5] If a voter marks "more choices than there are offices to be filled or measures that may prevail" for a particular contest—*i.e.*, what is known as an overvote—"the vote shall not be counted for that contest, but shall be counted in all other contests in which there is no overvote and the voter's choice can be clearly determined."  CCR tit. 2, § 20282(e).  If a

Officials are also directed to count "[d]amaged, torn or otherwise non-processable ballot[s]" by making a non-damaged, duplicate copy of the ballot that "exactly reflect[s] the voter's choices," enabling the ballot to be processed as usual. *Id.* §§ 20991(b)(2), 20282(a); Cal. Elec. Code §§ 15154(b)(1), 15210. Duplicated ballots must be clearly labeled as such. Cal. Elec. Code § 15210.

## II. STANDARD OF REVIEW

We review a district court's order granting a motion to dismiss *de novo*, *Thompson v. Paul*, 547 F.3d 1055, 1058 (9th Cir. 2008), which means we consider the matter anew without deference to the lower court's decision, *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988). We may affirm on any ground supported in the record. *Thompson*, 547 F.3d at 1058–59.

We will affirm the grant of a defendant's motion to dismiss if the plaintiff's well-pleaded allegations, taken as true, fail to plausibly show a legal violation. Put another way, we will affirm the dismissal of a claim if there is "no cognizable legal theory" in support of the plaintiff's claim or "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). If the allegations of the complaint "are 'merely consistent with' a defendant's liability," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), or are "more likely explained by

---

voter marks "fewer choices than there are offices to be filled or measures that may prevail," what is known as an undervote, "the vote choice(s) for all otherwise properly marked candidates or measures shall be counted." *Id.* § 20282(f).

lawful . . . behavior," *id.* at 680, the complaint will fall short of plausibly alleging a legal violation.

In adjudicating a motion to dismiss, we are required to assume the truth of the complaint's "well-pleaded" allegations. *Id.* at 679. Conclusory statements, unreasonable inferences, and "legal conclusion[s] couched as . . . factual allegation[s]," are not well-pleaded. *Id.* (quoting *Twombly,* 550 U.S. at 555). Such "bald allegations" will not be credited. *Id.* at 681.

## III.  DISCUSSION

EIPCa advances multiple theories of liability under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. First, EIPCa contends that the defendants have impermissibly "diluted" the voting power of in-person voters and voters in certain counties by inadvertently counting some invalid VBM ballots. Second, EIPCa claims that California's election rules lack sufficient specificity and uniformity to protect voters from arbitrary and unequal treatment. Third, and finally, EIPCa argues that alleged irregularities in California's elections from 2020 through the present violate their due process rights. We address each of these arguments in turn. We conclude, like the district court, that the complaint fails to plausibly allege a constitutional violation under any of these three theories.

### A.  The Fundamental Right to Vote

We begin with EIPCa's claim that the defendants have "diluted" the voting power of in-person voters and voters of certain counties by failing to adequately police ballots cast by mail. As we explain below, EIPCa's vote dilution claim fails as a matter of law because the allegations in the complaint fail to state a plausible claim that any one vote in

California has been impermissibly over- or under-weighted relative to any other. Assuming that California officials have inadvertently counted some invalid VBM ballots in the past, the effect that counting such ballots had on the relative voting power of all votes was the same, regardless of voting method or geography. A vote dilution claim requires a showing of *disproportionate* voting power for some voters over others, and EIPCa has not made—and cannot make—that showing based on the facts alleged. Its theory of vote dilution is simply not plausible.

### 1. *Framework of Analysis*

The right to vote is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), and is of "the most fundamental significance under our constitutional structure," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). A state law or practice that unduly burdens or restricts that fundamental right violates the Equal Protection Clause of the Fourteenth Amendment. *See Bullock v. Carter*, 405 U.S. 134, 140–41 (1972).

But not all election rules or practices impose constitutionally suspect burdens on the right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Under our federal Constitution, "States retain the power to regulate their own elections," *Burdick*, 504 U.S. at 433, and states have long "enacted comprehensive and sometimes complex election codes," each of which "inevitably affects—at least to some degree—the individual's right to vote," *Anderson*, 460 U.S. at 788. Because "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes," *Burdick*, 504 U.S. at 433 (quoting

*Storer v. Brown*, 415 U.S. 724, 730 (1974)), the Supreme Court has developed a "flexible standard" for assessing constitutional challenges to election rules, *id.* at 434. That standard has come to be known as the "*Anderson/Burdick* framework," named after the two Supreme Court decisions that elucidated it—*Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). This flexible standard requires courts to balance the nature and extent of the alleged burden on the right to vote against the State's interest in maintaining its chosen system of election administration. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021).

In *Anderson*, the Supreme Court invalidated an Ohio statute that imposed an earlier filing deadline and other special requirements on independent candidates for President—but not on the two major party candidates—to get their names printed on the ballot for the general election.[6] 460 U.S. at 782, 805–06. "Rely[ing] . . . on the analysis in a number of [its] prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment," *id.* at 786 n.7, the Court first assessed "the extent and nature" of the burden on voters' First and Fourteenth Amendment rights imposed by Ohio's rule, *id.* at 786 (quoting *Bullock*, 405 U.S. at 143). The Court found that the early filing deadline

---

[6] The case was brought by, among others, John B. Anderson, a Republican Party member who held more moderate views than the 1980 Republican Party presidential nominee, Ronald W. Reagan, and who sought to enter the presidential race as an Independent. Anderson had obtained the requisite number of signatures on the nominating petition under Ohio law to secure a place on the ballot, but because of the earlier filing deadline, the Ohio Secretary of State refused to accept his petition, thereby keeping him off. *Anderson v. Celebrezze*, 460 U.S. 780, 782–83 (1983).

had a "substantial" and discriminatory impact on "independent-minded voters" by forcing independent third-party candidates to solidify their candidacy long before those of the major party nominees, thereby limiting the choices available to independent voters. *Id.* at 790–95. The Court next examined the validity and magnitude of the State's interest in maintaining its discriminatory early filing deadline. *See id.* at 796. The Court agreed with Ohio that fostering informed and educated voters is an "important and legitimate interest," but it rejected the view that such an interest was "served at all by [Ohio's] requirement." *Id.* at 796, 798. It found "no merit in the State's [alternative] claim that the early filing deadline serve[d] the interest of treating all candidates alike," and it found that the deadline was "not precisely drawn to protect the parties from 'intraparty feuding,' whatever legitimacy that state goal may have in a Presidential election." *Id.* at 799, 805. Concluding that the burdens imposed on voters' "freedom of choice and freedom of association . . . unquestionably outweigh the State's minimal interest in imposing a March deadline" for independent candidates, but not on the two major party candidates, the Court invalidated Ohio's rule as violating the First and Fourteenth Amendments. *Id.* at 806.

The Court reaffirmed *Anderson*'s "flexible standard" a decade later as the "appropriate standard for evaluating a claim that a state law burdens the right to vote." *Burdick*, 504 U.S. at 434, 438; *see id.* at 432 (rejecting "the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny"). The Court explained that the standard requires us to first consider "the character and magnitude of the asserted injury" to voters' rights, before weighing that injury "against 'the precise interests put forward by the State as justifications for the

burden imposed by its rule.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789). If a plaintiff shows a "severe" burden on the right to vote, courts may uphold the challenged law or practice only if the State can show that it is "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). By contrast, laws that impose lesser burdens on the right to vote "trigger less exacting review." *Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)), *cert. denied*, 143 S. Ct. 525 (2022). Indeed, if a law "imposes only 'reasonable, nondiscriminatory restrictions' upon" voters' rights, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

Applying that standard, the *Burdick* Court upheld Hawaii's prohibition on write-in voting for primary and general elections against a challenge that it unduly burdened voters' ability to cast ballots for candidates of their choosing and the freedoms of association and expression. *See id.* at 430, 436–37. The Court concluded that, because Hawaii's election system "provides for easy access" to candidates for placement on the ballot in the first place, "any burden imposed by Hawaii's" rule prohibiting write-ins on "voters' rights to make free choices and to associate politically through the vote" was "a very limited one," at best. *Id.* at 436–39. Because the burden on voters' rights was only "slight," the State was not required to "establish a compelling interest to tip the constitutional scales in its direction." *Id.* at 439. The Court found that the two interests put forward by the State—avoiding "unrestrained factionalism at the general election" and guarding against so-

called "party-raiding"[7] in primary elections—were both "legitimate" interests reasonably advanced by the State's generally applicable rule. *Id.* at 439–40 (quotation marks omitted).

Applying *Anderson* and *Burdick* in the decades since those cases were decided, the Supreme Court and our court "have repeatedly upheld as 'not severe'" regulations impacting the right to vote "that are generally applicable, even-handed, politically neutral, and . . . protect the reliability and integrity of the election process." *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) (alteration in original) (quoting *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002)); *see, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 203 (2008) (plurality opinion) (concluding that Ohio's "legitimate state interests" in election modernization, preventing voter fraud, and safeguarding voter confidence were "sufficient" to justify the "limited burden on voters' rights" imposed by "a neutral, nondiscriminatory" voter identification law) (quoting *Burdick*, 504 U.S. at 434, 439); *id.* at 209 (Scalia, J., concurring in the judgment) (finding Ohio's interests "sufficient to sustain th[e] minimal burden" imposed by the State's "universally applicable" and "eminently reasonable" law); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 444, 458 (2008) (concluding that Washington's primary system, which identified candidates on the ballot "by their self-designated 'party preference,'" did "not impose any severe burden on . . . associational

---

[7] "Party raiding is generally defined as 'the organized switching of blocs of voters from one party to another in order to manipulate the outcome of the other party's primary election.'" *Burdick v. Takushi*, 504 U.S. 428, 439 (1992) (quoting *Anderson*, 460 U.S. at 788 n.9).

rights" and was "easily" justified by the State's "asserted interest in providing voters with relevant information about the candidates on the ballot"). As the Supreme Court has long explained and these decisions emphasize, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions" on the right to vote. *Timmons*, 520 U.S. at 358 (quotation marks omitted).

### 2. *Character and Magnitude of the Asserted Injury*

Applying the *Anderson/Burdick* framework here, we first identify "the character and magnitude" of the injury to voters' rights asserted by EIPCa in its complaint.[8] *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789); *see also Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018).

We find no well-pleaded allegation in EIPCa's complaint that any of the laws or practices EIPCa challenges actually burdens anyone's right to vote. *Short*, 893 F.3d at 677. EIPCa does not allege that the State or the Defendant Counties have created any obstacles to any of the named plaintiffs (or any other voter) from registering to vote, receiving a ballot, understanding the ballot, or casting the

---

[8] EIPCa suggests that dismissal is inappropriate because this case requires further development of the record before its claims may be evaluated under the *Anderson/Burdick* framework. We disagree. We routinely conduct the *Anderson/Burdick* analysis at the motion to dismiss stage. *See, e.g.*, *Clark v. Weber*, 54 F.4th 590, 593–94 (9th Cir. 2022) (conducting an *Anderson/Burdick* analysis at the motion to dismiss stage and affirming dismissal); *Tedards v. Ducey*, 951 F.3d 1041, 1068 (9th Cir. 2020) (same); *Rodriguez v. Newsom*, 974 F.3d 998, 1011 (9th Cir. 2020) (same), *cert. denied*, 141 S. Ct. 2754 (2021). As we explain below, dismissal of EIPCa's claim brought under the *Anderson/Burdick* framework is required because EIPCa has not plausibly alleged a cognizable burden on the right to vote.

ballot. *Cf., e.g.*, *Crawford*, 553 U.S. at 197–200 (considering whether a voter ID law posed an obstacle to voters' ability to register for, receive, and cast a ballot). EIPCa claims something different: it contends that California has so *un*-burdened the right to vote by mail that, "in some cases," officials have mistakenly counted invalid mail-in ballots, uniquely "diluting" the voting power of those who choose to cast their ballots in person or who vote in certain counties. Opening Brief ("Op. Br.") at 16, 20–21, *Election Integrity Project Cal., Inc. v. Weber*, No. 23-55726 (9th Cir. Sept. 29, 2023), ECF No. 16; *see* SAC at ¶¶ 151–52, 163–64.

Although EIPCa stylizes the burden on the right to vote as "vote dilution," EIPCa's complaint fails to plausibly support a cognizable vote dilution claim. As the Supreme Court recently explained in *Rucho v. Common Cause*, 588 U.S. 684 (2019), "'vote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry equal weight." *Id.* at 709. That principle, inherent in the Equal Protection Clause, requires that "each representative" in a political body "be accountable to (approximately) the same number of constituents," so that no group of voters retains an outsized edge in deciding the course of policymaking or representation relative to others in the same electoral unit. *Id.*

Two foundational cases—*Gray v. Sanders*, 372 U.S. 368 (1963), and *Reynolds v. Sims*, 377 U.S. 533 (1964)—demonstrate the principle. In *Gray*, the Court invalidated Georgia's "'county unit' vote-counting system, a sort of county-based electoral college that selected statewide officials using a majority of 'county unit' votes." *Short*, 893 F.3d at 678 (quoting *Gray*, 372 U.S. at 370–72). Under that system, Georgia allocated county unit votes "to each county out of proportion to population, thereby 'weight[ing] the

rural vote more heavily than the urban vote and . . . some small rural counties heavier than other larger rural counties.'" *Id.* (alterations in original) (quoting *Gray*, 372 U.S. at 379). The Court recognized that the system gave "one person . . . twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county[.]" *Gray*, 372 U.S. at 379. The Court held that, by giving some votes greater weight than others, Georgia's system "contravene[d] the principles of both voter *and* representational equality." *Evenwel v. Abbott*, 578 U.S. 54, 70 (2016) (citing *Gray*, 372 U.S. at 371–72, and *Reynolds*, 377 U.S. at 575).

The Court reached the same conclusion in *Reynolds*, striking down a plan for apportionment of seats in the Alabama legislature that would have weighted votes from rural counties more heavily than votes from urban counties by carving the state into legislative districts that covered significantly different numbers of constituents. 377 U.S. at 555. The Court reasoned:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Id.* And the Court quoted at length from Justice Douglas's dissent in *South v. Peters*:

> There is more to the right to vote than the
> right to mark a piece of paper and drop it in a
> box or the right to pull a lever in a voting
> booth.  The right to vote includes the right to
> have the ballot counted.  It also includes the
> right to have the vote counted at full value
> without dilution or discount.  That federally
> protected right suffers substantial dilution
> where a favored group has full voting
> strength and the groups not in favor have their
> votes discounted.

*Id.* at 555 n.29 (cleaned up) (quoting *South v. Peters*, 339
U.S. 276, 279 (1950) (Douglas, J., dissenting)).

In *Moore v. Ogilvie*, the Court extended the principles
articulated in the legislative apportionment cases to "[a]ll
procedures used by a State" that are "an integral part of the
election process."  394 U.S. 814, 818 (1969).  The plaintiffs
in *Moore*, "independent candidates for the offices of electors
of President and Vice President of the United States from
Illinois," challenged an Illinois rule requiring a minimum of
25,000 signatures, including 200 from each of at least 50 of
the State's counties, to nominate a candidate for the office of
elector.  *Id.* at 815.  Because "93.4% of the State's registered
voters reside[d] in the 49 most populous counties, and only
6.6% [were] resident in the remaining 53 counties," the
Court recognized that "[u]nder this Illinois law the electorate
in 49 of the counties which contain 93.4% of the registered
voters may not form a new political party and place its
candidates on the ballot," while just "25,000 of the
remaining 6.6% of registered voters properly distributed
among the 53 remaining counties may form a new party to
elect candidates to office."  *Id.* at 816, 819.   Such an

arrangement, the Court wrote, "discriminates against the residents of the populous counties of the State in favor of rural sections" in "an integral part of [Illinois's] elective system," violating the "one man, one vote basis of our representative government." *Id.* at 818–19.

As the foundational cases demonstrate, all qualified voters have the right to vote and to have their vote counted equally with other individual qualified voters in the same electoral unit. The crux of a vote dilution claim is *inequality* of voting power—not diminishment of voting power *per se*. After all, dilution of voting power, in an absolute sense, occurs any time the total number of votes increases in an election. Vote dilution in the *legal* sense occurs only when disproportionate weight is given to some votes over others within the same electoral unit. *Short*, 893 F.3d at 678.

Basic mathematical principles dictate that EIPCa's novel theory of "vote dilution" fails as a matter of law. Assuming that some invalid VBM ballots have been mistakenly counted as EIPCa alleges, any diminishment in voting power that resulted was distributed across all votes equally. That's because *any* ballot—whether valid or invalid—will always dilute the electoral power of all other votes in the electoral unit equally, regardless of the voting method a voter chooses to utilize.[9] The notion that invalid VBM ballots standing

---

[9] Consider a simple illustration. If 100 votes were counted in one election in a hypothetical County A and 105 votes were counted in the next County A election, five of which were invalid and should not have been counted, the vote share of each ballot counted in County A, including the vote share of the invalid ballots, would diminish from 1/100 (1.0%) to 1/105 (0.95%). The same would hold true if 105 valid ballots and zero invalid ballots were counted in the second election. Despite the inadvertent counting of the invalid ballots in the first hypothetical, all votes in the County retained "the same mathematical

alone have an unequal impact on only certain voters, causing their votes to "carry less weight" relative to all others, simply defies the mathematical reality.[10]  Op. Br. at 20.

Of course, a disproportionate number of invalid ballots counted in favor of one particular candidate, issue, party, or protected class of voters could raise heightened constitutional concerns.  *See Short*, 893 F.3d at 678–79 (explaining that uneven burdens on the right to vote and classifications drawn based on suspect statuses trigger heightened scrutiny).  EIPCa does not allege that any of the laws or practices it challenges rely on or incorporate suspect classifications, such as those drawn on the basis of race, ethnicity, or national origin.  *See McLaughlin v. Florida*, 379 U.S. 184, 192 (1964).  EIPCa also does not contend that "in-person voters," "residents of a county," or "voters who cast

_____

weight" as all others (0.95%).  *Dudum v. Arntz*, 640 F.3d 1098, 1112 (9th Cir. 2011).  The same principle would apply in an election for a statewide race, even if all of the invalid ballots for the statewide race were counted in only one county.

[10] EIPCa suggests that we should recognize a valid vote dilution claim where dilution in voting power, even if equally distributed, is the result of fraud or mistake.  We reject such an approach, which would serve only as an end-run around our well-established due process doctrine for analyzing the fundamental fairness and integrity of elections.  *See infra* Section III.C.  Moreover, the approach proposed by EIPCa would appear to be limitless: if every allegation of a mistakenly counted ballot were sufficient to state a vote dilution claim, "it would transform every violation of state election law . . . into a potential federal equal-protection claim requiring scrutiny of the government's interest in failing to do more to stop the illegal activity."  *Bognet v. Sec'y of Pennsylvania*, 980 F.3d 336, 355 (3d Cir. 2020) (quoting *Donald J. Trump for Pres., Inc. v. Boockvar*, 493 F. Supp. 3d 331, 391 (W.D. Pa. 2020)), *judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  We decline to adopt such a limitless theory for which we find no binding or persuasive support.

valid ballots" are protected groups whose classification triggers heightened scrutiny.  *See Short*, 893 F.3d at 679 ("County of residence is not a suspect classification.").  Nor does EIPCa allege that any specific candidate, issue, party, or other cognizable class of voters has *disproportionately* benefitted from or suffered injury as a result of the invalid ballots that it alleges officials have mistakenly counted in recent elections.[11]  Without more, the complaint fails to plausibly demonstrate that the voting power of any group of voters in California is unequally diluted any time an invalid VBM ballot is inadvertently counted.

*       *       *

In *Short v. Brown*, we affirmed a district court's refusal to preliminarily enjoin the Voter's Choice Act—the 2016

---

[11] EIPCa alleges that "minority voters . . . have historically relied upon in-person voting to a greater degree than other groups," suggesting that any harm to in-person voters also inures disproportionately to "minority voters."  SAC at ¶ 141.  We have already determined, however, that in-person voters are not specifically and disproportionately impacted by the counting of invalid ballots.  Thus, this passing allegation fails to support a plausible showing of disparate impact on the basis of race, ethnicity, or national origin.

EIPCa appears to allege that some counties count more invalid VBM ballots than others, and that this means the counties that count more invalid ballots are diluting the votes of valid ballots cast in other counties.  Without a factual basis on which to conclude that invalid VBM ballots confer a disproportionate benefit or disadvantage on any one group of voter over any other, including residents of particular counties, we asked counsel for EIPCa at oral argument whether California has any apportionment structure or election system under which residents of a county would stand to gain relative to residents of other counties by simply obtaining a higher number of absolute ballots cast in their county compared to other counties.  EIPCa identified no such structure or system in California, and we are aware of none.

statute which first authorized fourteen California counties to opt in to the all-mailed-ballot election system. 893 F.3d at 674–75. The plaintiffs in *Short* argued that the Act unduly burdened the right to vote for voters outside of the fourteen pilot counties by making it easier for voters within those counties to vote, while maintaining the status quo for those outside of the counties. *Id.* at 677–78. Applying the *Anderson/Burdick* framework, we concluded that California's all-mailed-ballot election system "does not burden anyone's right to vote." *Id.* at 677. "Instead," we found that the Voter's Choice Act made "it easier for some voters to cast their ballots by mail, something that California voters already can do." *Id.* Finding no cognizable burden on the right to vote alleged in the plaintiffs' complaint, we concluded that the plaintiffs were unlikely to succeed on the merits and affirmed the district court's denial of preliminary relief.

Our decision in *Short* underscored the commonsense principle that generally applicable, even handed, and politically neutral election regulations that tend to make it easier to vote generally do not impose a cognizable burden on the right to vote. *See id.* at 677–78; *accord Hobbs*, 18 F.4th at 1195–96 ("The 2019 law made it *easier* for a different category of voters to effect their vote, but we fail to see how that law raises constitutional concerns here.") (citing *Short*, 893 F.3d at 678).[12] The same principle applies

---

[12] EIPCa misguidedly argues that our decision in *Short* is distinguishable because it involved a motion for preliminary injunction as opposed to a motion to dismiss and, "unlike the standard on a motion for preliminary injunction, this Court can only consider the allegations in Appellants' complaint." Op. Br. at 15. We do not find *Short* distinguishable on this basis. Our reliance on *Short* is limited to *Short*'s analysis of the merits of the plaintiffs' claims in that case (not the other factors considered in

with equal force here.  Elections officials in California, as in all other jurisdictions, may at times inadvertently or mistakenly count invalid ballots.  *See Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("The unfortunate reality is that the possibility of electoral fraud [or mistake] can never be *completely* eliminated, no matter which type of ballot is used.").   But the inadvertent counting of some invalid ballots, without more, does not limit, prevent, or otherwise burden the ability of any voter to cast a lawful ballot consistent with their voting preference, or to have their ballot "counted equally in determining the final tally."  *Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020) (as amended).[13]   The burden on the right to vote that EIPCa asserts is thus no burden at all.

---

adjudicating a preliminary injunction), and our court's merits analysis in *Short*, like our analysis here, did not rely on anything more than the plaintiffs' complaint and the text of the law at issue in that case.  *See Short*, 893 F.3d at 677–79.

[13] To our knowledge, every court to have considered a "vote dilution" claim analogous to the one raised by EIPCa in this case has rejected the claim.  *See Bognet*, 980 F.3d at 355–57 (collecting cases); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970); *Pettengill v. Putnam Cnty. R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1973); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 929–30 (D. Nev. 2020); *Donald J. Trump for Pres., Inc.*, 493 F. Supp. 3d at 418–19 (collecting additional cases); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1322 (N.D. Ga. 2020) (same). Many of these decisions held that plaintiffs raising equal protection challenges to election rules on the basis that some invalid ballots have been or might be counted failed to show a concrete and/or particularized injury for Article III standing purposes.  We have already held that the requirements of Article III are satisfied in this case based on EIPCa's organizational standing.  *See Election Integrity Project Cal., Inc.*, 2022 WL 16647768, at *2.  But whether evaluated in the context of Article III or on the merits, the relevant principle is the same: the mere fact that some invalid ballots have been inadvertently counted, without more,

## B.  *Bush v. Gore*

EIPCa also asserts that around two-dozen California laws and regulations governing the wide expanse of California's election administration system, and Defendant Counties' practices under these rules, violate the Equal Protection Clause by failing to adhere to the "minimum requirement for nonarbitrary treatment of voters," citing *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam). Specifically, EIPCa contends that (1) California arbitrarily and unfairly grants VBM voters additional time to vote after polls close; (2) California's statewide standards and protocols for verifying voter signatures, determining the intent of the voter based on ballot markings, and remaking damaged ballots are insufficiently detailed, resulting in arbitrary and uneven application of the rules; and (3) state and local officials have arbitrarily failed to maintain accurate voter rolls.  We address each of these theories in turn, finding none to state a plausible claim.

In the elections context, the Supreme Court has articulated the "minimum requirement" of rationality as an "obligation to avoid arbitrary and disparate treatment of the members of [the] electorate" by the state.[14]  *Bush*, 531 U.S.

---

does not suffice to show a distinct harm to any group of voters over any other.  Under California's election system, "[e]very qualified person gets one vote and each vote is counted equally in determining the final tally." *Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020) (as amended).

[14] As we have previously explained, a state law or practice that does not incorporate suspect classifications or burden a fundamental right generally "merit[s] no special scrutiny" under the Equal Protection Clause.  *Short*, 893 F.3d at 679 (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 806–08 (1969)).  To the extent a law or practice affects similarly situated non-suspect classes differently, it will survive equal protection review provided it is "rationally related to a

at 105.  To comply with this requirement, state election rules and practices may not be so lacking in uniformity or in "minimal procedural safeguards" that they facilitate or otherwise cause the wholly arbitrary treatment of ballots or voters by elections officials.  *Id.* at 105–06, 109.

In *Bush v. Gore*, the Court invalidated the Florida Supreme Court's mandated manual recount of the 2000 presidential election as lacking "sufficient guarantees of equal treatment" because the recount order failed to provide *any* standard for elections officials to use when determining the intent of voters.  *Id.* at 106–07.  The paper punchcard ballots utilized in the 2000 presidential election in Florida were especially "prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may [have] thwart[ed] voter intent."  *Weber*, 347 F.3d at 1106.  Without a uniform standard to determine the intent of the voter, counties in Florida utilized "varying standards to determine what was a legal vote," resulting in recount outcomes that were "markedly disproportionate to the difference in population between the counties."  *Bush*, 531 U.S. at 107.  "[A]t least one county changed its evaluative

---

legitimate state interest."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see also Mathews v. De Castro*, 429 U.S. 181, 185 (1976) (explaining that ordinary legislative distinctions are "entitled to a strong presumption of constitutionality" and will survive rational basis review as long as they are not "arbitrary").  We do not decide in this case whether the standard applied by the Supreme Court in *Bush v. Gore* departed from ordinary rational basis review under the Equal Protection Clause because, even assuming *Bush* applied a heightened standard, we find that the well-pleaded allegations of EIPCa's complaint fail to state a claim under a straightforward application of *Bush*.  *See Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (addressing a claim that Oregon lacked sufficiently uniform signature verification rules under *Bush v. Gore*).

standards *during* the counting process." *Id.* at 106 (emphasis added). In another county, "three members of the county canvassing board applied different standards in defining a legal vote" simultaneously. *Id.* To make matters worse, the recount order failed to "specify *who* would recount the ballots." *Id.* at 109 (emphasis added). As a result, "[t]he county canvassing boards were forced to pull together ad hoc teams of judges from various Circuits who had no previous training in handling and interpreting ballots." *Id.* Due to the special potential for over- or under-votes associated with the punchcard ballot system, the Court determined that "[t]he formulation of uniform rules to determine intent based on these recurring circumstances" was both "practicable" and "necessary" to ensure equal treatment of voters. *Id.* at 105–06. Because the "recount mechanisms implemented in response to the decisions of the Florida Supreme Court" lacked any such uniform standards or rules, the Court held that the recount failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." *Id.* at 105.

Although the Court ordered a drastic remedy in the circumstances,[15] it emphasized that the standard it applied to

---

[15] The Supreme Court in *Bush v. Gore* underscored that the factual circumstances in which the case arose were essential to the Court's holding and the remedy it ordered. 531 U.S. 98, 109–10 (2000) ("The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections. Instead, we are presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards."); *see also Lemons*, 538 F.3d at 1106 (noting that the *Bush* Court limited its ruling "to the present circumstances" of Florida's 2000 recount) (quoting *Bush*, 531 U.S. at 109); *see also Rodriguez*, 974 F.3d at 1006 (describing the "precedential value of *Bush* [as] limited" by the Court's express limitation to the facts

Florida's court-ordered recount was merely the "minimal" standard of non-arbitrary state action. *Id.* at 110; *see also id.* at 105 ("The recount mechanisms . . . do not satisfy the minimum requirement for nonarbitrary treatment of voters."). That standard does not require absolute uniformity of election rules nor total precision in their formulation. State-by-state and intra-state variation in the administration of elections is a feature—not a bug—of our federal system. *See Pub. Integrity All.*, 836 F.3d at 1028 (emphasizing, in rejecting a constitutional challenge to Tucson's hybrid system for city council elections, that "our democratic federalism [is] a system that permits states to serve 'as laboratories for experimentation to devise various solutions where the best solution is far from clear'") (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015)); *Short*, 893 F.3d at 677, 679 (noting that an individual state may have a valid interest in "incremental election-system experimentation"); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (describing the states' "broad power to prescribe the 'Times, Places and Manner of holding [federal] Elections'") (quoting U.S. Const. Art. I, § 4, cl. 1); *Timmons*, 520 U.S. at 358 (describing the equally matched power of the states to regulate state elections). The Supreme Court has never questioned that "local entities, in the exercise of their expertise, may develop different systems for implementing elections," *Bush*, 531 U.S. at 109, and we have repeatedly

---

at hand), *cert. denied*, 141 S. Ct. 2754 (2021). But the general principle that *Bush* applied—that "the rudimentary requirements of equal treatment and fundamental fairness" prohibit states from engaging in wholly "arbitrary and disparate treatment" of members of the public—is not unique to that case and we do not hesitate to apply it here. 531 U.S. at 107, 109.

upheld election administration rules that reasonably provide for jurisdiction-by-jurisdiction variation, *e.g.*, *Short*, 893 F.3d at 674–75 (declining to enjoin the Voter's Choice Act, which allowed a select number of counties to opt in to an all-mailed-ballot election system); *Weber*, 347 F.3d at 1106–07 (sustaining a county's decision to implement a touchscreen voting system).  All that is required is "some assurance" that election rules and practices satisfy "the rudimentary requirements of equal treatment and fundamental fairness." *Bush*, 531 U.S. at 109.

California's election rules, and County Defendants' practices pursuant to those rules, satisfy these "rudimentary requirements." *Id.*

### 1. *Extra Time Not Given*

EIPCa contends that California's election rules arbitrarily provide VBM voters additional time to vote after polls close.  To start, we note that any voter in California can choose whether to vote by mail or in person, undermining any assertion that the election rules themselves arbitrarily treat voters unequally.  Moreover, we see no provision in the rules themselves allowing VBM voters additional time to vote, nor any well-pleaded allegations in EIPCa's complaint that they can.  Under the applicable rules, all ballots must be completed on or before the close of polls on election day. *See* Cal. Elec. Code §§ 14212, 14401, 3020(a).  VBM ballots received by elections officials up to 7 days after election day may be deemed "timely cast," but only if they are completed and postmarked on or before the close of polls on election day. *Id.* § 3020(b)(1).

EIPCa speculates that a voter could, hypothetically, "backdate" a VBM ballot envelope, mail the ballot after election day (or after polls close on election day), "and still

have [the] ballot counted."  Op. Br. at 23.  But we may only credit EIPCa's *factual* allegations.  We may not entertain "'imaginary' cases."  *Wash. State Grange*, 552 U.S. at 449– 50.  EIPCa alleges no instances of voters "backdating" ballot envelopes, nor of any such ballot ever being counted. Moreover, EIPCa's hypothetical ignores that a late-mailed ballot would be postmarked as mailed *after* election day and would therefore be untimely within the terms of the Election Code, irrespective of the voter's fraudulent or mistaken "backdate" on the envelope.[16]   *See* Cal. Elec. Code § 3020(b)(1).  Such a hypothetical ballot could be counted legally only on the off chance the postmark were missing or illegible, and even then only if elections officials could not obtain *any* "information . . . from the United States Postal Service or the bona fide private mail delivery company to indicate the date on which the ballot was mailed."  Cal. Elec. Code § 3020(b)(2); *see also* CCR tit. 2, § 20991(b)(8). EIPCa, again, makes no allegation of any such ballot ever being cast or counted.

At most, EIPCa alleges that it has recorded unspecified instances of elections officials collecting ballots from ballot mailboxes after polls closed.  SAC at ¶ 133.  But there is a considerable difference between taking custody of an untimely ballot and *counting* that ballot, and EIPCa has

---

[16] EIPCa seems to allege in the SAC that the California Secretary of State issued guidance directing private mail carriers in California and the federal U.S. Postal Service to backdate the postmarks on ballot envelopes dropped into mailboxes after election day.  *See* SAC at ¶ 131. The district court correctly found this allegation to be implausible, speculative, and plainly contradicted by judicially noticeable facts, a conclusion which EIPCa has not challenged on appeal.  We observe that EIPCa has maintained throughout this litigation that it does not assert any fraud on the part of state or local officials.

made no allegation that any untimely ballot has ever been *counted*. Nor do we find it reasonable to infer that any such ballots have been counted based solely on the fact that elections officials took custody of ballots after election day. *See Iqbal*, 556 U.S. at 680 (explaining that conduct that is "not only compatible with, but indeed [is] more likely explained by, lawful . . . behavior" fails to state a claim of wrongdoing).

### 2. *Signature Verification and Voter Intent*

EIPCa's claim that California lacks sufficiently uniform and specific rules concerning VBM ballot signatures and vote counting likewise lacks a plausible basis in the allegations of EIPCa's complaint.

Although EIPCa relies almost exclusively on the Supreme Court's decision in *Bush* for support, EIPCa's allegations related to California's signature verification and ballot counting rules lack any remote resemblance to the unique facts of Florida's court-ordered recount considered in *Bush*. EIPCa complains, for example, that elections officials are free to initially compare VBM envelope signatures either manually or with the assistance of signature verification technology. *See* Cal. Elec. Code § 3019(a)(2)(G); CCR tit. 2, § 20961. But whether officials review signatures manually or with the aid of technology, the uniform standard officials must abide by remains the same. Under that standard, any signature that is flagged either manually or with the aid of technology as possessing "multiple, significant, and obvious differing characteristics when compared to all signatures in the voter's registration record" must be subjected to the same, second-level, manual inspection process. *See* Cal. Elec. Code § 3019(c)(1); CCR tit. 2, § 20961. Under that process, a VBM ballot will be set

aside only if two qualified elections officials "each find beyond a reasonable doubt that the signature [on the VBM ballot return envelope] differs in multiple, significant, and obvious respects from all signatures in the voter's registration record." Cal. Elec. Code § 3019(c)(2). What's more, California's statutes and regulations provide detailed guidance to elections officials on which factors or characteristics to consider (or not consider) when comparing signatures, *see, e.g.*, *id.* § 3019(a)(2)(D)–(E); CCR tit. 2, § 20960(f), many of which are mandatory, *see, e.g.*, Cal. Elec. Code § 3019(a)(2)(C)–(D); CCR tit. 2, § 20960(g). Thus, the rules provide a uniform standard for determining when a signature must be rejected; a uniform process for matching signatures; a designation as to who is authorized to verify signatures; detailed and specific considerations for elections officials to follow when comparing signatures; and multiple, independent layers of review. Such rules and guidance are more than sufficient to satisfy the "rudimentary requirements of equal treatment and fundamental fairness." *Bush*, 531 U.S. at 109.

Indeed, California's signature verification rules are far more comprehensive and detailed, and no less uniform, than signature verification rules we previously have upheld under the Equal Protection Clause. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104, 1106 (9th Cir. 2008). In *Lemons*, we considered a challenge to Oregon's policy governing the verification of signature samples on referendum petitions. *See id.* at 1100–01. We found that the policy, which directed elections officials simply to "[c]ompare the signature on the petition and the signature on the voter registration card to identify whether the signature is genuine" and to reject signatures that "do not match," was "sufficiently uniform and specific to ensure equal treatment of voters." *Id.* at

1100–01, 1106. We further found that Oregon's "signature verification process [had] 'sufficient guarantees of equal treatment,'" because "all counties subjected initially rejected signatures to a second level of review," all counties compared "petition signatures [with] existing voter registration cards," and "all counties refused to consider extrinsic evidence." *Id.* at 1106 (quoting *Bush*, 531 U.S. at 107). Nothing in EIPCa's complaint reveals a material distinction between this case and *Lemons*. If anything, the rules EIPCa challenges here go above and beyond the policy we considered in *Lemons*.

Nor do EIPCa's allegations support its contention that elections officials plausibly have engaged in arbitrary and unequal treatment of voters in implementing the signature verification rules described above. EIPCa makes numerous allegations that general, unspecified "irregularities" in signature verification have occurred in the past, that officials have not "meaningfully" verified signatures, and that signatures have been verified that, according to EIPCa's lay observers, "did not match." *See, e.g.*, SAC at ¶ 117, lines 1–2; *id.* ¶ 118, p. 28, line 27; *id.* at 29, lines 12–14; *id.* ¶ 120, p. 29, lines 21–22, 25; *id.* at 30, lines 1–3; *id.* ¶ 124, lines 27–28. Because these allegations are vague, conclusory, and establish nothing more than the *potential* for the counting of invalid votes, they do not, even if taken as true, plausibly allege the kind of arbitrary treatment that would constitute an equal protection violation.

EIPCa also alleges that, among jurisdictions that have opted to utilize signature verification technology, some counties have calibrated their signature verification machines to be more or less sensitive to variation in signatures. *E.g.*, *id.* ¶ 109. The fact that some counties may calibrate their machines to flag more signatures for

secondary review does not reasonably suggest that any county has failed to abide by the statewide standard. *See* Cal. Elec. Code § 3019(c)(1). EIPCa does not allege that any county has calibrated its machines to a standard *below* the uniform standard for matching signatures imposed by the State.

EIPCa makes a similar allegation that different counties review VBM ballot envelope signatures at different speeds, with some counties "spending five seconds or less per each set of four [signatures]" and others engaging in a "slow" review process. SAC at ¶¶ 107, 118; *see also id.* ¶¶ 120–22, 125. EIPCa likewise alleges that some counties have set a minimum number of "points of comparison" to look at when comparing signatures, while others have not. *Id.* ¶¶ 106–07, 121. As with the signature verification machines, the mere fact that some officials may spend more time looking at signatures or may look at a minimum number of the characteristics listed in the statewide regulations does not reasonably suggest that any other official has failed to adhere to the robust standard by which all officials must abide.

EIPCa asserts that unspecified numbers of VBM ballots have been counted in Defendant Counties despite having ballot envelope signatures that were missing or that displayed a different name than that of the voter. *See, e.g.*, *id.* ¶ 115 (Contra Costa County elections officials in 2020 allegedly "accepted" one ballot envelope with a signature that differed from the voter's name); *id.* ¶ 117 (Kern County elections officials in 2021 verified an unspecified number of "signatures that didn't have the same name" and "ballots with no signature at all"); *id.* ¶ 118 (Los Angeles County officials in 2020 counted an unspecified number of ballots whose envelopes were missing voter signatures). But we have emphasized that uniform election standards can

produce different results, and we have found that "isolated discrepancies" analogous to those alleged by EIPCa are insufficient to "demonstrate the absence of a uniform standard," *Lemons*, 538 F.3d at 1106–07, particularly when the plaintiffs fail to allege that any difference observed between counties is "markedly disproportionate to [a] difference in population," *Bush*, 531 U.S. at 107. EIPCa alleges that "more" irregularities have occurred in Defendant Counties, but the SAC contains no allegations showing that any difference in irregularities is "markedly disproportionate" relative to population or "statistical[ly] significan[t]" taking into account the number of voters in the Defendant Counties relative to those of other counties in the state. *Id.*; *Lemons*, 538 F.3d at 1107. Without more, the isolated discrepancies EIPCa identifies fail to demonstrate arbitrary and unequal treatment of voters in signature verification.[17]

---

[17] EIPCa argues that two decisions not binding on us counsel a different outcome: *League of Women Voters of Kansas v. Schwab*, 525 P.3d 803, 828 (Kan. Ct. App. 2023), *aff'd in part and rev'd in part*, 549 P.3d 363 (Kan. 2024), and *Stewart v. Blackwell*, 444 F.3d 843 (6th Cir. 2006), *vacated as moot*, 473 F.3d 692 (6th Cir. 2007) (en banc). Both are inapposite. *League of Women Voters of Kansas* involved a state law challenge to Kansas's signature verification statute, which, like the recount procedure at issue in *Bush*, "contain[ed] *no* standards to determine what constitutes a signature match." 525 P.3d at 828 (emphasis added). No such facts are present here. In *Stewart*, the Sixth Circuit applied strict scrutiny to a claim that the use of punchcard ballots in some counties but not others—the same type of ballot at issue in *Bush v. Gore*—created an impermissible, unequal risk that validly cast ballots would not be counted in certain counties. 444 F.3d at 872; *see id.* at 846, 859 n.8, 861, 869; *cf. Common Cause S. Christian Leadership Conf. of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1107–10 (C.D. Cal. 2001); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002). As we

Our conclusion is the same with respect to California's vote counting and ballot duplication rules. By contrast to the standardless vote counting order considered in *Bush*, and far surpassing the standard we reviewed in *Lemons*, California's vote counting rules are more than sufficiently detailed and uniform to pass muster under the Equal Protection Clause. The State's vote counting standard applies uniformly to "the counting of all ballots and votes regardless of the vote tabulation method used, for the initial count . . . and any recount." CCR tit. 2, § 20282; *see id.* §§ 20283, 20284. It provides a comprehensive list of different mark types that are to be counted as a vote in favor of or against a candidate or voting position. *See id.* § 20282(c)(1)–(2). And it provides a detailed explanation of how to interpret and count overvotes and undervotes. *See id.* § 20282(e)–(f). The State's implementing regulations further set forth uniform and specific protocols for remaking ballots, which incorporate the same uniform and specific vote counting procedures and standards that apply to all other ballots. *See* CCR tit. 2, § 20991(b)(2); Cal. Elec. Code § 15210.

EIPCa's complaint fails to show that officials acting under these rules have counted or remade ballots in an arbitrarily unequal manner. The SAC alleges, consistent with the applicable rules, that "[s]ome counties use machine technology" to aid in vote counting, while others use "manual" methods or a "hybrid model." SAC at ¶ 111. As we have already explained, the alternative use of manual and machine methods to apply the same, uniform standard does not, by itself, reasonably suggest arbitrary treatment of ballots. Nor does the fact that "some" of the Defendant

---

have already explained, EIPCa has failed to state an analogous claim here.

Counties "have only one team verifying the intent of the voter whereas [others] have multiple teams," *id.* ¶ 112, or that officials have counted ballots consistent with the uniformly applicable regulations, *see id.* ¶¶ 114, 122.

Taken together, EIPCa's allegations fail to plausibly suggest the absence of sufficiently uniform and specific standards or an actionable failure by elections officials to adhere to those standards. *Lemons*, 538 F.3d at 1106–07.

### 3. *Maintenance of Voter Rolls*

We also reject EIPCa's contention that elections officials' failure to maintain accurate voter rolls reflects arbitrary and unequal treatment of in-person voters or voters in certain counties. *See* Op. Br. at 23. EIPCa does not allege that officials have failed to maintain accurate voter rolls disproportionately in particular locations, or for registrants of particular political affiliations, races or ethnicities, or any other cognizable characteristic. *See also supra* Section III.A. (explaining that the SAC does not plausibly allege an unequal burden on the right to vote caused by the inadvertent counting of some invalid VBM ballots). Nor does EIPCa contend that California lacks a sufficiently uniform or specific standard for maintaining voter rolls.[18] Without more, the complaint does not plausibly demonstrate that California's alleged failure to purge voter rolls has resulted in "*unequal* evaluation of ballots" or otherwise violated the

---

[18] To the contrary, EIPCa asserts that the National Voter Registration Act ("NVRA") provides the applicable, uniform standard by which California elections officials must abide. *See* SAC at ¶ 51; 52 U.S.C. § 20501 *et seq.* EIPCa makes the conclusory allegation that California has failed to comply with the NVRA, but it has not brought a claim under the NVRA despite ample opportunities to amend the complaint. *See* SAC at ¶ 52; 52 U.S.C. § 20510(b).

"minimum requirement for nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105–06 (emphasis added).

* * *

California's laws and regulations provide more than sufficient "assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied," *Bush*, 531 U.S. at 109, and no allegations in EIPCa's complaint plausibly suggest otherwise.

## C.  Due Process Clause

EIPCa's final claim is that election irregularities in California have so "systematically den[ied] equality in voting" as to violate the Due Process Clause of the Fourteenth Amendment.  Op. Br. at 29 (quoting *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980)).  This claim fails as well.

Election irregularities that are so "pervasive [that they] undermine[] the organic processes of the ballot" violate the fundamental fairness principles inherent in the Due Process Clause of the Fourteenth Amendment.  *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1184 (9th Cir. 1988) (internal quotation marks omitted).  "It is hornbook law," however, that a showing of mere "garden variety election irregularities" is insufficient to state a due process violation.  *Id.* at 1183 (internal quotation marks omitted). The "possibility of electoral fraud" or mistake "can never be *completely* eliminated," and "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems" without undue judicial second-guessing. *Lake v. Fontes*, 83 F.4th 1199, 1203–04 (9th Cir. 2023) (cleaned up) (quoting *Weber*, 347 F.3d at 1106–07), *cert. denied*, 144 S. Ct. 1395 (2024); *see Dudum*, 640 F.3d at 1117

("There is no perfect election system, and our search for one would prove no more successful than a hunt for the mythical snark."). Thus, even errors, irregularities, *ex post* changes in law or procedure, and fraud will not amount to a denial of due process if they are of the "garden variety" sort reasonably associated with the public administration of elections. *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir.) (upholding the 1996 Hawaiian Convention Vote against Due Process Clause and First Amendment challenges), *as amended on denial of reh'g and reh'g en banc* (June 23, 1998), *cert. denied sub nom. Citizens for a Const. Convention v. Yoshina*, 525 U.S. 1103 (1999). Even garden variety election irregularities that "control the outcome of the vote or election" do not violate the Due Process Clause. *Id.*

Garden variety irregularities have historically included, but are not limited to, allegations of "[m]ere fraud or mistake," *id.*; "claims of lax security," *Soules*, 849 F.2d at 1184; absentee ballots delivered by persons other than the voter, *id.*; human and/or mechanical error resulting in miscounted ballots, *Bennett*, 140 F.3d at 1226 (citing *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975); *Gold v. Feinberg*, 101 F.3d 796, 801–02 (2d Cir. 1996); and *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986)); the counting of some votes that were illegally cast, *id.* (citing *Pettengill v. Putnam Cnty. R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1973)); and the mistaken allowance of non-party member votes in a primary election, *id.* (citing *Powell v. Power*, 436 F.2d 84, 85–86 (2d Cir. 1970)).

By contrast, irregularities that have been found to surpass the "garden variety" type have included the disenfranchisement of an entire electorate through the failure

to hold a legally required election, *see Duncan v. Poythress*, 657 F.2d 691, 703 (5th Cir. Unit B Sept. 1981), *cert. granted*, 455 U.S. 937 (1982), *dismissing cert. as improvidently granted*, 459 U.S. 1012; "outrageous racial discrimination" resulting in a complete "lack of integrity" in the election, *Griffin v. Burns*, 570 F.2d 1065, 1080 (1st Cir. 1978); and knowing efforts by elections officials "to prevent an honest count . . . of the votes lawfully cast" in an election, *United States v. Saylor*, 322 U.S. 385, 389 (1944).  We find nothing akin to such examples of "significant disenfranchisement" in EIPCa's complaint.  *Bennett*, 140 F.3d at 1227.

The allegations of the complaint fail to plausibly demonstrate the scale of "massive disenfranchisement," *Bennett*, 140 F.3d at 1226–27, or complete lack of integrity, *Griffin*, 570 F.2d at 1080, necessary to state a claim under the Due Process Clause.  Although EIPCa alleges that it has thousands of incident reports documenting "a vast number" of election irregularities, it offers limited factual content, and none of the incidents EIPCa does describe "transcend[] garden variety problems."  SAC at ¶¶ 105, 126–27; *Bennett*, 140 F.3d at 1226.[19]

To start, a large portion of EIPCa's allegations, taken as true, would establish nothing more than the *potential* for irregularity.  *See, e.g.*, SAC at ¶ 3B (describing the "*potential* exploitation of vulnerable populations"); *id.* ¶ 8 (describing the possibility of "*potentially* ineligible persons"

---

[19] The mere allegation that EIPCa has received a number of complaints related generally to election administration from unspecified individuals in unspecified locations at unspecified dates does not by itself provide "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *Twombly*, 550 U.S. at 557.

voting); *id.* ¶ 57 (speculating that "ballots *could have been* . . . removed from the trash, filled out, and counted"); *id.* ¶ 58 (alleging that *if* so-called "ballot harvesting" occurred, it had an "extreme *potential* for fraud") (all emphases added); *see also id.* ¶¶ 59, 60, 81, 118, 132.[20]

As an example, EIPCa alleges a handful of instances in which ballots were, in the opinion of EIPCa's observers, "left unsecured." *E.g.*, *id.* ¶¶ 6, 116. But EIPCa does not allege that any ballots were improperly taken, retained, or otherwise tampered with. EIPCa also describes polling locations in which lay observers were permitted to observe ballot processing and vote counting proceedings but could not stand close enough to elections workers to be able to hear or see everything that transpired during vote processing. *E.g.*, *id.* ¶¶ 96–97, 99–104. Such allegations fail to plausibly "bring into question the fundamental fairness" of the elections EIPCa challenges, *Soules*, 849 F.2d at 1184, plausibly establish that officials "undermine[d] the 'organic processes' of the ballot," *id.* (quoting *Hennings*, 523 F.2d at 864), or establish that any election resulted in the "significant disenfranchisement" of voters, *Bennett*, 140 F.3d at 1227.

EIPCa further alleges that thousands of ineligible registrants have incorrectly remained on the voter rolls, thousands of VBM ballots have been mailed to incorrect addresses or to individuals who were likely ineligible to vote, and tens of thousands of duplicate VBM ballots have

---

[20] We note that the complaint does not allege any fraud on the part of any elections officials in California. *See* Pls.' Combined Opp'n to Ds' Mots. to Dismiss at 1, 3–4, *Election Integrity Project Cal., Inc. v. Weber*, No. 2:21-cv-00032 (C.D. Cal. Apr. 14, 2023), ECF. No. 167 ("Plaintiffs do not allege specific elements of fraud.").

been mailed to registered voters.  *See, e.g.*, SAC at ¶¶ 50, 64, 85–88.  These allegations undoubtedly describe purported errors in the administration of California's elections.  But the complaint fails to draw a plausible connection between these errors and any "massive disenfranchisement" of voters or "pervasive" counting of invalid ballots.  *Bennett*, 140 F.3d at 1227.  To the contrary, the total number of invalid ballots that the SAC plausibly alleges to have been counted in California elections since 2012 is so exceedingly minute as to have no measurable impact on the fundamental fairness or integrity of California's elections.  EIPCa alleges that, in the November 2012 election, 113 people across nine counties "appear" to have voted twice.  SAC at ¶ 55.  It alleges that, in 2020, 596 Nevadans voted in California, 180 individuals voted in both Nevada and California, 72 individuals whose identities appear to be associated with deceased individuals voted in California, and 13 voters voted twice in the 2020 primary election.  *Id.* ¶¶ 85, 136.[21]  Finally, EIPCa alleges that some election observers have reported seeing unspecified numbers of VBM ballots "counted" despite nonconforming or missing signatures on VBM ballot return envelopes.  *E.g.*, *id.* ¶ 110.  In sum, EIPCa alleges that 974 invalid ballots of unspecified types and from unspecified locations, and an unknown additional number of invalid mail-in ballots, have inadvertently been counted across a decade of California elections in which tens of millions of ballots were cast.

Nor do allegations that are "not only compatible with, but indeed [are] more likely explained by, lawful . . . behavior" plausibly state a claim.  *Iqbal*, 556 U.S.

---

[21] EIPCa does not allege the manner by which these votes were cast (*i.e.*, in person or by mail), or the counties in which the votes were cast.

at 680 (citing *Twombly*, 550 U.S. at 567). For example, EIPCa's complaint describes instances in which voters were permitted to complete provisional ballots in person although they had not yet forfeited their VBM ballots or had already returned VBM ballots. SAC at ¶¶ 119, 124. These allegations are consistent with officials' adherence to California's provisional ballot rules, which protect against double-voting while ensuring that no otherwise eligible voter is turned away from the polls. *See* Cal. Elec. Code § 3015; CCR tit. 2, § 20990(a). Similarly, EIPCa alleges that individuals returned VBM ballots on others' behalf, consistent with California's rules authorizing voters to designate a third party to return a ballot. *See* SAC at ¶ 118, p. 28; *id.* ¶¶ 121, 124; Cal. Elec. Code § 3017(a)(2). EIPCa alleges that voter rolls increased, consistent with a growing electorate and same-day voter registration. SAC at ¶ 123. It further alleges that people with limited voting histories voted, consistent with the ordinary practice of democracy. *Id.* ¶ 64. It alleges numerous instances in which elections officials counted ballots consistent with the statewide election procedures. *Id.* ¶¶ 6, 114, 122. And it alleges that elections officials at times limited observers' access to protect against the spread of disease during the COVID-19 pandemic, to protect voter privacy, or to stop disruptions to proceedings. *Id.* ¶¶ 95, 97–98, 102, 122. None of these allegations plausibly raise an inference of wrongdoing.

Finally, we are limited to reviewing the allegations of the complaint as it is written. EIPCa contends in its briefing on appeal that it has "allege[d] that nearly 124,000 ineligible VBM votes were counted in the 2020 election." Op. Br. at 22. Counsel for EIPCa repeated this assertion at oral argument. *See* Oral Argument at 41:20–41:28 (Feb. 5, 2024), https://perma.cc/ZYN4-D894. These statements

grossly misstate the allegations of the complaint and will not be credited.   What the complaint in fact alleges is that "124,000 more votes were counted in the 2020 election than registrants with voting histories for that election."  SAC at ¶ 137.  In other words, 124,000 people voted for the first time in California in 2020.   Such an assertion does not remotely amount to an allegation that 124,000 *ineligible* voters cast ballots, or that 124,000 invalid *mail-in* ballots were cast.  The only plausible inference we may draw from EIPCa's allegation is one consistent with the ordinary practice of democracy: 124,000 people, accounting for less than one percent of all votes cast in California's 2020 general election, voted for the first time in that election.[22]  *See* Cal. Sec'y State, *Secretary of State Padilla Certifies Record Setting General Election Results* (Dec. 11, 2020) (last visited May 2, 2024), https://perma.cc/R8RE-ZY3G (reporting that 17,785,151 votes were cast in California's 2020 general election); *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) ("Pursuant to Federal Rule of Evidence 201, we may . . . take judicial notice of 'matters of public record,'" provided such facts are not "subject to reasonable dispute") (citations omitted).

In sum, EIPCa's allegations are a far cry from the showing required to plausibly demonstrate irregularities calling into question the fundamental fairness and integrity of California's elections.  *See Bennett*, 140 F.3d at 1226–27 (finding allegations that "some" invalid ballots were miscounted insufficient to demonstrate "pervasive error that

---

[22] Counsel for EIPCa is advised to review Federal Rule of Appellate Procedure 28 and our corresponding Circuit Rules, which require parties to present accurate and reliable support for their claims on appeal. *Grant v. City of Long Beach*, 96 F.4th 1255, 1256 (9th Cir. 2024).

undermines the integrity of the vote"). As we noted in *Soules*, "[e]lections are, regrettably, not always free from error. Voting machines malfunction, registrars fail to follow instructions, absentee ballots are improperly administered, poll workers become over-zealous, and defeated candidates are, perhaps understandably, inclined to view these multifarious opportunities for human error in a less than charitable light." 849 F.2d at 1184 (quoting *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), *cert. denied*, 479 U.S. 1088 (1987)). Because EIPCa's complaint amounts to no more than a recitation of "garden variety" election irregularities, we find no error in the district court's dismissal of EIPCa's due process claim. *Id.* at 1183.

## D. Leave to Amend

EIPCa argues that, even if the district court correctly dismissed its complaint, it abused its discretion in denying EIPCa a further opportunity to amend the complaint. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). A district court does not abuse its discretion in denying leave to amend where "any further amendment to the complaint would likely prove futile." *Allen*, 911 F.2d at 374 (affirming dismissal and denial of leave to amend second amended complaint). A "district court's discretion to deny leave to amend is particularly broad where [the] plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

This is the third complaint filed by EIPCa over the course of this lawsuit. EIPCa's two previously filed complaints contained nearly identical operative allegations and claims as those we review here. Neither before the district court nor on appeal has EIPCa articulated any factual allegation or

legal theory it would advance in a fourth complaint that would cure the deficiencies found by the district court or articulated here—nor has it explained why any such allegations or theories would have been previously unavailable to it. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008) ("Appellants fail to state what additional facts they would plead if given leave to amend, or what . . . discovery they would conduct to discover such facts."); *Allen*, 911 F.2d at 374.  For these reasons, we are not left with a "definite and firm conviction that the district court committed a clear error of judgment" by denying EIPCa further leave to amend. *Allen*, 911 F.2d at 373; *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020) (finding no abuse of discretion where amendment would not change the fact that plaintiffs' legal theories are not cognizable as a matter of law).

## IV.  CONCLUSION

The constitutional safeguards we are bound to apply in this case are clear.  State and local officials may not unduly burden the right to vote.  A state's election administration standards and practices must "avoid arbitrary and disparate treatment of the members of its electorate." *Bush*, 531 U.S. at 105.  Elections wholly lacking in integrity cannot stand. Based on the allegations of the complaint, California's election laws and regulations and Defendant Counties' practices more than satisfy these constitutional mandates.[23]

---

[23] We note that the federal Constitution is not the sole avenue by which those aggrieved by election irregularity, alleged fraud, or other wrongdoing may seek redress. *Cf. Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (explaining that a county's use of a touchscreen voting method did not leave "voters without any protection from fraud, or any means of verifying votes, or any way to audit or recount"). The

EIPCa might prefer that California adopt different election policies. But "[n]othing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests" that we, as unelected federal judges, can or should "micromanage a state's election process." *Short*, 893 F.3d at 677, 679; *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) ("[T]he Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules."). Were we to accept EIPCa's legal theories on the record before us, we would inevitably find ourselves "thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Powell*, 436 F.2d at 86. That is not the role that the Constitution or Congress has provided for our court. *See Weber*, 347 F.3d at 1107 & n.2 (9th Cir. 2003) ("[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing.").

**AFFIRMED.**

---

Constitution provides only the floor—not the ceiling—of available voter protections. *See Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021).